UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NANCY COTTON                         )
                                     )
        Plaintiff,                   )
                                     )        Case No. 1:07-cv-00971
v.                                   )        Judge Reggie B. Walton
                                     )
GRUNLEY CONSTRUCTION CO.,            )
INC., et al.                         )
                                     )
        Defendants.                  )
                                     )

## <u>PLAINTIFF'S RULE 26(A)(2) EXPERT DISCLOSURES</u>

COMES NOW, Plaintiff, Nancy Cotton, by and through undersigned counsel, and

pursuant to <u>Fed. R. Civ. Pro. 26(a)(2)</u>, hereby submit the following Plaintiff's Rule

26(a)(2) Expert Disclosures:


**1. Thomas C. Borzilleri, Ph.D.**
Economic Consultant
Three Democracy Center
6905 Rockledge Drive
Suite 600
Bethesda, MD  20817

1. <u>Complete statement of all opinions to be expressed and basis and reasons therefore:</u> *See* Exhibit A;
2. <u>Data or other information considered by witness in forming opinions:</u> *See* Exhibit A;
3. <u>Exhibits to be used as a summary of or support for the opinions:</u> *See* Exhibit A;
4. <u>Qualifications of witness, including list of all publications authored within the preceding ten years:</u> Dr. Borzilleri has not authored any publications within the preceding ten years.
5. <u>Compensation to be paid for study and testimony:</u> *See* Exhibit A;
6. <u>Other cases in which witness has testified as an expert at trial or by deposition within the preceding four years:</u> *See* Exhibit A.

**2. Charles Demark, M.S., C.R.C., C.C.M.**
Certified Rehabilitation Counselor
Coastal Vocational Services, Inc.

355 Crawford St., Suite 510
Portsmouth, VA 23707

1. Complete statement of all opinions to be expressed and basis and reasons
   therefore: *See* Exhibit B;
2. Data or other information considered by witness in forming opinions: *See* Exhibit
   B;
3. Exhibits to be used as a summary of or support for the opinions: *See* Exhibit B;
4. Qualifications of witness, including list of all publications authored within the
   preceding ten years: Mr. DeMark has not authored any publications within the
   preceding ten years.
5. Compensation to be paid for study and testimony: *See* Exhibit B;
6. Other cases in which witness has testified as an expert at trial or by deposition
   within the preceding four years: *See* Exhibit B.

**3. Norman V. Kohn, M.D.**
122 South Michigan Avenue, Suite 1407
(send mail to Suite 1300)
Chicago, Illinois 60603-6107

1. Complete statement of all opinions to be expressed and basis and reasons
   therefore: *See* Exhibit C;
2. Data or other information considered by witness in forming opinions: *See* Exhibit
   C;
3. Exhibits to be used as a summary of or support for the opinions: *See* Exhibit C;
4. Qualifications of witness, including list of all publications authored within the
   preceding ten years: *See* Exhibit C;
5. Compensation to be paid for study and testimony: *See* Exhibit C;
6. Other cases in which witness has testified as an expert at trial or by deposition
   within the preceding four years: *See* Exhibit C.

**4. Larry Miller, Architect**
LAM Associates
2122 Holland-Sylvania Road
Toledo, OH 43615

1. Complete statement of all opinions to be expressed and basis and reasons
   therefore: Mr. Miller's testimony is expected to include, but is not limited to, that
   but for the negligence of defendants, the injury to plaintiff could not have
   happened. Furthermore, to the extent that the development of the evidence does
   not clear up the contradictions and gaps created by the existing testimony to date,
   Mr. Miller may opine that the post accident failure to preserve evidence
   materially affected the ability to identify how the incident took place and made it
   more difficult for the plaintiff to prevail in her claim. However, since discovery is

continuing and approximately 2,000 pages of contracts were recently received by plaintiff's counsel, a complete and final report can not be produced at this time.

2. <u>Data or other information considered by witness in forming opinions:</u> Mr. Miller is expected to rely on his knowledge of architecture, engineering, and construction; building codes and OSHA regulations; contracts, drawings, and bid sets for the construction project; photographs, deposition testimony of corporate executives, and expert reports.

3. <u>Exhibits to be used as a summary of or support for the opinions:</u> Exhibits include, but are not limited to, drawings, contracts, bid sets, deposition transcripts of corporate executives, expert reports.

4. <u>Qualifications of witness, including list of all publications authored within the preceding ten years:</u> *See* Exhibit D;

5. <u>Compensation to be paid for study and testimony:</u> Compensation to be paid will be supplemented with Mr. Miller's report.

6. <u>Other cases in which witness has testified as an expert at trial or by deposition within the preceding four years:</u> Cases in which Mr. Miller testified as an expert at trial or by deposition in the preceding four years will be supplement with his report.

**5. Raphael Minsky, Ed.D., P.C.**
Rehabilitation Psychology
The Christopher Condominium
Suite 101
4808 Moorland Lane
Bethesda, Maryland 20814

1. <u>Complete statement of all opinions to be expressed and basis and reasons therefore:</u> *See* Exhibit E;

2. <u>Data or other information considered by witness in forming opinions:</u> *See* Exhibit E;

3. <u>Exhibits to be used as a summary of or support for the opinions:</u> *See* Exhibit E;

4. <u>Qualifications of witness, including list of all publications authored within the preceding ten years:</u> *See* Exhibit E;

5. <u>Compensation to be paid for study and testimony:</u> *See* Exhibit E;

6. <u>Other cases in which witness has testified as an expert at trial or by deposition within the preceding four years:</u> *See* Exhibit E.

**6. Michael S. Morse, Ph.D.**
Biomedical Expert
P.O. Box 710402
San Diego, CA 92171

1. Complete statement of all opinions to be expressed and basis and reasons therefore: Complete statement of all opinions to be expressed and basis and reasons therefore: *See* Exhibit F;

2. Data or other information considered by witness in forming opinions: *See* Exhibit F;

3. Exhibits to be used as a summary of or support for the opinions: *See* Exhibit F;

4. Qualifications of witness, including list of all publications authored within the preceding ten years: *See* Exhibit F;

5. Compensation to be paid for study and testimony: *See* Exhibit F;

6. Other cases in which witness has testified as an expert at trial or by deposition within the preceding four years: *See* Exhibit F.

Respectfully submitted,

_____
Ron Simon (DC Bar #945238)
SIMON & ASSOCIATES
1707 N Street, N.W.
Washington, D.C.  20036
(202) 429-0094
Counsel for the Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NANCY COTTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:07-cv-00971 |
| v. | ) | Judge Reggie B. Walton |
| | ) | |
| GRUNLEY CONSTRUCTION CO., INC., et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **CERTIFICATE OF DISCOVERY**

I HEREBY CERTIFY that on the 29th day of August, 2008, Plaintiff's Rule 26(a)(2) Expert Disclosures were mailed via first class mail, postage prepaid to:

Paul Pearson, Esq.
Law Offices of Roger S. Mackey
14008 Park East Circle
Chantilly, VA  20151
*Attorney for Grunley Construction Co., Inc.*

Jacquelyn Kramer, Esq.
Law Offices of Guido Porcarelli
200 International Circle, Suite 1500
Hunt Valley, MD  21030
*Attorney for Singleton Electric Co., Inc.*

Molly Ryan, Esq.
Thompson O'Donnell, LLP
1212 New York Ave., NW
Suite 1000
Washington, DC 20005
*Attorney for LB&B Associates, Inc.*

Respectfully submitted,

_____
Ron Simon (DC Bar #945238)
SIMON & ASSOCIATES

1707 N Street, N.W.
Washington, D.C.  20036
(202) 429-0094
Counsel for the Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NANCY COTTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:07-cv-00971 |
| v. | ) | Judge Reggie B. Walton |
| | ) | |
| GRUNLEY CONSTRUCTION CO., | ) | |
| INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that copies of Plaintiff's Rule 26(a)(2) Expert Disclosures were sent first class mail this 29th day of August, 2008 to:

Paul Pearson, Esq.
Law Offices of Roger S. Mackey
14008 Park East Circle
Chantilly, VA 20151
*Attorney for Grunley Construction Co., Inc.*

Jacquelyn Kramer, Esq.
Law Offices of Guido Porcarelli
200 International Circle, Suite 1500
Hunt Valley, MD 21030
*Attorney for Singleton Electric Co., Inc.*

Molly Ryan, Esq.
Thompson O'Donnell, LLP
1212 New York Ave., NW
Suite 1000
Washington, DC 20005
*Attorney for LB&B Associates, Inc.*

Respectfully submitted,

_____
Ron Simon (DC Bar #945238)
SIMON & ASSOCIATES

1707 N Street, N.W.
Washington, D.C.  20036
(202) 429-0094
Counsel for the Plaintiff

# EXHIBIT
# A

# THE LOSS OF EARNING CAPACITY SUSTAINED BY

## NANCY E. COTTON

Submitted to:

### RON SIMON, ESQ.
Simon & Associates
1707 N Street, NW
Washington, DC 20036

Submitted By:

### THOMAS C. BORZILLERI, PH.D.
Economic Consultant
6701 Democracy Boulevard
Suite 300
Bethesda, Maryland 20817
202-862-3630



August 28, 2008

## SUMMARY OF FINDINGS

I estimated losses in this matter and place the present value of Mrs. Nancy Cotton's cash earning losses at <u>$602,418</u> to <u>$814,027.</u> The higher number assumes continuous work to age 66, Mrs. Cotton's Normal Retirement Age under Social Security, while the lower number is calculated on employment expectancy, age 63.[1]

According to the U.S. Department of labor, as of September 2007, private sector costs for insurance benefits (insurance benefits, health, life, and disability), added 10.8% to cash earnings, retirement and savings plans 5.0% and legally required benefits (Social Security, Medicare, worker's Compensation, Unemployment Compensation), 12.0%. Combined these three components add 27.8% to cash earnings.[2] To provide a conservative estimate of losses, I assumed fringe benefits at 20% of gross earnings, raising losses to <u>**$756,062 to $1,021,642.**</u>

This estimate is a current market cost, based on the current market price for an annuity to replace the economic value of the losses she has sustained, and is likely to sustain, over time. It is therefore an actuarially reduced present value, taking into account Mrs. Cotton's year to year survival probability (based on a normal life expectancy), income taxes, and interest.

It should be noted that annuity prices change with changes in the money markets and interest rates, so while my analytical method will remain the same, this analysis will be updated at time of trial to reflect the market price for an annuity at that time. Should rates be higher than they are now, the resulting loss estimates will be lower. Alternatively, should rates be lower than they are now, resulting loss estimates will be higher.

## INFORMATION PROVIDED BY COUNSEL

The information that follows has been provided to me by Counsel and outlines the basic elements of the case I have been asked to value. As various additional facts become known and/or stipulated to, my estimates may be revised to take those matters into account.

I have been provided with Mrs. Cotton's date of birth, July 9, 1950 and the date she was injured, July 26, 2005. I have also been provided with a report

---

[1]   Millimet, Daniel L., Nieswiadomy, Michael, Ryu, Hang, Slottje, Daniel, **Estimating Worklife Expectancy,: an Econometric Approach**, Journal of Econometrics, Volume 113, Issue 1, March 2003, Pages 83-11, and **Marriage, Children and Worklife Expectancy**, Millimet, Daniel L., Nieswiadomy, Hang, Slottje, Daniel, Southern Methodist University, August 2003.

[2] U.S. Department of Labor, **Employer Costs for Employee Compensation**, Table 9, September, 2007, http://www.bls.gov/news.release/ecec.t09.htm

prepared on August 26, 2008 by Charles DeMark, a Certified Rehabilitation Counselor, of Coastal Vocational Services Inc.

At the time of her injury, she was employed by the National Archives, a GS-6, Step 5, and had been with the government since 1997. She had completed her MBA at Trinity College in May of 2004 and was seeking to change careers into the business field.

According to the Coastal report, her earning capacity at the time of her injury was approximately $100,000 per year. For these calculations, I assumed she would have found such employment by January 1, 2006. The Coastal report also concludes that she is incapable of future work and has no future earning capacity.

**OVERVIEW OF METHOD**
Economic losses may be computed in so-called "real" or after-inflation terms or in terms of nominal amounts, dollar losses without adjusting for purchasing power. Either calculation produces approximately the same answer. Typically in the "real" approach, historical rates of real earnings growth, in the range of 1% to 3% per year, and real interest rates, also in the 1% to 3% per year range, are cited as a reasonable forecast of these rates for the future.

I favor the alternative approach, one in which nominal rates of earnings growth and market interest rates are used. I use an earnings growth forecast prepared each year by the Social Security Administration.[3] This forecast produces earnings growth forecasts in the 3.8% to 4.2% per year range, inflation in the 2.8% range, and real earnings growth in the 1% range in real or after-inflation terms, consistent with U.S. economic history, as is typically cited in the after-inflation approach.

In place of an after-inflation interest rate forecast of bond yields for discounting I use the current market price for the purchase of an annuity to "discount" these future losses. Using a market price to purchase a contract to replace future income rather than a forecast for assumed future investment returns, real or nominal returns, eliminates this source of forecast uncertainty and provides, I believe, a more accurate assessment of the present value of losses than any approach that requires direct forecasting.

I calculate losses to two ages. First I assume retirement at the normal age for unreduced Social Security retirement benefits. Second I calculate losses

---

[3] Board of Trustees, Federal Old-Age and Survivors Insurance and Disability Insurance Trust Funds, *2008 Annual Report of the Board*, Washington, D.C., March 25, 2008, Page 92, Table V.B1.

to work expectancy – the probable number of years a party with certain characteristics will be employed in the future. .

## BASIS FOR FUTURE EARNINGS GROWTH ASSUMPTION

United States economic history demonstrates that both money income and real, or after-inflation earnings increase over time. First, over the past half-century and measured in current dollars, average earnings have increased each year. Second, earnings tend to increase faster than prices; real earnings grow: the average annual rate of change in the average real wage in OASDI covered employment was .9% per year over the 40 years, 1967-2006. Real earnings growth was 1.7% per year for the ten-year period 1997-2006, higher than the longer-term average. The assumed ultimate real earnings growth is approximately 1.1% per year.

Real wage growth depends fundamentally upon productivity growth - and the best economic evidence available indicates that there is no negative trend in productivity. In fact, U.S. productivity growth has averaged approximately 1.7% per year from 1966 to 2006, not much different that productivity growth measured over a century. Increases in worker productivity result in a) higher profits, b) higher wages, c) lower prices or d) some combination of the three. The evidence further indicates that such performance is an appropriate expectation for the future.

## ECONOMIC ASSUMPTIONS OF THE SOCIAL SECURITY SYSTEM

I have incorporated the expectation of future wage increases into my analysis with the use of the Social Security economic assumption set prepared by the Social Security Administration for its annual report to the Congress of the United States.[4]   By law, the Social Security Administration must report annually to the Congress of the United States on the expected financial status of the system, both in the short term and over the next 75 years. As a consequence of this legal requirement, and because both the taxes taken in and benefits to be paid out depend crucially on earnings growth and inflation, the Social Security Administration develops year-by-year estimates of expected, future, average earnings growth and expected future inflation.

These forecasts result from an analysis of past economic history including productivity growth, earnings growth, international trade issues, changes in the labor force supply and demand, inflation, and for the first 10 years of the forecast period, short-term economic cycles as well.   I use the so-called Intermediate Assumption Set, which represent the Social Security Administration's best estimate of the future, long run economic performance of the U. S. economy.

---

[4]   *2008 Annual Report of the Board*, Washington, D.C., Table V.B1.

3

In my view, these estimates are consistent with U.S. economic history and current research, objective, and reasonably representative of the economic future. The growth rates I actually use are reproduced on my printouts and are taken from the Annual Report of the Board of Trustees of the Federal Old Age and Survivors Insurance and Disability Trust Funds, Transmitted to the Congress March 25, 2008.

## THE PRESENT VALUE OF FUTURE LOSSES

Given an estimate of year by year, expected losses, these future losses must be converted into a present dollar equivalent. While there are numerous financial instruments that might be used to establish the present value of a future loss, I perform my conversion using information on the current annuity market provided the United States Pension Benefit Guaranty Corporation (PBGC).[5]  These annuity prices are used to value all future losses. Note however, that while I estimate current market annuity prices for this analysis using the average prices reported by the PBGC methodology, any annuity from a solid company producing the same replacement income is an acceptable valuation alternative.[6]

PBGC is a United States Government agency charged with the responsibility of insuring pension plans in the event of employer default under the Employee Retirement Income Security Act (ERISA). As a consequence of that responsibility, PBGC monitors the annuity market and has the American Council of Life Insurers collect price data each month from a national sample of insurance and annuity companies. The PBGC Methodology permits the analyst to approximate the current price of an annuity found in this survey, given only the party's age and gender.

The methodology is essentially a method to distribute and disseminate current annuity prices. The prices, as stated above, come from a survey of the market and are not forecasts. Each month, the PBGC provides "interest factors", based on its survey results that are to be combined with its specific life table. Neither the specific life table nor the factors to be used, determine these annuity prices - which again, come from a survey.

These interest factors are not the yield on a specific financial instrument but rather rates, which when mathematically combined with the specific PBGC mortality tables, reproduces the findings of the PBGC annuity price survey for the age and gender of the party involved. As the PBGC explains:

---

[5] United States Government, *Code of Federal Regulations*, 29 CFR Parts 2619, 2676, & 4044, Washington, D.C., March 14, 2005.
[6] I estimate current market annuity prices for this analysis using the PBGC methodology, but any quality annuity contract producing the same replacement income is an alternative for the establishment of present value.

*"These derived interest factors are not market interest rates. The factors stand in for all the many components used in annuity pricing that are not reflected in the given mortality table e.g., assumed yield on investment, margins for profit and contingencies, premium and income taxes, and marketing and sales expenses."*

The PBGC price survey provides an accurate, cost-effective, and objective estimate of the actual, current market price required to purchase a future flow of income equal to the amount required to compensate the injured party for expected future losses. Implicitly, my compensation approach is to provide Mrs. Cotton with cash payment sufficient to cover past losses and cash payment sufficient to purchase an annuity, a market-determined present value, to replace future losses.

I am not requiring that such an instrument actually be chosen for compensation purposes. I am using annuity prices as an indicator of the financial market's "tradeoff" between the value of future dollars and the value of present dollars, inclusive of available investments, the time period involved, cash requirements associated with compensation, and mortality considerations. PBGC price information is current, reflecting actual economic conditions in the money market in the month of the lost earnings analysis and in fact, is a function of the current yields on the professionally managed, investment portfolios of insurance or annuity companies that back these annuity contracts.[7]

The use of an annuity price to establish the discounted present value of future losses provides a number of advantages over the more familiar approach in which an analyst explicitly specifies an expected yield on a particular financial instrument or investment portfolio, typically bonds. Most importantly, an annuity price is an actual, market price at this point in time, not a forecast of future yields.

In addition, PBGC prices are objective, provided by the U.S. Government, and not prepared for the purpose of the litigation at issue. The price is a market price, favoring neither plaintiff nor defense and such prices are public information that may be easily verified by all parties to the litigation. Finally, an annuity provides for periodic payments, a flow of compensating income timed similarly to the losses that are expected to occur in the future. Regardless of the future course of interest rates, an annuity price provides

---

[7]    The PBGC Methodology involves 2 components: the financial flow required to pay the annuity to individuals, and for *groups* of employees, an administrative cost component. Because I am dealing with an individual rather than a group of employees, I use only the financial flow. Administrative expenses are ignored and therefore my estimated annuity price may be somewhat below group annuity market prices.

the actual market cost today, to purchase the required future flow of compensating payments for future losses.

## VALUATION ADJUSTMENTS

The annuity prices that PBGC monitors however are taxable annuities and therefore the compensating income I calculate using these prices will be less than the income Mrs. Cotton would have earned had she not been injured. Ideally, the compensating instrument would be tax-free, so that the flow of compensation after tax would exactly equal the flow of income I seek to replace without the complication of taxes. Tax free municipal bonds represent one alternative financial instrument that could be used, but to do so gives up the advantage of using a current price and requires that a rate of return forecast be made for the damage period.

To approximate the price of a tax-free annuity, I calculate the approximate tax liability associated with the annuity payments and increase each year's payment such that after taxes, Mrs. Cotton would receive the amount I estimate that she has lost. This is similar to performing the analysis with tax-free municipal bonds but it maintains the advantages I believe exist when an annuity price is used for the future loss calculation. This adjustment increases the loss estimates by the present value of expected taxes on the compensation, just as the loss estimates would be increased if I used the lower yields associated with tax-free instruments.

This is the column labeled "Estimated Tax on Annuity" on the attached printouts, Schedule 3. It should be noted however, that my analysis produces loss estimates both with and without this adjustment. The column labeled "Market Value @ PBGC" provides losses without the above tax adjustment. In the event that my adjustment is deemed inappropriate however, estimates are provided both with and without it.

## ESTIMATING RESULTS: LOSSES

Detailed printouts of my calculations are attached to this report. Three schedules are provided. Schedule 1 displays some of the basic data used in the calculation and various summary statistics that result from my calculations while Schedules 2 and 3 provide the year-by-year details of my estimates.

Schedule 2, Past & Expected Earnings Losses: Column 2 displays the rate of earnings growth used to increase Mrs. Cotton's earnings over time. These are the Social Security growth rates. Column 4 labeled "Gross Earnings, 2008 Dollars" displays my estimated earnings over time expressed in today's dollars and shows the estimated year by year earnings Mrs. Cotton would achieve over time. It is a benchmark calculation, useful for appraising the reasonableness of resulting estimates of future earnings.

The next column, Column 5, converts those dollars to so-called current dollars, dollars of the year in question, rather than in terms of today's purchasing power.  Column 7 labeled "Earnings But For Injury" is self-explanatory.  The next four columns are comparable, but concern earning given the injury.  The difference between earnings had the injury not occurred and probable earnings now is my estimate of losses, Column 12 "Estimated Losses, Current Dollars".

**Schedule 3, Annuity Cost to Replace Lost Earnings**: Schedule 3 displays the conversion of these earnings loss amounts into actuarially discounted present or market values.  Column 14 is the PBGC discount rates for the year in question while Column 16 shows the resulting annual discount factors.  Column 17, "Estimated Losses, Current Dollars" on Schedule 3 is identical to Column 12, "Estimated Losses, Current Dollars" on Schedule 2, except that all past losses are adjusted to 2008 dollars.  Column 18 shows the year to year survival probabilities given the person's age and sex.  Column 19 shows the present value or market replacement cost of each payment valued using the PBGC annuity price.

As discussed above however, this annuity would have tax consequences to the recipient and would therefore result in less income than the party would have earned, had the injury not occurred. Column 20 labeled "Estimated Tax on Annuity" provides my estimate of the tax consequences of the annuity and therefore the additional payment that would be required to leave Mrs. Cotton in the same economic status as she would have had without the injury. These augmented payments are then reduced for the probability of survival and again priced using the PBGC methodology to estimate annuity prices in Column 22. Column 23 shows losses for different ages of labor force withdrawal.

# References

Board of Trustees, Federal Old-Age and Survivors Insurance and Disability Insurance Trust Funds, *2008 Annual Report of the Board*, Washington, D.C., March 25, 2008, Page 92,  Table V.B1. http://www.ssa.gov/OACT/TR/TR08/V_economic.html#170227

United States Government, *Code of Federal Regulations*, 29 CFR Parts 2619, 2676, & 4044, Washington, D.C., March 14, 2005. http://thefederalregister.com/d.p/2005-03-14-05-4950

Millimet, Daniel L., Nieswiadomy, Michael, Ryu, Hang, Slottje, Daniel, *Estimating Worklife Expectancy: an Econometric Approach*, *Journal of Econometrics, Volume 113, Issue 1, March 2003, Pages 83-11*, http://faculty.smu.edu/millimet/pdf/worklifekidspaper.pdf


*Marriage, Children and Worklife Expectancy,* Millimet, Daniel L., Nieswiadomy, Hang, Slottje, Daniel http://www.econ. unt.edu/research/pdf/01-04NiesWorklife.pdf

Cieka, James, Donley, Thomas, and Goldman, Jerry, *A Markov Process Model of Worklife Expectancies by Educational Attainment Based on Labor Market Activity in 1997-98,*  Journal of Legal Economics, Volume 10, Number 3, Winter, 2000-01.

Cotton, Female Injury, Earnings, Coastal, 100K, Simon.xls

| EARNINGS SUMMARY SHEET | $100,000 Capacity, Coastal Vocational | | | |
|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| Date of Analysis: | 28-Aug-08 | | | | |
| Name: | Cotton | Losses Assuming Work to | SSA Normal Retirement Age | 66.00 | $814,027 |
| Attorney' Name: | Simon | | Fringe Benefits        20.0% | $207,614 | $1,021,642 |
| Income Replaced: | After-Tax | Losses Assuming Work to | Work Expectancy | 63.08 | $602,418 |
| | | | Fringe Benefits        20.0% | $153,644 | $756,062 |

| | | | | | |
|---|---|---|---|---|---|
| PAST LOSSES: | 26-Jul-05 | To: | 28-Aug-08 | | $207,521 |
| FUTURE LOSSES: | 29-Aug-08 | To: | 8-Jul-16 | | |

| | | | |
|---|---|---|---|
| Annuity Value of Net Future Losses, PBGC Taxable Annuity Price: | | | $602,597 |
| Annuity Value of Approximate Tax on Compensation Adds: | 0.65% | | $3,909 |
| Current Market Price to Buy Annuity equal to Future losses, Payment Stream Only: | | | $606,506 |

| | | | |
|---|---|---|---|
| **MARKET PRICE TO REPLACE FUTURE LOSSES, MONTH OF:** | **Aug-08** | | **$814,027** |

**Benchmarks, Approximate Implied Growth - See Attached Tables for Actual Rates Used**

| | | | |
|---|---|---|---|
| Earnings Capacity  at Loss Start Date: | 26-Jul-05 | | $36,157 |
| Earnings Capacity  as of Today, No Injury: | 28-Aug-08 | | $109,620 |
| Earnings Capacity  as of Today, Injured | 28-Aug-08 | | $0 |

| | | | |
|---|---|---|---|
| **PBGC Instruction Set, Rate for First 20 Years** | **6.24%** | **PBGC Rate Years Thereafter:** | **5.31%** |
| Alternative Used for Analysis, Direct Discounting: | | | #N/A |
| Annuity Price with Tax Adjustment Comparable to Tax-Free Bond Yield of: | | | 0.32% |

| | | | |
|---|---|---|---|
| **Date of Birth of Party:** | **09-Jul-50** | **Date Injury First Caused Reduction  in Earnings** | **26-Jul-05** |
| **Age at Injury:** | 55.05 Age at End of Injury Year: | 55.00          Exact Age on Analysis Date: | 58.14 |
| | Normal Life Expectancy, as of Injury, PBGC Life Tables, 94 GAM, Adjusted to: | 2008 | 30.21 |
| | Normal Life Expectancy as of Today, PBGC Life Tables 94 GAM, Adjusted to: | 2008 | 27.45 |
| | | Reported Life Expectancy at Injury: | 30.21 |
| | | Age + LX As of Date of Analysis: | **85.58** |

**Worklife Expectancy**

*Worklife* Expectancy in 1997-1998, Ciecka, Donley & Goldman, 2001

| | Sex | Marital | Family | Race | Education | | |
|---|---|---|---|---|---|---|---|
| | Female | All | All | All | Graduate Degree | 10.01 | |
| | | | Age at Event Plus worklife at Event | | | 65.06 | |
| | | | GAM94 Probablity of Survival to age | 66.00 | 0.94366 | | |
| | | | Adjusted Estimate before LX Reduction | | | 10.61 | **65.65** |

*Work* Expectancy Over 1992-2000, Millimet, Nieswiadomy, Ryu & Slottje, 2002

| | Sex | Marital | Family | Race | Education | | |
|---|---|---|---|---|---|---|---|
| | Female | Married | No Children | White | College | 7.58 | |
| | | | Age at Event Plus worklife at Event | | | 62.62 | |
| | | | GAM94 Probablity of Survival to age | 66.00 | 0.94366 | | |
| | | | Adjusted Estimate before LX Reduction | | | 8.03 | **63.08** |
| | | | | Implied Date | | 8/5/13 | |

**Taxation**

| | |
|---|---|
| Average Effective Earned Income Tax Rate, No Event, State & Federal: | 21.87% |
| Average Effective Earned Income Tax Rate, Event, State & Federal: | 6.14% |
| Average Effective State & Local Tax Rate on Compensating Annuity: | 0.63% |

Cotton, Female Injury, Earnings, Coastal, 100K, Simon.xls

| Year (1) | SSA Growth Rates No Injury (2) | Age (3) | Gross Earnings 2008 Dollars (4) | PAST & EXPECTED EARNINGS LOSSES | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Gross Earnings Current $ (5) | Estimated Taxes on Earnings (6) | Earnings But For Injury (7) | Earnings Growth Injured (8) | Gross Earnings Injured (9) | Estimated Taxes on Earnings (10) | Earnings Given Injury (11) | Estimated Losses Current $ (12) |
| 1/1/05 | | | | | | | | | | | |
| 2005 | #DIV/0! | 54.48 | $39,894 | $36,157 | $4,001 | $32,156 | #N/A | $27,769 | $2,152 | $25,617 | $6,538 |
| 2006 | 176.57% | 55.48 | $106,606 | $100,000 | $21,704 | $78,296 | -14.85% | $23,645 | $1,005 | $22,641 | $55,655 |
| 2007 | 5.00% | 56.48 | $108,360 | $105,000 | $23,047 | $81,953 | #N/A | $0 | $0 | $0 | $81,953 |
| 2008 | 4.40% | 57.48 | $109,620 | $109,620 | $24,250 | $85,370 | #N/A | $0 | $0 | $0 | $85,370 |
| 2009 | 4.10% | 58.48 | $111,006 | $114,114 | $25,454 | $88,660 | #N/A | $0 | $0 | $0 | $88,660 |
| 2010 | 4.20% | 59.48 | $112,518 | $118,907 | $26,756 | $92,151 | #N/A | $0 | $0 | $0 | $92,151 |
| 2011 | 4.00% | 60.48 | $114,165 | $123,664 | $28,082 | $95,581 | #N/A | $0 | $0 | $0 | $95,581 |
| 2012 | 3.90% | 61.48 | $115,386 | $128,486 | $29,370 | $99,116 | #N/A | $0 | $0 | $0 | $99,116 |
| 2013 | 4.00% | 62.48 | $116,733 | $133,626 | $30,761 | $102,865 | #N/A | $0 | $0 | $0 | $102,865 |
| 2014 | 4.00% | 63.48 | $118,096 | $138,971 | $32,214 | $106,757 | #N/A | $0 | $0 | $0 | $106,757 |
| 2015 | 3.90% | 64.48 | $119,359 | $144,391 | $33,680 | $110,711 | #N/A | $0 | $0 | $0 | $110,711 |
| 2016 | #N/A | 65.48 | $120,637 | $77,835 | $11,755 | $66,080 | #N/A | $0 | $0 | $0 | $66,080 |
| 2017 | #N/A | 66.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2018 | #N/A | 67.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2019 | #N/A | 68.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2020 | #N/A | 69.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2021 | #N/A | 70.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2022 | #N/A | 71.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2023 | #N/A | 72.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2024 | #N/A | 73.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2025 | #N/A | 74.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2026 | #N/A | 75.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2027 | #N/A | 76.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2028 | #N/A | 77.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2029 | #N/A | 78.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2030 | #N/A | 79.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2031 | #N/A | 80.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2032 | #N/A | 81.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2033 | #N/A | 82.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2034 | #N/A | 83.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2035 | #N/A | 84.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2036 | #N/A | 85.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2037 | #N/A | 86.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2038 | #N/A | 87.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2039 | #N/A | 88.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2040 | #N/A | 89.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2041 | #N/A | 90.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2042 | #N/A | 91.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2043 | #N/A | 92.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2044 | #N/A | 93.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2045 | #N/A | 94.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2046 | #N/A | 95.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2047 | #N/A | 96.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2048 | #N/A | 97.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2049 | #N/A | 98.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2050 | #N/A | 99.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2051 | #N/A | 100.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2052 | #N/A | 101.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2053 | #N/A | 102.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2054 | #N/A | 103.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| 2055 | #N/A | 104.48 | $0 | $0 | $0 | $0 | #N/A | $0 | $0 | $0 | $0 |
| SUMS: | | | | $1,330,771 | $291,075 | | | $51,414 | $3,156 | $48,258 | $991,438 |

Cotton, Female Injury, Earnings, Coastal, 100K, Simon.xls

## ANNUITY COST TO REPLACE LOST EARNINGS

| Year (13) | PBGC RATES (14) | Age (15) | PBGC Discount Factor (16) | Estimated Losses Current $ (17) | Survival Probability GAM94 (18) | Mkt.Value @ PBGC 2008 Dollars (19) | Taxes on Annuity Current $ (20) | Effective Tax Rate on Annuity (21) | Payment Required Current $ (22) | Mkt. Value Tax Adjusted 2008 Dollars (23) | Cumulative Losses (24) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/1/05 | | | 1.000000 | | - | | | | | | |
| 2005 | 0.00% | 54.48 | 1.000000 | $7,214 | 1.00000 | $7,214 | $0 | 0.0% | $7,214 | $7,214 | $7,214 |
| 2006 | 0.00% | 55.48 | 1.000000 | $59,332 | 1.00000 | $59,332 | $0 | 0.0% | $59,332 | $59,332 | $66,546 |
| 2007 | 0.00% | 56.48 | 1.000000 | $84,575 | 1.00000 | $84,575 | $0 | 0.0% | $84,575 | $84,575 | $151,121 |
| 2008 | 0.00% | 57.48 | 1.000000 | $85,370 | 1.00000 | $85,370 | $464 | 0.5% | $85,834 | $85,834 | $236,955 |
| 2009 | 6.24% | 58.48 | 0.941265 | $88,660 | 0.99632 | $83,146 | $505 | 0.6% | $89,165 | $83,619 | $320,574 |
| 2010 | 6.24% | 59.48 | 0.885980 | $92,151 | 0.99210 | $80,999 | $551 | 0.6% | $92,702 | $81,483 | $402,058 |
| 2011 | 6.24% | 60.48 | 0.833942 | $95,581 | 0.98728 | $78,695 | $600 | 0.6% | $96,181 | $79,189 | $481,247 |
| 2012 | 6.24% | 61.48 | 0.784960 | $99,116 | 0.98179 | $76,386 | $643 | 0.6% | $99,759 | $76,881 | $558,128 |
| 2013 | 6.24% | 62.48 | 0.738856 | $102,865 | 0.97554 | $74,143 | $692 | 0.7% | $103,556 | $74,642 | $632,771 |
| 2014 | 6.24% | 63.48 | 0.695459 | $106,757 | 0.96846 | $71,903 | $743 | 0.7% | $107,500 | $72,404 | $705,174 |
| 2015 | 6.24% | 64.48 | 0.654611 | $110,711 | 0.96048 | $69,609 | $794 | 0.7% | $111,505 | $70,108 | $775,282 |
| 2016 | 6.24% | 65.48 | 0.616163 | $66,080 | 0.95161 | $38,745 | $0 | 0.0% | $66,080 | $38,745 | $814,027 |
| 2017 | 6.24% | 66.48 | 0.579973 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2018 | 6.24% | 67.48 | 0.545908 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2019 | 6.24% | 68.48 | 0.513844 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2020 | 6.24% | 69.48 | 0.483663 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2021 | 6.24% | 70.48 | 0.455255 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2022 | 6.24% | 71.48 | 0.428516 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2023 | 6.24% | 72.48 | 0.403347 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2024 | 6.24% | 73.48 | 0.379657 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2025 | 6.24% | 74.48 | 0.357358 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2026 | 6.24% | 75.48 | 0.336368 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2027 | 6.24% | 76.48 | 0.316612 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2028 | 6.24% | 77.48 | 0.298015 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2029 | 6.24% | 78.48 | 0.280512 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2030 | 5.31% | 79.48 | 0.266367 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2031 | 5.31% | 80.48 | 0.252936 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2032 | 5.31% | 81.48 | 0.240183 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2033 | 5.31% | 82.48 | 0.228072 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2034 | 5.31% | 83.48 | 0.216572 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2035 | 5.31% | 84.48 | 0.205652 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2036 | 5.31% | 85.48 | 0.195283 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2037 | 5.31% | 86.48 | 0.185436 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2038 | 5.31% | 87.48 | 0.176086 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2039 | 5.31% | 88.48 | 0.167207 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2040 | 5.31% | 89.48 | 0.158776 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2041 | 5.31% | 90.48 | 0.150770 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2042 | 5.31% | 91.48 | 0.143168 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2043 | 5.31% | 92.48 | 0.135949 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2044 | 5.31% | 93.48 | 0.129094 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2045 | 5.31% | 94.48 | 0.122585 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2046 | 5.31% | 95.48 | 0.116404 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2047 | 5.31% | 96.48 | 0.110534 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2048 | 5.31% | 97.48 | 0.104961 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2049 | 5.31% | 98.48 | 0.099669 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2050 | 5.31% | 99.48 | 0.094643 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2051 | 5.31% | 100.48 | 0.089871 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2052 | 5.31% | 101.48 | 0.085339 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2053 | 5.31% | 102.48 | 0.081036 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2054 | 5.31% | 103.48 | 0.076950 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| 2055 | 5.31% | 104.48 | 0.073070 | $0 | - | $0 | $0 | 0.0% | $0 | $0 | $814,027 |
| | | | | | | | | 0.0% | | | |
| **SUMS:** | | | | $998,412 | | $810,118 | $4,991 | 0.6% | $1,003,404 | $814,027 | |

...

Cotton, Female Injury, Earnings, Coastal, 100K, Simon.xls

**SCHEDULE 4: LOST FRINGE BENEFITS**

| Employer Contributions Year | Age | PBGC Discount Factor | Earnings Uninjured | Fringes 20% | Earnings Injured | Fringes 20% | Survival Probability | Losses At PBGC | Losses Tax Adjusted | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|
| (24) | (25) | (26) | (27) | (28) | (29) | (30) | (31) | (32) | (33) | (34) |
| 1/1/05 | | | | | | | | | | |
| 2005 | 54.48 | 1.000000 | $36,157 | $7,231 | $27,769 | $5,554 | 1.000000 | $1,678 | $1,678 | $1,678 |
| 2006 | 55.48 | 1.000000 | $100,000 | $20,000 | $23,645 | $4,729 | 1.000000 | $15,271 | $15,271 | $16,949 |
| 2007 | 56.48 | 1.000000 | $105,000 | $21,000 | $0 | $0 | 1.000000 | $21,000 | $21,000 | $37,949 |
| 2008 | 57.48 | 1.000000 | $109,620 | $21,924 | $0 | $0 | 1.000000 | $21,924 | $22,043 | $59,992 |
| 2009 | 58.48 | 0.941265 | $114,114 | $22,823 | $0 | $0 | 0.99632 | $21,403 | $21,525 | $81,517 |
| 2010 | 59.48 | 0.885980 | $118,907 | $23,781 | $0 | $0 | 0.99210 | $20,903 | $21,028 | $102,545 |
| 2011 | 60.48 | 0.833942 | $123,664 | $24,733 | $0 | $0 | 0.98728 | $20,363 | $20,491 | $123,036 |
| 2012 | 61.48 | 0.784960 | $128,486 | $25,697 | $0 | $0 | 0.98179 | $19,804 | $19,933 | $142,969 |
| 2013 | 62.48 | 0.738856 | $133,626 | $26,725 | $0 | $0 | 0.97554 | $19,263 | $19,393 | $162,362 |
| 2014 | 63.48 | 0.695459 | $138,971 | $27,794 | $0 | $0 | 0.96846 | $18,720 | $18,850 | $181,212 |
| 2015 | 64.48 | 0.654611 | $144,391 | $28,878 | $0 | $0 | 0.96048 | $18,157 | $18,287 | $199,499 |
| 2016 | 65.48 | 0.616163 | $77,835 | $15,567 | $0 | $0 | 0.95161 | $9,128 | $9,128 | $208,627 |
| 2017 | 66.48 | 0.579973 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2018 | 67.48 | 0.545908 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2019 | 68.48 | 0.513844 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2020 | 69.48 | 0.483663 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2021 | 70.48 | 0.455255 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2022 | 71.48 | 0.428516 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2023 | 72.48 | 0.403347 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2024 | 73.48 | 0.379657 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2025 | 74.48 | 0.357358 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2026 | 75.48 | 0.336368 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2027 | 76.48 | 0.316612 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2028 | 77.48 | 0.298015 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2029 | 78.48 | 0.280512 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2030 | 79.48 | 0.266367 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2031 | 80.48 | 0.252936 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2032 | 81.48 | 0.240183 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2033 | 82.48 | 0.228072 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2034 | 83.48 | 0.216572 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2035 | 84.48 | 0.205652 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2036 | 85.48 | 0.195283 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2037 | 86.48 | 0.185436 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2038 | 87.48 | 0.176086 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2039 | 88.48 | 0.167207 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2040 | 89.48 | 0.158776 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2041 | 90.48 | 0.150770 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2042 | 91.48 | 0.143168 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2043 | 92.48 | 0.135949 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2044 | 93.48 | 0.129094 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2045 | 94.48 | 0.122585 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2046 | 95.48 | 0.116404 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2047 | 96.48 | 0.110534 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2048 | 97.48 | 0.104961 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2049 | 98.48 | 0.099669 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2050 | 99.48 | 0.094643 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2051 | 100.48 | 0.089871 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2052 | 101.48 | 0.085339 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| 2053 | 102.48 | 0.081036 | $0 | $0 | $0 | $0 | - | $0 | $0 | $208,627 |
| | | | | | | | | $207,614 | $208,627 | |

# REPORT


## THE PRESENT VALUE OF FUTURE
## LIFE CARE EXPENSES


OF


## NANCY COTTON

Submitted to:

### RON SIMON, ESQ.
Simon & Associates
1707 N Street, NW
Washington, DC 20036


Submitted By:

### THOMAS C. BORZILLERI, Ph.D.
Economic Consultant
6701 Democracy Boulevard
Suite 300
Bethesda, Maryland 20817
202-862-3630




August 28, 2008

## SUMMARY

I have placed a present value on the expected care outlays associated with the life care plan prepared by Raphael Minsky, Ed.D. on August 20, 2008 for the benefit of Nancy Cotton. The present value of the cost of the plan is **$750,753** to **$821,008.**

This plan has been valued using the current market price for the purchase of an annuity to provide for these future needs. Annuity prices change with changes in interest rates and financial markets. If such changes occur producing a substantial change in the cost of the plan, these estimates will be updated if appropriate.

## MAJOR ITEMS OF EXPENDITURE

**Medical Goods and Services:** The plan requires various medical needs: physician's services and prescription drugs. I place the present value of these medical goods and services at **$131,336**. The estimated cost growth rate I use is based on the 48-year differential between medical inflation and general price inflation, approximately 1.9% per year. This produces expected inflation rates for medical goods and services in the range of 4.7% per year.

**General Goods and Services:** The plan includes supplies and equipment that in my opinion would be expected to escalate in cost over time at the general rate of inflation. I place the present value of the cost of these goods and services at **$6,967.** I assume that costs for this category of goods and services will grow with the general Consumer Price Index, in the range of 2.8% per year.

**Medically Related Labor Costs:** This category includes house cleaning, assistance with shopping and assisted living. I place the present value of these services at **$612,450** to **$682,705**. The lower number assumes that costs will grow in line with expected future general earnings growth rates, in the range of 3.9% per year, while the higher number assumes that costs for these services will grow at .5% faster than average earnings growth rates, explained in more detail below.

## OVERVIEW OF LIFE CARE PLAN METHODOLOGY

My calculations rely on the economic assumption set prepared by the Social Security Administration for its annual report to the Congress of the United States and on observed trends in the inflation rates for various categories of goods and services included in the plan.

I first allocate expected spending into components: Goods and services whose prices are likely to be dominated by general inflation ("Non-Medical Goods and Services"); services whose prices are likely to be dominated by general earnings increases or professional services such as nursing care ("Medically Related Labor Expenses"; Education services; and goods and services likely to be dominated by inflation in medical care sector ("Medical Goods and Services"). If the life care planner provides a range for expenses or the duration over which services are needed, I use the average cost or the average duration.

1

I use the Social Security Administration's general inflation and economy-wide earnings growth for my baseline assumptions, in the general range of 3% per year for inflation and 4% per year for earnings growth. Starting with the 2008 cost for the goods or services required, I calculate expected costs year by year by increasing those 2008 costs by the rates described above.

These future outlays are then brought to present value using current market annuity prices that account for both life expectancy and interest. Using this market price eliminates a source of forecast uncertainty, future interest rates, and provides a more accurate assessment of present value than any approach that requires more forecasting.

## GENERAL INFLATION AND EARNINGS: SOCIAL SECURITY ESTIMATES

The method of analysis I use relies on future general inflation rates and future earnings growth rates both to predict future medical inflation rates and to bound my estimates. These growth rates are taken from the economic assumption set prepared by the Social Security Administration for its annual report to the Congress of the United States[1].

By law, the Social Security Administration must report annually to the Congress of the United States on the expected financial status of the system, both in the short term and over the next 75 years. As a consequence of this legal requirement, and because both the taxes taken in and benefits to be paid out depend crucially on earnings growth and inflation, the Social Security Administration develops year-by-year estimates of expected, future, average earnings growth and expected future inflation.

These forecasts result from an analysis of past economic history including productivity growth, earnings growth, international trade issues, changes in the labor force supply and demand, inflation, and for the first 10 years of the forecast period, short-term economic cycles as well. I use the so-called Intermediate Assumption Set, which represent the Social Security Administration's "Best Estimate" of the future, long run performance of the U. S. economy. These economic assumptions are consistent with U.S. economic history, objective, and reasonably representative of our economic future.

The growth rates I actually use are reproduced on my printouts and are taken from page 92 of the Annual Report of the Board of Trustees of the Federal Old-Age and Survivors Insurance and Disability Trust Funds, Transmitted to the Congress April 25, 2008.

---

[1]    Board of Trustees, Federal Old-Age and Survivors Insurance and Disability Insurance Trust Funds, *2008 Annual Report of the Board*, Washington, D.C., April 25, 2008, Table V.B1, Page 92.

**LIFE EXPECTANCY ISSUES:** The life table is that of the Pension Benefit Guaranty Corporation (PBGC), the GAM94, updated to 2008 using the procedures specified by the PBGC. These calculations are performed using year to year survival probabilities, instead of one number, "life expectancy". The one number, life expectancy, is constructed by summing survival probabilities. If in a population of a certain age, 45% are expected to live one more year and 35% are expected to live two more years and 20% are expected to live three more years, the life expectancy of persons of that age is (.45x1 plus .35x2 plus .2x3) 1.7 years. Note that 45% will die before "life expectancy" and 55% will die beyond "life expectancy". In a present value calculation, timing matters. To assume 100% survival to life expectancy and zero chance of living thereafter loads the calculation towards the earlier, less discounted years.

The mathematically correct method of computation is to weight the expected expenditure by the probability of living to that age. In other words, while an expenditure two years from today for a 20-year-old is "likely", it is not 100% likely regardless of life expectancy, because no one is guaranteed another day. Similarly, while an expenditure 50 years from today for a 50-year-old person is "unlikely", it is a possibility because people can and do outlive their life expectancies and life tables do go out to age 110. How likely or unlikely an expenditure will actually be incurred is measured by survival probability. Each item enters the calculation according to the probability of its occurrence.

**MEDICAL CARE INFLATION RATES:** Price increases in the medical care sector have been significantly greater, over long periods of time, than the rate of inflation for other goods and services in the U.S. economy. Below is a table showing the general rate of inflation, the medical care rate of inflation and the difference between the two, measured over different time periods. In all cases the seasonally unadjusted indices from the U.S. Department of Labor, Bureau of Labor Statistics are used.

| Thru 2007 | Medical Inflation CPI-MED | General Inflation CPI-U | Difference |
|---|---|---|---|
| Since 1950 | 5.7% | 3.8% | 1.8% |
| Since 1965 | 6.5% | 4.3% | 2.2% |
| Since 1970 | 6.5% | 4.6% | 1.9% |
| Since 1980 | 5.9% | 3.5% | 2.4% |
| Since 1990 | 4.6% | 2.8% | 1.9% |

It should be added that there is no statistically significant evidence of a time trend in this difference: there is no evidence that the difference is systematically getting larger or smaller over time.

Numerous policy proposals have been offered to slow the rate of price and expenditure growth for medical goods and services and alter the basic structure of

3

medical care markets. In recent years it has been hoped that managed care would reduce the rate of medical care inflation but that has not proven to be the case.

In August 2005, the U.S. Agency for Health Care Research and Quality (www.ahrq.gov) issued a report of findings from the Medical Expenditures Panel Survey that showed increases in health insurance premiums of 9% to 10% in 2003.

A study by the General Accounting Office published in August 2005 found higher rates of price increase for prescription drugs as well.[2] The GAO found that the rate of inflation for 96 drugs frequently used by Medicare and non-Medicare enrollees increased at an annual rate of 4.6% during the 2000 to 2004 period, while the general Consumer Price Index increased only 2.5% per year during the same period.

On average, since the creation of Medicare in 1965, the difference has averaged inflation plus 2.2% and since 1951, inflation plus 1.8%. To provide a conservative estimate, I assume medical inflation will exceed general inflation by the 1.8% difference calculated over the last 57 years.

**THE GROWTH IN NURSING PAY**
I use nursing pay growth as proxy for the pay growth of trained medical professionals such as therapists and other health care professionals as well as for my estimates for the cost of expected nursing services. The University of Texas Medical Branch at Galveston has undertaken annual surveys of nursing salaries in hospitals and medical schools since 1963. From 1963 through 1988, the survey requested information on starting and maximum salaries for Registered Nurses and from 1965 forward, Licensed Vocational Nurses were included in the sample. In 1989, the University ceased publishing starting and maximum salaries and now provides only average salaries for these professions.

From 1963 to 1988, RN starting salaries grew by 1.3% per year after inflation and maximum salaries grew by 1.8% per year after inflation. For licensed vocational nurses, after inflation earnings growth was 1.0% per year for starting salaries and 1.3% per year for maximum salaries. As a benchmark, the Social Security Administration's average earnings for the U.S. population grew about .5% percent per year over the same period. Generally then, licensed vocational nursing salaries grew .5% to .8% percent faster than average earnings did over the period and registered nurses salaries grew .8% to 1.3% faster than earnings in general.

From 1988 through 1993, The University ceased publishing starting and maximum salaries and now publishes various statistics for nursing positions in general. Average real earnings growth during this period for LVNs was -1.3% and for RNs, only .3 - negative or very slow earnings growth. If I extend the starting and

---

[2] General Accounting Office, Price Trends for Frequently Used brand and Generic Drugs from 2000 through 2004, GAO-05-779, August 2005

4

maximum pay growth series using these overall averages, I get 1.1% and 1.6% real growth for starting and maximum RN rates from 1963 through 1993 and .7% and .9% for LVN rates from 1965 through 1993. Over the same periods, SSA real earnings growth rates ran approximately .5% per year.

The National Compensation Survey has collected detailed wage information by occupation since 1997.[3] The US average wage for Registered Nurses was $20.11 per hour in 1997 and $29.10 per hour in June 2006, an annual rate of growth of 4.2% per year.[4] For LPNs wages grew from $12.56 in 1997 to $18.12 in June 2006, also an annual rate of growth of 4.2%. That same survey found that average U.S. wages across all occupations grew from $15.09 in 1997 to $19.29 in June 2006, an increase of only 2.8% per year. The earnings of Registered Nurses and LPNS grew substantially faster than average wages during the period. My approach to the escalation of RN, LPN or health professional costs uses expected, economy-wide, earnings growth for one estimate and economy-wide earnings plus 1/2% for the other.

**THE GROWTH IN NURSING HOME COSTS:** A recent study of nursing home costs found that annual nursing home expenses per person rose from $13,866 in 1986 to $22,561 in 1996 – an annual rate of growth of 5.0% per year[5]. Average daily expenses rose from $56 a day in 1987 to $118 per day in 1996, 8.6% per year. Over the same period, general inflation only increased at 3.4% per year.

The MetLife Market Survey found that in 2006, the average daily cost for a private room in a nursing home was $206 a day[6]. For a semi-private room, costs were $183 per day. Comparisons to the Rhodes and Sommers study figure of $118 per day in 1996, indicates that nursing home costs have continued to grow at 5.7% per year.

The Consumer Price Index has monitored the prices of "Nursing Homes and Adult Day Services" since December, 1996. Since that time, while the general Consumer Price Index has increased at an annual rate of 2.7%, this index has increased at an annual rate of 4.5% - 66% faster. The Social Security Administration's Average Wage Index has grown from $25,914 in 1996 to $42,286 in 2008, an annual rate of increase of 4.2%. Hence the Nursing Homes and Adult Day Services index has increased fasted than general prices and faster than general wages over the same period.

---

[3] U.S. Department of Labor, Bureau of Labor Statistics, National Compensation Survey: Occupational Wages in the United States, June, 2006, published June, 2007.

[4] For 2006, http://www.bls.gov/ncs/ocs/sp/ncbl0910.pdf http:, for 1997//www.bls.gov/ncs/ocs/sp/ncbl0153.pdf

[5] Rhoades, Jeffrey A. and Sommers, John P., Trends in Nursing Home Expenses, 1986 and 1996, Health Care Financing Review, Fall 2003, Volume 25, Number 1.

[6] MetLife Mature Market Institute, *The MetLife Market Survey of Nursing Home and Home Care Costs, September, 2006*, http://www.metlife.com/WPSAssets/18756958281159455975V1F2006NHHCMarketSurvey.pdf

Because I do not believe such extreme rates of growth found in the Rhodes and Sommers study to be sustainable over the longer-term, I value expected nursing home costs the way I value Labor-Related Medical Expenses. I use expected, economy-wide, earnings growth for one estimate and economy-wide earnings plus 1/2% for the other, putting growth in the range of 3.8% to 4.4% per year.

## THE PRESENT VALUE OF FUTURE OUTLAYS
Given an estimate of year by year, expected costs, these future costs must be converted into a present dollar equivalent. While there are numerous financial instruments that might be used to establish the present value of a future expense, I perform my conversion using information on the current annuity market provided the United States Pension Benefit Guaranty Corporation (PBGC)[7]. These annuity prices are used to value all future expenses. Note however, that while I estimate current market annuity prices for this analysis using the average prices reported by the PBGC methodology, any annuity from a solid company producing the same replacement income is an acceptable valuation alternative[8].

PBGC is a United States Government agency charged with the responsibility of insuring pension plans in the event of employer default under the Employee Retirement Income Security Act (ERISA). As a consequence of that responsibility, PBGC monitors the annuity market and has the American Council of Life Insurers collects price data each quarter from a national sample of insurance and annuity companies. The PBGC Methodology permits the analyst to approximate the current price of an annuity found in this survey, given only the party's age and gender.

The methodology is essentially a method to distribute and disseminate current annuity prices. The prices themselves, as stated above, come from a survey of the market and are not forecasts. Each month, the PBGC provides "interest factors", based on its survey results that are to be combined with its specific life table, the GAM94. Neither the specific life table nor the "interest factors" to be used, determine these annuity prices - which again, come from a survey.

These rates are not the yield on a *specific financial instrument* but rather rates, which when mathematically combined with the specific PBGC mortality tables (so-called GAM94 Tables), *reproduces* the findings of the PBGC annuity price survey for the age and gender of the party involved. As the PBGC explains:

*"These derived interest factors are not market interest rates. The factors stand in for all the many components used in annuity pricing that are not reflected in the given*

---

[7] United States Government, **Code of Federal Regulations**, 29 CFR Parts 2619, 2676, & 4044, Washington, D.C., March 14, 2005.

[8] I estimate current market annuity prices for this analysis using the PBGC methodology, but any quality annuity contract producing the same replacement income is an alternative for the establishment of present value.

*mortality table e.g., assumed yield on investment, margins for profit and contingencies, premium and income taxes, and marketing and sales expenses. Because of the relationship among annuity prices, a mortality table, and the derived interest factors, it is never meaningful to compare PBGC's interest factors to market interest rates. The PBGC's interest factor is meaningful only in combination with the PBGC's mortality assumptions."*[9]

Hence, PBGC rates are <u>not</u> traditional discount rates in the sense of expected yields or rates of return on a portfolio, but rather a technical instruction to implement the Methodology. The PBGC rates are *applied to an actuarially reduced* stream of income, reduced by year to year survival probabilities, and hence the *implicit* rates of return are higher than would be the case if the income stream was an unreduced flow certain, as in a typical discounting problem.

The PBGC price survey provides an accurate, cost-effective, and objective estimate of the actual, current market price required to purchase a future flow of income equal to the amount required to compensate the injured party for expected future losses. I am not requiring that such an instrument actually be chosen for compensation purposes. I am using annuity prices as an indicator of the financial market's "tradeoff" between the value of future dollars and the value of present dollars, inclusive of available investments, the time period involved, cash requirements associated with compensation, and mortality considerations. PBGC price information is current, reflecting actual economic conditions in the money market in the month of the analysis and in fact, *is* a function of the current yields on the professionally managed, investment portfolios of insurance or annuity companies that back these annuity contracts[10].

The use of an annuity price to establish the discounted present value of future losses provides a number of advantages over the more familiar approach in which an analyst explicitly specifies an expected yield on a particular financial instrument or investment portfolio, typically bonds. Most importantly, an annuity price is an actual, market <u>price</u> at this point in time, not a forecast of future yields.

In addition, PBGC prices are objective, provided by the U.S. Government, and not prepared for the purpose of the litigation at issue. The price is a market price, favoring neither plaintiff nor defense and such prices are public information that may be easily verified by all parties to the litigation. Finally, an annuity provides for periodic payments, a flow of compensating income timed similarly to the losses that are expected to occur in the future. Regardless of the future course of interest rates, an annuity price provides the actual market cost today, to purchase the

---

[9] http://thefederalregister.com/d.p/2005-03-14-05-495
[10] The PBGC Methodology involves 2 components: the financial flow required to pay the annuity to individuals, and for *groups* of employees, an administrative cost component. Because I am dealing with an individual rather than a group of employees, I use <u>only</u> the financial flow. Administrative expense is ignored and therefore my estimated annuity price may be somewhat below group annuity market prices.

required future flow of compensating payments for future losses.

If you have any additional questions concerning this matter, please let us know.

**APPENDIX I: Medical Care Price Indices**

The Bureau of Labor Statistics maintains consumer price indices on a number of categories of medical care goods and services that define the limits of my estimating approach to future medical care prices.  Some of these indices, the overall All Medical Care Index, Medical Care Commodities, Prescription Drugs, Medical Care Services, Physician Services, Dental Services, and Hospital Room Charges, go back to 1935 while others are of more recent inception.  The Nonprescription Drugs and Medical Supplies Index, the Eye Care Index, and the Services by Other Medical Professionals Index have been maintained separately only since 1986 while the Professional Medical Services index began in 1967.  Unfortunately, one of the most important components of consumer health related expenditures, medical insurance premiums, is not directly monitored by BLS because of technical difficulties.

**The Medical Care Index:** This is the most broadly based medical price index available, and the index I have focused on for my estimates.  It includes all medical goods and all medical services, including estimates for consumer-paid cost of health insurance premiums, and it begins in 1936.  There are two sub-index categories that comprise this overall Medical Care Index, Medical Care Commodities and Medical Care Services:

    1.  **Medical Care Commodities:** This index began in 1987 and is comprised of prescription drugs, non-prescription drugs, and medical supplies.  This is the appropriate price index to use when pricing the various hard goods and equipment such as beds, wheelchairs and other equipment needs associated with life care or rehabilitation plans, but again, it has only been produced since 1987. It is therefore of limited use in forecasting expected trends in the prices of drugs or various medical "hard goods" over long periods of time.

    2.  **Medical Care Services:** This index includes professional medical services, hospital services, and an estimated, consumer-paid, cost of medically related goods and services.  Health insurance premiums are not directly priced however, because of the difficulty in standardizing coverages from year to year and the difficulty in accounting for employer-paid, rather than consumer-paid, insurance premiums.  The health insurance premium component of Medical Care Services is estimated from overall medical expenditure data.  This broad-based, Medical Care Services Index is available back to 1936.  There are a number of sub-indices within this Medical Care Services Index.

    a)  **Professional Medical Services:** an index created in 1967, which includes:

        1) All Physician Services, other than dental or eye care, also maintained as a separate index starting in 1936.

        2) Dental Care also maintained separately and also started in 1936.

        3) Eye Care, maintained separately since only since 1987.

4) **Services by Other Medical Professionals**, another index started in 1986. It includes therapists, nurse practitioners in or out of the office, psychologists and others. This is an important category of services in many cases, particularly those involving home care. Unfortunately, this index has only been maintained separately since 1986 and hence, like the Medical Care Goods Index, cannot be used to calculate long-term trends. As of October, 1994, this index monitored the following number of Other Medical Professionals: Psychologist (34), Podiatrist (44), Chiropractor (136), Physician Assistant (2), Nurse Practitioner (2), Physical Therapist (14), Nurse (4), Other (31). This last category includes Mental Health & Marriage Counselors, Speech Therapists, Psychiatric Social Workers and Psychotherapists. Some of the categories are exceedingly small. For example, there are only 6 nurses in the sample.

b) **Hospital and Related Medical Services:** an index created in 1978 to include:

1) Hospital Room and Board published since 1936.

2) Hospital Inpatient Services to include all nursing home care published since 1987.

3) Outpatient Services including tests, emergency room care, short-stay units published since 1987.

Again, while it is possible to get a long term series on the cost of a hospital room, the hospital service index has been collected for too few years to be of assistance for estimating trends.

In general, because of its wide coverage and the very long period for which data is available, I believe use of the overall Medical Goods and Service index is the most appropriate index to use when forecasting expected prices for medically related expenses. It is this index that I refer to when I discuss medical care inflation, when I calculate the differences between overall inflation and medical inflation, and when I attempt to mathematically relate medical prices to the general CPI.

Cotton, LCP, Minsky, Simon.xls

## SUMMARY OF GOODS & SERVICES

**LIFE CARE PLAN FOR:** Nancy Cotton

| | |
|---|---|
| **Plan Author:** | Raphel Minsky, Ed.D. |
| **Date of Plan:** | 8/20/08 |
| **Date of Valuation:** | 8/28/08 |
| **Normal LX, GAM94, Adjusted to 2008** | 27.45 |
| **LX Used For Estimates:** | 27.45 |

**MEDICAL GOODS & SERVICES**

| Prices dominated by CPI in the Medical Sector | **Present Value** |
|---|---|
| Neurologist | $22,700 |
| Psychiatrist, Medication Monitoring, First Year | $10,400 |
| Psychiatrist, Medication Monitoring, Thereafter | $52,631 |
| Individual Psychotherapy, First Year | $3,600 |
| Individual Psychotherapy, Next Two Years | $5,208 |
| Neuropsychological Evaluation | $2,414 |
| Brain MRI | $2,395 |
| Blood Monitoring, Paxil or Other | $4,127 |
| Medications | $27,860 |
| **SUBTOTAL** | **$131,336** |

**GENERAL GOODS & SERVICES**

| | **Present Value** |
|---|---|
| Transportation Costs for Treatments, First Year | $1,160 |
| Transportation Costs for Treatments, Next Two Years | $1,621 |
| Transportation Costs for Treatments, Thereafter | $4,186 |
| **SUBTOTAL** | **$6,967** |

**MEDICALLY RELATED, LABOR INTENSIVE SERVICES**     **Present Value**

Prices Dominated by General Wage Growth or Medical Professional Pay

| | LOW | HIGH |
|---|---|---|
| House Cleaning Crew | $24,314 | $24,314 |
| Shopping, Other Trips | $100,425 | $100,425 |
| Assisted Living | $487,711 | $557,966 |
| | **LOW** | **HIGH** |
| **SUBTOTAL** | **$612,450** | **$682,705** |

| | LOW | HIGH |
|---|---|---|
| **TOTAL COST OF PLAN:** | **$750,753** | **$821,008** |

Thomas C. Borzilleri, Ph.D.

Cotton, LCP, Minsky, Simon.xls

# Goods & Services, Price Changes Related to Medical CPI

| | | |
|---|---|---|
| Analysis Date | 8/28/08 | |
| Party Name: | Nancy Cotton | |
| Date of Birth: | 7/9/50 | |
| Age of Date of Analysis: | 58.14 | |
| Additional Years of Life, 94GAM Adjusted to 2008: | 27.45 | |
| Additional Years of Life Assumed: | 27.45 | |
| Life Table Setback: | 0        "Rated Age": | 58.00 |

| | | |
|---|---|---|
| INFLATION DIFFERENCE, 1951 Thru | 2007 | 1.82% |
| INFLATION DIFFERENCE, 1997 Thru | 2007 | 1.43% |
| INFLATION DIFFERENCE, | | 1.85% |
| INFLATION DIFFERENCE, 1965 Thru | 2007 | 6.05% |
| PBGC Rate Set, First Years: | 20 | 6.05% |
| Thereafter: | | 5.12% |
| **PRESENT VALUE** | | **$131,336** |

| YEAR | PBGC RATE SET | AGE End Year | COST In 2008 DOLLARS | GENERAL INFLATION (SSA) | CATEGORY INFLATION CPI Plus 1.82% | COST IN FUTURE DOLLARS | PRESENT VALUE OF CPI PLUS 1.82% | CUMULATIVE PRESENT VALUE | CHANCE OF SURVIVING TO EACH AGE | YEAR TO YEAR SURVIVAL PROB SURVIVAL METHOD |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 2007 | | 57.48 | $16,385 | 2.29% | 5.94% | $16,385 | $16,385 | $16,385 | 1.0000 | $16,385 |
| 2008 | 6.05% | 58.48 | $6,585 | 2.80% | 4.62% | $6,889 | $6,496 | $22,881 | 0.9963 | $6,472 |
| 2009 | 6.05% | 59.48 | $9,085 | 2.80% | 4.62% | $9,944 | $8,842 | $31,723 | 0.9921 | $8,772 |
| 2010 | 6.05% | 60.48 | $6,585 | 2.50% | 4.32% | $7,519 | $6,304 | $38,027 | 0.9873 | $6,224 |
| 2011 | 6.05% | 61.48 | $4,785 | 2.80% | 4.62% | $5,716 | $4,519 | $42,546 | 0.9818 | $4,437 |
| 2012 | 6.05% | 62.48 | $4,785 | 2.80% | 4.62% | $5,980 | $4,458 | $47,004 | 0.9755 | $4,349 |
| 2013 | 6.05% | 63.48 | $4,785 | 2.80% | 4.62% | $6,256 | $4,398 | $51,402 | 0.9685 | $4,259 |
| 2014 | 6.05% | 64.48 | $7,535 | 2.80% | 4.62% | $10,307 | $6,832 | $58,234 | 0.9605 | $6,562 |
| 2015 | 6.05% | 65.48 | $4,785 | 2.80% | 4.62% | $6,848 | $4,280 | $62,515 | 0.9516 | $4,073 |
| 2016 | 6.05% | 66.48 | $4,785 | 2.80% | 4.62% | $7,164 | $4,223 | $66,737 | 0.9418 | $3,977 |
| 2017 | 6.05% | 67.48 | $4,785 | 2.80% | 4.62% | $7,495 | $4,166 | $70,903 | 0.9313 | $3,879 |
| 2018 | 6.05% | 68.48 | $4,785 | 2.80% | 4.62% | $7,841 | $4,109 | $75,012 | 0.9200 | $3,781 |
| 2019 | 6.05% | 69.48 | $4,785 | 2.80% | 4.62% | $8,204 | $4,054 | $79,066 | 0.9080 | $3,681 |
| 2020 | 6.05% | 70.48 | $4,785 | 2.80% | 4.62% | $8,583 | $3,999 | $83,065 | 0.8953 | $3,581 |
| 2021 | 6.05% | 71.48 | $4,785 | 2.80% | 4.62% | $8,979 | $3,945 | $87,011 | 0.8816 | $3,478 |
| 2022 | 6.05% | 72.48 | $4,785 | 2.80% | 4.62% | $9,394 | $3,892 | $90,903 | 0.8669 | $3,374 |
| 2023 | 6.05% | 73.48 | $4,785 | 2.80% | 4.62% | $9,828 | $3,840 | $94,743 | 0.8508 | $3,267 |
| 2024 | 6.05% | 74.48 | $4,785 | 2.80% | 4.62% | $10,282 | $3,788 | $98,531 | 0.8337 | $3,158 |
| 2025 | 6.05% | 75.48 | $4,785 | 2.80% | 4.62% | $10,757 | $3,737 | $102,267 | 0.8150 | $3,045 |
| 2026 | 6.05% | 76.48 | $4,785 | 2.80% | 4.62% | $11,254 | $3,686 | $105,954 | 0.7940 | $2,927 |
| 2027 | 6.05% | 77.48 | $4,785 | 2.80% | 4.62% | $11,774 | $3,637 | $109,591 | 0.7711 | $2,804 |
| 2028 | 6.05% | 78.48 | $4,785 | 2.80% | 4.62% | $12,318 | $3,619 | $113,210 | 0.7463 | $2,701 |
| 2029 | 5.12% | 79.48 | $4,785 | 2.80% | 4.62% | $12,887 | $3,602 | $116,812 | 0.7196 | $2,592 |
| 2030 | 5.12% | 80.48 | $4,785 | 2.80% | 4.62% | | | | | |

Cotton, LCP, Minsky, Simon.xls

Thomas C. Borzilleri, Ph.D.

Cotton, LCP, Minsky, Simon.xls

| YEAR | PBGC RATE SET | AGE End Year | COST In 2008 DOLLARS | GENERAL INFLATION (SSA) | CATEGORY INFLATION CPI Plus 1.82% | COST IN FUTURE DOLLARS | PRESENT VALUE OF CPI PLUS 1.82% | CUMULATIVE PRESENT VALUE | CHANCE OF SURVIVING TO EACH AGE | YEAR TO YEAR SURVIVAL PROB METHOD |
|---|---|---|---|---|---|---|---|---|---|---|
| 2031 | 5.12% | 81.48 | $4,785 | 2.80% | 4.62% | $13,483 | $3,585 | $120,397 | 0.6909 | $2,477 |
| 2032 | 5.12% | 82.48 | $4,785 | 2.80% | 4.62% | $14,105 | $3,568 | $123,966 | 0.6600 | $2,355 |
| 2033 | 5.12% | 83.48 | $4,785 | 2.80% | 4.62% | $14,757 | $3,551 | $127,517 | 0.6271 | $2,227 |
| 2034 | 5.12% | 84.48 | $4,785 | 2.80% | 4.62% | $15,439 | $3,534 | $131,051 | 0.5924 | $2,094 |
| 2035 | 5.12% | 85.48 | $4,785 | 2.80% | 4.62% | $16,152 | $3,517 | $134,568 | 0.5551 | $1,952 |
| 2036 | 5.12% | 86.48 | $4,785 | 2.80% | 4.62% | $16,898 | $3,501 | $138,069 | 0.5152 | $1,803 |
| 2037 | 5.12% | 87.48 | $4,785 | 2.80% | 4.62% | $17,679 | $3,484 | $141,553 | 0.4729 | $1,648 |
| 2038 | 5.12% | 88.48 | $4,785 | 2.80% | 4.62% | $18,496 | $3,467 | $145,020 | 0.4296 | $1,490 |
| 2039 | 5.12% | 89.48 | $4,785 | 2.80% | 4.62% | $19,350 | $3,451 | $148,471 | 0.3846 | $1,327 |
| 2040 | 5.12% | 90.48 | $4,785 | 2.80% | 4.62% | $20,244 | $3,435 | $151,906 | 0.3399 | $1,167 |
| 2041 | 5.12% | 91.48 | $4,785 | 2.80% | 4.62% | $21,180 | $3,418 | $155,324 | 0.2961 | $1,012 |
| 2042 | 5.12% | 92.48 | $4,785 | 2.80% | 4.62% | $22,158 | $3,402 | $158,726 | 0.2540 | $864 |
| 2043 | 5.12% | 93.48 | $4,785 | 2.80% | 4.62% | $23,182 | $3,386 | $162,111 | 0.2134 | $723 |
| 2044 | 5.12% | 94.48 | $4,785 | 2.80% | 4.62% | $24,253 | $3,370 | $165,481 | 0.1761 | $593 |
| 2045 | 5.12% | 95.48 | $4,785 | 2.80% | 4.62% | $25,373 | $3,354 | $168,835 | 0.1425 | $478 |
| 2046 | 5.12% | 96.48 | $4,785 | 2.80% | 4.62% | $26,545 | $3,338 | $172,172 | 0.1129 | $377 |
| 2047 | 5.12% | 97.48 | $4,785 | 2.80% | 4.62% | $27,772 | $3,322 | $175,494 | 0.0869 | $289 |
| 2048 | 5.12% | 98.48 | $4,785 | 2.80% | 4.62% | $29,055 | $3,306 | $178,800 | 0.0652 | $216 |
| 2049 | 5.12% | 99.48 | $4,785 | 2.80% | 4.62% | $30,397 | $3,290 | $182,090 | 0.0476 | $157 |
| 2050 | 5.12% | 100.48 | $4,785 | 2.80% | 4.62% | $31,802 | $3,275 | $185,365 | 0.0338 | $111 |
| 2051 | 5.12% | 101.48 | $4,785 | 2.80% | 4.62% | $33,271 | $3,259 | $188,624 | 0.0230 | $75 |
| 2052 | 5.12% | 102.48 | $4,785 | 2.80% | 4.62% | $34,808 | $3,244 | $191,867 | 0.0152 | $49 |
| 2053 | 5.12% | 103.48 | $4,785 | 2.80% | 4.62% | $36,416 | $3,228 | $195,095 | 0.0096 | $31 |
| 2054 | 5.12% | 104.48 | $4,785 | 2.80% | 4.62% | $38,098 | $3,213 | $198,308 | 0.0059 | $19 |
| 2055 | 5.12% | 105.48 | $4,785 | 2.80% | 4.62% | $39,859 | $3,197 | $201,506 | 0.0034 | $11 |
| 2056 | 5.12% | 106.48 | $4,785 | 2.80% | 4.62% | $41,700 | $3,182 | $204,688 | 0.0019 | $6 |
| 2057 | 5.12% | 107.48 | $4,785 | 2.80% | 4.62% | $43,627 | $3,167 | $207,855 | 0.0010 | $3 |
| 2058 | 5.12% | 108.48 | $4,785 | 2.80% | 4.62% | $45,642 | $3,152 | $211,007 | 0.0006 | $2 |
| 2059 | 5.12% | 109.48 | $4,785 | 2.80% | 4.62% | $47,751 | $3,137 | $214,144 | 0.0003 | $1 |

Thomas C. Borzilleri, Ph.D.

## Goods & Services, Price Changes Related to General CPI

| | |
|---|---|
| Analysis Date | 8/28/08 |
| Party Name | Nancy Cotton |
| Date of Birth | 7/9/50 |
| Age of Date of Analysis: | 58.14 |
| Additional Years of Life, 94GAM Adjusted to 2008: | 27.45 |
| Additional Years of Life Assumed: 0   "Rated Age": | 58.00 |
| Life Table Setback: 0 | 85.58487623 |

PBGC Rate Set, First Years:  20
Thereafter:  6.05%  5.12%

**PRESENT VALUE   $6,967**

| YEAR (1) | PBGC RATE SET (2) | AGE End Year (3) | COST IN 2008 DOLLARS (4) | GENERAL INFLATION (SSA) (5) | CATEGORY INFLATION CPI ONLY (6) | COST IN FUTURE DOLLARS (7) | PRESENT VALUE @ CPI (8) | CUMULATIVE PRESENT VALUE (9) | CHANCE OF SURVIVING TO AGE (10) | YEAR TO YEAR SURVIVAL PROB METHOD (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 6.05% | 57.48 | $1,160 | 2.29% | 2.29% | $1,160 | $1,160 | $1,160 | 1.0000 | $1,160 |
| 2008 | 6.05% | 58.48 | $580 | 2.80% | 2.80% | $596 | $562 | $1,722 | 0.9963 | $560 |
| 2009 | 6.05% | 59.48 | $580 | 2.80% | 2.80% | $613 | $545 | $2,267 | 0.9921 | $541 |
| 2010 | 6.05% | 60.48 | $580 | 2.50% | 2.50% | $628 | $527 | $2,794 | 0.9873 | $520 |
| 2011 | 6.05% | 61.48 | $290 | 2.80% | 2.80% | $323 | $255 | $3,049 | 0.9816 | $250 |
| 2012 | 6.05% | 62.48 | $290 | 2.80% | 2.80% | $332 | $247 | $3,297 | 0.9755 | $241 |
| 2013 | 6.05% | 63.48 | $290 | 2.80% | 2.80% | $341 | $240 | $3,537 | 0.9685 | $232 |
| 2014 | 6.05% | 64.48 | $290 | 2.80% | 2.80% | $351 | $233 | $3,769 | 0.9605 | $223 |
| 2015 | 6.05% | 65.48 | $290 | 2.80% | 2.80% | $361 | $225 | $3,995 | 0.9516 | $215 |
| 2016 | 6.05% | 66.48 | $290 | 2.80% | 2.80% | $371 | $219 | $4,213 | 0.9418 | $206 |
| 2017 | 6.05% | 67.48 | $290 | 2.80% | 2.80% | $381 | $212 | $4,425 | 0.9313 | $197 |
| 2018 | 6.05% | 68.48 | $290 | 2.80% | 2.80% | $392 | $205 | $4,630 | 0.9200 | $189 |
| 2019 | 6.05% | 69.48 | $290 | 2.80% | 2.80% | $403 | $199 | $4,829 | 0.9080 | $181 |
| 2020 | 6.05% | 70.48 | $290 | 2.80% | 2.80% | $414 | $193 | $5,022 | 0.8953 | $173 |
| 2021 | 6.05% | 71.48 | $290 | 2.80% | 2.80% | $426 | $187 | $5,209 | 0.8816 | $165 |
| 2022 | 6.05% | 72.48 | $290 | 2.80% | 2.80% | $438 | $181 | $5,391 | 0.8669 | $157 |
| 2023 | 6.05% | 73.48 | $290 | 2.80% | 2.80% | $450 | $176 | $5,566 | 0.8508 | $150 |
| 2024 | 6.05% | 74.48 | $290 | 2.80% | 2.80% | $462 | $170 | $5,737 | 0.8337 | $142 |
| 2025 | 6.05% | 75.48 | $290 | 2.80% | 2.80% | $475 | $165 | $5,902 | 0.8150 | $135 |
| 2026 | 6.05% | 76.48 | $290 | 2.80% | 2.80% | $489 | $160 | $6,062 | 0.7940 | $127 |
| 2027 | 6.05% | 77.48 | $290 | 2.80% | 2.80% | $502 | $155 | $6,217 | 0.7711 | $120 |
| 2028 | 5.12% | 78.48 | $290 | 2.80% | 2.80% | $516 | $152 | $6,369 | 0.7463 | $113 |
| 2029 | 5.12% | 79.48 | $290 | 2.80% | 2.80% | $531 | $148 | $6,517 | 0.7196 | $107 |
| 2030 | 5.12% | 80.48 | $290 | 2.80% | 2.80% | $546 | $145 | $6,662 | 0.6909 | $100 |
| 2031 | 5.12% | 81.48 | $290 | 2.80% | 2.80% | $561 | $142 | $6,804 | 0.6600 | $94 |
| 2032 | 5.12% | 82.48 | $290 | 2.80% | 2.80% | $577 | $139 | $6,943 | 0.6271 | $87 |
| 2033 | 5.12% | 83.48 | $290 | 2.80% | 2.80% | $593 | $136 | $7,079 | 0.5920 | $81 |

Thomas C. Borzilleri, Ph.D.

| YEAR (1) | PBGC RATE SET (2) | AGE End Year (3) | COST IN 2008 DOLLARS (4) | GENERAL INFLATION (SSA) (5) | CATEGORY INFLATION CPI ONLY (6) | COST IN FUTURE DOLLARS (7) | PRESENT VALUE @ CPI (8) | CUMULATIVE PRESENT VALUE (9) | CHANCE OF SURVIVING TO AGE (10) | YEAR TO YEAR SURVIVAL PROB METHOD (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2034 | 5.12% | 84.48 | $290 | 2.80% | 2.80% | $593 | $136 | $7,079 | 0.5924 | $80 |
| 2035 | 5.12% | 85.48 | $290 | 2.80% | 2.80% | $609 | $133 | $7,211 | 0.5551 | $74 |
| 2036 | 5.12% | 86.48 | $290 | 2.80% | 2.80% | $627 | $130 | $7,341 | 0.5152 | $67 |
| 2037 | 5.12% | 87.48 | $290 | 2.80% | 2.80% | $644 | $127 | $7,468 | 0.4729 | $60 |
| 2038 | 5.12% | 88.48 | $290 | 2.80% | 2.80% | $662 | $124 | $7,592 | 0.4296 | $53 |
| 2039 | 5.12% | 89.48 | $290 | 2.80% | 2.80% | $681 | $121 | $7,714 | 0.3846 | $47 |
| 2040 | 5.12% | 90.48 | $290 | 2.80% | 2.80% | $700 | $119 | $7,832 | 0.3399 | $40 |
| 2041 | 5.12% | 91.48 | $290 | 2.80% | 2.80% | $719 | $116 | $7,948 | 0.2961 | $34 |
| 2042 | 5.12% | 92.48 | $290 | 2.80% | 2.80% | $739 | $114 | $8,062 | 0.2540 | $29 |
| 2043 | 5.12% | 93.48 | $290 | 2.80% | 2.80% | $760 | $111 | $8,173 | 0.2134 | $24 |
| 2044 | 5.12% | 94.48 | $290 | 2.80% | 2.80% | $781 | $109 | $8,281 | 0.1761 | $19 |
| 2045 | 5.12% | 95.48 | $290 | 2.80% | 2.80% | $803 | $106 | $8,388 | 0.1425 | $15 |
| 2046 | 5.12% | 96.48 | $290 | 2.80% | 2.80% | $826 | $104 | $8,491 | 0.1129 | $12 |
| 2047 | 5.12% | 97.48 | $290 | 2.80% | 2.80% | $849 | $102 | $8,593 | 0.0869 | $9 |
| 2048 | 5.12% | 98.48 | $290 | 2.80% | 2.80% | $873 | $99 | $8,692 | 0.0652 | $6 |
| 2049 | 5.12% | 99.48 | $290 | 2.80% | 2.80% | $897 | $97 | $8,789 | 0.0476 | $6 |
| 2050 | 5.12% | 100.48 | $290 | 2.80% | 2.80% | $922 | $95 | $8,884 | 0.0338 | $5 |
| 2051 | 5.12% | 101.48 | $290 | 2.80% | 2.80% | $948 | $93 | $8,977 | 0.0230 | $3 |
| 2052 | 5.12% | 102.48 | $290 | 2.80% | 2.80% | $975 | $91 | $9,068 | 0.0152 | $1 |

Thomas C. Borzilleri, Ph.D.

## Medically Related, Labor Intensive Service Costs

| Field | Value |
|---|---|
| Analysis Date | 8/28/2008 |
| Party Name | Nancy Cotton |
| Date of Birth | 7/8/1950 |
| Age of Date of Analysis | 58.14 |
| Additional Years of Life, 94GAM Adjusted to 2008 | 27.45 |
| Additional Years of Life Assumed | 58.00 |
| Life Table Setback | 0  "Rated Age" |

INFLATION DIFFERENCE, 1951 To 2007    0.50%

PBGC Rate Set, First Years: 20   Thereafter
6.05%   5.12%

| PRESENT VALUE | |
|---|---|
| SSA EARNINGS 0.50% | $612,450 |
| GENERAL EARNINGS PLUS | $688,387 |

| YEAR (1) | PBGC RATE SET (2) | AGE End Year (3) | COST IN 2008 DOLLARS (4) | GENERAL EARNINGS (SSA) (5) | COST IN FUTURE DOLLARS (6) | PRESENT VALUE @ SSA (7) | CUMULATIVE PRESENT VALUE (8) | CHANCE OF LIVING TO EACH AGE (9) | YEAR to YEAR SURVIVAL PROB METHOD (10) | GENERAL EARNINGS PLUS 0.50% (11) | COST IN FUTURE DOLLARS (12) | SSA EARNINGS PRESENT VALUE @ EARNINGS + 0.50% (13) | CUMULATIVE PRESENT VALUE (14) | YEAR TO YEAR SURVIVAL PROB METHOD (15) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | | 57 | $7,557 | 4.40% | $7,557 | $7,557 | $7,557 | 1.0000 | $7,557 | 4.40% | $7,557 | $7,557 | $7,557 | $7,557 |
| 2008 | 6.05% | 58 | $7,557 | 4.10% | $7,867 | $7,391 | $14,975 | 0.9963 | $7,391 | 4.60% | $7,905 | $7,454 | $15,011 | $7,426 |
| 2009 | 6.05% | 59 | $7,557 | 4.20% | $8,197 | $7,289 | $22,264 | 0.9983 | $7,231 | 4.70% | $8,276 | $7,359 | $22,369 | $7,301 |
| 2010 | 6.05% | 60 | $7,557 | 4.00% | $8,525 | $7,148 | $29,411 | 0.9921 | $7,057 | 4.50% | $8,649 | $7,251 | $29,621 | $7,159 |
| 2011 | 6.05% | 61 | $7,557 | 3.90% | $8,868 | $7,003 | $36,414 | 0.9873 | $6,875 | 4.40% | $9,029 | $7,138 | $36,759 | $7,011 |
| 2012 | 6.05% | 62 | $7,557 | 3.90% | $9,212 | $6,875 | $43,282 | 0.9816 | $6,700 | 4.50% | $9,435 | $7,034 | $43,793 | $6,862 |
| 2013 | 6.05% | 63 | $7,557 | 4.00% | $9,580 | $6,735 | $50,016 | 0.9755 | $6,522 | 4.40% | $9,860 | $6,931 | $50,724 | $6,713 |
| 2014 | 6.05% | 64 | $7,557 | 3.90% | $9,954 | $6,592 | $56,615 | 0.9709 | $6,337 | 4.40% | $10,294 | $6,823 | $57,548 | $6,554 |
| 2015 | 6.05% | 65 | $7,557 | 3.90% | $10,342 | $6,464 | $63,079 | 0.9685 | $6,152 | 4.30% | $10,747 | $6,717 | $64,265 | $6,392 |
| 2016 | 6.05% | 66 | $7,557 | 3.90% | $10,735 | $6,337 | $69,406 | 0.9516 | $5,959 | 4.40% | $11,209 | $6,606 | $70,872 | $6,222 |
| 2017 | 6.05% | 67 | $7,557 | 3.80% | $11,143 | $6,193 | $75,599 | 0.9560 | $5,767 | 4.30% | $11,691 | $6,497 | $77,369 | $6,051 |
| 2018 | 6.05% | 68 | $7,557 | 3.90% | $11,578 | $6,067 | $81,667 | 0.9413 | $5,582 | 4.40% | $12,205 | $6,396 | $83,765 | $5,885 |
| 2019 | 6.05% | 69 | $7,557 | 3.90% | $12,028 | $5,944 | $87,611 | 0.9208 | $5,397 | 4.40% | $12,742 | $6,297 | $90,062 | $5,717 |
| 2020 | 6.05% | 70 | $7,557 | 3.90% | $12,486 | $5,824 | $93,435 | 0.9060 | $5,214 | 4.40% | $13,303 | $6,199 | $96,261 | $5,550 |
| 2021 | 6.05% | 71 | $7,557 | 3.90% | $12,966 | $5,706 | $99,141 | 0.8896 | $5,030 | 4.40% | $13,888 | $6,102 | $102,363 | $5,380 |
| 2022 | 6.05% | 72 | $7,557 | 3.90% | $13,492 | $5,590 | $104,731 | 0.8690 | $4,850 | 4.40% | $14,499 | $6,007 | $108,371 | $5,208 |
| 2023 | 6.05% | 73 | $7,557 | 3.90% | $14,019 | $5,366 | $110,197 | 0.8506 | $4,680 | 4.40% | $15,137 | $5,914 | $114,285 | $5,032 |
| 2024 | 6.05% | 74 | $7,557 | 3.90% | $14,565 | $5,257 | $115,574 | 0.8337 | $4,474 | 4.40% | $15,722 | $5,722 | $120,107 | $4,854 |
| 2025 | 6.05% | 75 | $7,557 | 3.90% | $15,133 | $5,133 | $120,831 | 0.8150 | $4,264 | 4.40% | $16,499 | $5,641 | $125,638 | $4,671 |
| 2026 | 6.05% | 76 | $7,557 | 3.90% | $15,723 | $5,046 | $125,981 | 0.7940 | $4,088 | 4.40% | $17,225 | $5,641 | $131,036 | $4,480 |
| 2027 | 6.05% | 77 | $7,557 | 3.90% | $16,337 | $4,987 | $131,028 | 0.7740 | $3,891 | 4.40% | $17,983 | $5,516 | $137,036 | $4,117 |
| 2028 | 5.12% | 78 | $7,557 | 3.90% | $16,974 | $4,987 | $136,015 | 0.7463 | $3,722 | 4.40% | $18,774 | $5,516 | $142,551 | $4,117 |
| 2029 | 5.12% | 79 | $107,400 | 3.90% | $250,640 | $70,059 | $206,074 | 0.7196 | $47,841 | 4.40% | $278,553 | $56,031 | $297,741 | $66,031 |
| 2030 | 5.12% | 80 | $107,400 | 3.90% | $260,415 | $70,059 | $279,321 | 0.6909 | $47,175 | 4.40% | $290,809 | $20,413 | $297,741 | $53,425 |
| 2031 | 5.12% | 81 | $107,400 | 3.90% | $270,571 | $64,443 | $343,763 | 0.6627 | $45,175 | 4.40% | $303,605 | $54,540 | $374,540 | $50,690 |
| 2032 | 5.12% | 82 | $107,400 | 3.90% | $281,124 | $67,648 | $411,412 | 0.6271 | $42,425 | 4.40% | $316,963 | $76,273 | $450,812 | $47,834 |
| 2033 | 5.12% | 83 | $107,400 | 3.90% | $292,087 | $66,863 | $478,275 | 0.5924 | $42,175 | 4.40% | $330,910 | $75,750 | $526,563 | $44,875 |
| 2034 | 5.12% | 84 | $107,400 | 3.90% | $303,419 | $66,087 | $544,362 | 0.5551 | $36,682 | 4.40% | $345,470 | $75,231 | $601,794 | $41,758 |
| 2035 | 5.12% | 85 | $107,400 | 3.90% | $315,315 | $65,320 | $609,662 | 0.5152 | $36,682 | 4.40% | $360,670 | $74,716 | $676,510 | $38,493 |
| 2036 | 5.12% | 86 | $107,400 | 3.90% | $327,612 | $64,562 | $674,245 | 0.4729 | $30,532 | 4.40% | $376,540 | $74,204 | $750,714 | $35,092 |
| 2037 | 5.12% | 87 | $107,400 | 3.90% | $340,389 | $63,813 | $738,057 | 0.4296 | $27,412 | 4.40% | $393,108 | $73,696 | $824,411 | $31,658 |
| 2038 | 5.12% | 88 | $107,400 | 3.90% | $353,664 | $63,072 | $801,130 | 0.3846 | $24,259 | 4.40% | $410,404 | $73,191 | $897,602 | $28,151 |
| 2039 | 5.12% | 89 | $107,400 | 3.90% | $367,467 | $62,340 | $865,470 | 0.3399 | $21,188 | 4.40% | $428,462 | $72,690 | $970,292 | $24,706 |
| 2040 | 5.12% | 90 | $107,400 | 3.90% | $381,792 | $61,617 | $925,087 | 0.2961 | $18,245 | 4.40% | $447,315 | $72,192 | $1,042,484 | $21,376 |
| 2041 | 5.12% | 91 | $107,400 | 3.90% | $396,677 | $60,902 | $985,470 | 0.2534 | $15,472 | 4.40% | $466,996 | $71,698 | $1,114,182 | $18,214 |
| 2042 | 5.12% | 92 | $107,400 | 3.90% | $412,148 | $60,195 | $1,046,183 | 0.2134 | $12,848 | 4.40% | $487,544 | $71,207 | $1,185,388 | $15,199 |
| 2043 | 5.12% | 93 | $107,400 | 3.90% | $428,221 | $59,496 | $1,105,679 | 0.1761 | $10,478 | 4.40% | $508,896 | $70,719 | $1,256,107 | $12,455 |
| 2044 | 5.12% | 94 | $107,400 | 3.90% | $444,972 | $58,806 | $1,164,485 | 0.1425 | $8,380 | 4.40% | $531,392 | $70,235 | $1,326,342 | $10,000 |
| 2045 | 5.12% | 95 | $107,400 | 3.90% | $462,274 | $58,123 | $1,222,608 | 0.1129 | $6,564 | 4.40% | $554,773 | $69,753 | $1,396,095 | $7,877 |
| 2046 | 5.12% | 96 | $107,400 | 3.90% | $480,303 | $57,449 | $1,280,057 | 0.0869 | $4,992 | 4.40% | $579,183 | $69,276 | $1,465,371 | $6,019 |
| 2047 | 5.12% | 97 | $107,400 | 3.90% | $499,034 | $56,783 | $1,336,839 | 0.0652 | $3,702 | 4.40% | $604,687 | $68,801 | $1,534,172 | $4,486 |

Cotton, LCP, Minsky, Simon.xls / Medical Labor Estimates

Cotton, LCP, Minsky, Simon.xls

Thomas C. Borzilleri, Ph.D.

Cotton, LCP, Minsky, Simon.xls

| YEAR | PBGC RATE SET | AGE End Year | COST IN 2008 DOLLARS | GENERAL EARNINGS (SSA) | COST IN FUTURE DOLLARS | PRESENT VALUE @ SSA | CUMULATIVE PRESENT VALUE | CHANCE OF LIVING TO EACH AGE | YEAR to YEAR SURVIVAL PROB METHOD | GENERAL EARNINGS PLUS 0.50% | COST IN FUTURE DOLLARS | PRESENT VALUE @ EARNINGS + 0.50% | CUMULATIVE PRESENT VALUE | YEAR TO YEAR SURVIVAL PROB METHOD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2049 | 5.12% | 99 | $107,400 | 3.90% | $518,497 | $56,123 | $1,392,962 | 0.0476 | $2,673 | 4.40% | $631,273 | $68,330 | $1,602,502 | $3,255 |
| 2050 | 5.12% | 100 | $107,400 | 3.90% | $538,718 | $55,472 | $1,448,433 | 0.0338 | $1,876 | 4.40% | $659,049 | $67,862 | $1,670,364 | $2,284 |
| 2051 | 5.12% | 101 | $107,400 | 3.90% | $559,728 | $54,828 | $1,503,261 | 0.0230 | $1,262 | 4.40% | $688,047 | $67,397 | $1,737,761 | $1,552 |
| 2052 | 5.12% | 102 | $107,400 | 3.90% | $581,558 | $54,191 | $1,557,452 | 0.0152 | $822 | 4.40% | $718,321 | $66,936 | $1,804,697 | $1,016 |
| 2053 | 5.12% | 103 | $107,400 | 3.90% | $604,238 | $53,563 | $1,611,015 | 0.0096 | $522 | 4.40% | $749,927 | $66,477 | $1,871,174 | $641 |
| 2054 | 5.12% | 104 | $107,400 | 3.90% | $627,804 | $52,941 | $1,663,956 | 0.0059 | $316 | 4.40% | $782,924 | $66,022 | $1,937,196 | $388 |
| 2055 | 5.12% | 105 | $107,400 | 3.90% | $652,288 | $52,326 | $1,716,282 | 0.0034 | $180 | 4.40% | $817,373 | $65,570 | $2,002,765 | $226 |
| 2056 | 5.12% | 106 | $107,400 | 3.90% | $677,727 | $51,719 | $1,768,001 | 0.0019 | $100 | 4.40% | $853,337 | $65,120 | $2,067,886 | $126 |
| 2057 | 5.12% | 107 | $107,400 | 3.90% | $704,159 | $51,119 | $1,819,120 | 0.0010 | $54 | 4.40% | $890,884 | $64,674 | $2,132,560 | $68 |
| 2058 | 5.12% | 108 | $107,400 | 3.90% | $731,621 | $50,526 | $1,869,646 | 0.0006 | $28 | 4.40% | $930,083 | $64,231 | $2,196,791 | $36 |
| 2059 | 5.12% | 109 | $107,400 | 3.90% | $760,154 | $49,939 | $1,919,585 | 0.0003 | $14 | 4.40% | $971,006 | $63,791 | $2,260,583 | $18 |
| 2060 | 5.12% | 110 | $0 | 3.90% | $0 | $0 | $1,919,585 | 0.0001 | $0 | 4.40% | $0 | $0 | $2,260,583 | $0 |

Cotton, LCP, Minsky, Simon.xls / Medical Labor Estimates

# THOMAS C. BORZILLERI, PH.D.

Economic Consultant
One Democracy Plaza
6701 Democracy Boulevard
Suite 300
Bethesda, Maryland 20817

TELEPHONE: (202) 862-3630
FAX: (202) 862-3634
E-MAIL: tcb1011@verizon.net

## SUMMARY OF PROFESSIONAL QUALIFICATIONS

**ACADEMIC DEGREES:**
Ph.D., Economics, University of Maryland, College Park, 1979
M.A., Economics, University of Maryland, College Park, 1973
B.S., Economics, University of Maryland, College Park, 1970

**COMPREHENSIVE FIELD EXAMINATIONS:** Industrial Organization and Anti-Trust, Monetary Theory and Policy, Macro and Micro Economic Theory, Social Policy.

**OTHER FIELDS OF GRADUATE STUDY:** Econometrics and Statistics, Input-Output modeling, Microsimulation modeling, Monte Carlo techniques, Urban and Regional Economics, Environmental Economics.

**DOCTORAL DISSERTATION:** "A Microanalytic Simulation Model of the Retirement Decision and Social Security Costs"

### PROFESSIONAL EXPERIENCE

**1989-PRESENT, ECONOMIC CONSULTANT:** Private practice, economic analysis concerning a variety of economic issues and expert testimony in Washington, D.C. area courts. Areas of analysis include damage computations, anti-trust economics, business and professional practice valuation, analyses of lost profits, earnings losses from personal injury and wrongful death, competitive market analysis, pension valuation, wrongful discharge, statistical analysis in discrimination matters, and other subjects. Qualified as an economic and/or actuarial expert in Anne Arundel, Charles, Baltimore City & County, Frederick, Howard, Montgomery, Prince George's, Washington and St. Mary's County Circuit Courts in Maryland, Superior Court in D.C., Arlington, Alexandria, Fairfax, Loudoun, Orange, and Prince William Circuit Courts in Virginia, Circuit Court in Sacramento California, Federal Courts in Baltimore & Greenbelt, Maryland, Houston, Texas, Washington, D.C., Wilmington, Delaware, and Alexandria, Virginia. Appointed Special Master by Prince George's County Court, Court Appointed Expert by Prince George's County Court, Served as Judge's Consultant in Public Utility Condemnation Proceedings, Prince George's County Court..

**1985-1989, SENIOR ECONOMIC CONSULTANT, DIRECTOR OF INSURANCE STUDIES, J. W. WILSON & ASSOCIATES:** Fields of expertise included damage estimates in anti-trust and lost profit cases, econometric and simulation modeling and analysis, survey research, and economic analysis of competitive issues and profitability. Emphasis on the insurance industry and preparation of expert testimony in property-casualty insurance rate-making cases. Studies included analyses of medical malpractice insurers (West Virginia, North Carolina), workers compensation insurers (Louisiana, Texas, Maine, Virginia), automobile insurance (New Jersey, South Carolina, California, Washington, D.C.). Expert economist testimony concerning profitability, rate of return,

extent of competition, statistical analysis before the Maine Insurance Commission, Virginia Corporation Council, D.C. Public Service Commission.

**1978-1985, ECONOMIC CONSULTANT**

**NATIONAL ASSOCIATION OF RETIRED FEDERAL EMPLOYEES:** Authored an independent study of the historical effects of inflation on Civil Service retirement income and the effect of proposed Congressional legislation to alter the cost-of-living adjustment provisions of the Civil Service Retirement System.

**AMERICAN ASSOCIATION OF RETIRED PERSONS:** Authored numerous independent studies including an analysis of the rates of return for workers from participation in the Social Security System, analyses of the effect of inflation on the income and wealth of the retired population, analyses of the accuracy of the Consumer Price Index, analyses and evaluations of employment programs, the preparation of macro-economic forecasts, and the preparation of legislative and public policy analyses.

**THE PRESIDENT'S COMMISSION ON PENSION POLICY:** Authored two independent studies published by the Commission, one valuing the contribution to retirement income made by twelve Federal programs providing non-cash benefits (Medicare, Food Stamps, Housing Programs, etc.) to the retired population, the other analyzing income adequacy standards (the official poverty level, BLS family budgets, etc.) and developing an original income adequacy standard which was adopted by the Commission in its report to the President.

**OFFICE OF TECHNOLOGY ASSESSMENT:** Retained to consult for OTA staff, prepare analyses, and provide professional independent review of a study prepared by OTA for the Congress of the effects of technological change on the U.S. economy and consumer income.

**UNITED STATES SENATE:** Authored an independent study published by the U.S. Senate on the effects of macro-economic events on the income, wealth, and employment of the older population.

**1973-1978, CHIEF ECONOMIST, AMERICAN ASSOCIATION OF RETIRED PERSONS:** Responsibilities included preparation of economic analyses for presentation to the Congress, testifying and lobbying for the Association, studies of Association older-worker employment programs, legislative analyses, development of policy positions on a wide variety of public policy issues, survey research, economic forecasting, and the development of financial service products for the AARP members.

Fedrule

| DATE | CASE | TYPE | JURISDICTION | EVENT |
|---|---|---|---|---|
| 1/8/2004 | Jackson | Injury | Berkley County Circuit | Deposition |
| 1/13/2004 | Kubas | Injury | Fairfax County Circuit Court | Trial |
| 1/14/2004 | Bullen & Giles | Failure to promote | Federal Court in Wilmington Del. | Trial |
| 1/15/2004 | Fried | Contract Issue | DC Superior Court | Deposition |
| 2/4/2004 | Sprague | Injury | Charles County Circuit | Trial |
| 2/17/2004 | Choe | Practice Valuation | Fairfax County Circuit Court | Deposition |
| 2/18/2004 | Ibida | Injury | DC Superior Court | Deposition |
| 2/23/2004 | Depudjua | Injury | DC Superior Court | Deposition |
| 3/1/2004 | Elliot | Wrongful Termination | Baltimore City | Trial |
| 3/2/2004 | Howard | Medical Malpractice | Anne Arundal Circuit Court | Deposition |
| 3/9/2004 | Langston | Injury Case | Montgomery County Circuit | Trial |
| 3/9/2004 | Choe | Medical Practice Valuation | Fairfax County Circuit Court | Trial |
| 3/25/2004 | Brady's Black Orchard | Lost Profits | Montgomery County Circuit | Deposition |
| 4/13/2004 | Boone | Injury | Montgomery County Circuit | Trial |
| 4/23/2004 | Nasir | Computation | Prince Georges County Circuit | Deposition |
| 4/26/2004 | Mong | Life Care Cost | Washington County Circuit | Deposition |
| 5/3/2004 | Calderon | Death Case | 9/11 Commission | Hearing |
| 5/3/2004 | Halmon | Death Case | 9/11 Commission | Hearing |
| 5/7/2004 | Leahy | Life Care Cost | Middlesex County, New Jersy | Depositon |
| 5/12/2004 | Harrison | Injury Case | DC Superior Court | Trial |
| 5/18/2004 | Medwed | Injury Case | Alexandria Circuit Court | Trial |
| 5/20/2004 | Johnson | Death Case | Baltimore Circuit Court | Deposition |
| 5/26/2004 | Gross | Death Case | Baltimore Circuit Court | Deposition |
| 6/2/2004 | Boss | Injury Case | Baltimore Circuit Court | Deposition |
| 6/10/2004 | Wood | Injury Case | Baltimore Circuit Court | Deposition |
| 6/14/2004 | Andriozzi | Injury Case | Providence RI Circuit Court | Deposition |
| 6/15/2004 | Laydon | Pension Value | Fairfax County Circuit Court | Deposition |
| 6/16/2004 | Chaudry | Injury Case | Baltimore Circuit Court | Trial |
| 7/13/2004 | Lynn | Injury Case | Prince Georges County Circuit | Deposition |
| 7/15/2004 | Conyers | Injury Case | Williamsburg Va Circuit | Deposition |
| 7/19/2004 | Green | Injury Case | DC Superior Court | Deposition |
| 7/19/2004 | Smith | Injury Case | Baltimore Circuit Court | Deposition |
| 7/22/2004 | O'Grady | Injury Case | Anne Arundal Circuit Court | Deposition |
| 8/24/2004 | DeSantos | Injury Case | Montgomery County Circuit | Deposition |
| 8/25/2004 | Myers | Death Case | Louden County Circuit | Trial |
| 8/27/2004 | Wooden | Injury Case | Middlesex County, New Jersy | Deposition |
| 9/14/2004 | Utley | Injury Case | Howard County | Trial |
| 9/17/2004 | Willis | Death Case | Prince Georges County Circuit | Deposition |
| 9/28/2004 | Conyers | Injury Case | Williamsburg Va Circuit | Trial |
| 10/1/2004 | Maybin | Injury Case | Middlesex County, New Jersy | Deposition |
| 10/4/2004 | Riner | Wrongful Termination | Berkley County Circuit | Deposition |
| 10/4/2004 | Ward | Sexual Harrassment | Berkley County Circuit | Deposition |
| 10/6/2004 | Jednorski | Injury Case | Baltimore County Circuit | Trial |
| 10/8/2004 | McCoy | Injury | Baltimore City | Deposition |
| 10/18/2004 | Baucom | Injury | Baltimore City | Deposition |
| 10/22/2004 | McCaulley | Injury | PG County | Deposition |
| 10/26/2004 | Govan | Injury | PG County | Deposition |
| 11/12/2004 | Keller | Products | Middlesex County, New Jersy | Deposition |
| 11/12/2004 | Tageson | Products | Middlesex County, New Jersy | Deposition |
| 11/12/2004 | Brown | Injury | Montgomery County | Deposition |
| 11/15/2004 | Renaldue | Injury | PG County | Deposition |
| 11/22/2004 | Norwood | Injury | Fairfax County Circuit Court | Deposition |
| 11/23/2004 | Leyva | Wrongful Termination | Federal Court in Wilmington Del. | Deposition |
| 12/6/2004 | Engles | Death Case | Montgomery County Circuit | Trial |

Fedrule

| DATE | CASE | TYPE | JURISDICTION | EVENT |
|---|---|---|---|---|
| 12/8/2004 | Burns | Injury Case | DC Superior Court | Deposition |
| 12/14/2004 | Norwood | Death Case | Fairfax County Circuit Court | Trial |
| 1/7/2005 | Inge | Injury | Danville Virginia Circuit | Deposition |
| 1/10/2005 | Walker | Injury | Prince William County Circuit | Trial |
| 1/11/2005 | Ceron | Injury | Montgomery County Circuit | Trial |
| 1/31/2005 | Inge | Injury | Fairfax County Circuit Court | Deposition |
| 2/28/2005 | Williams | Injury | PG County | Deposition |
| 3/2/2005 | Rhee | Injury | Alexandria Circuit Court | Trial |
| 3/4/2005 | Wade | Injury | DC Superior Court | Deposition |
| 3/9/2005 | McCauley | Injury | PG County | Trial |
| 3/10/2005 | Cesnaro | Injury | DC Superior Court | Deposition |
| 3/31/2005 | O'Brian | Death | Baltimore City Circuit | Deposition |
| 4/6/2005 | Williams | Death | Baltimore County Circuit | Trial |
| 4/18/2005 | Brown | Injury | PG County | Deposition |
| 4/20/2005 | Moore | Death | Prince William Country | Trial |
| 5/5/2005 | Bertin | Death | Baltimore City Circuit | Trial |
| 5/26/2005 | Silver | Injury | Baltimore City Circuit | Deposition |
| 5/27/2005 | Stanton Trial | Valuation of Award | Baltimore City Circuit | Trial |
| 6/6/2005 | Taylor | Death | Fairfax County Circuit Court | Trial |
| 6/13/2005 | Watkins | Injury | DC Superior Court | Deposition |
| 6/18/2005 | Price | Injury | Fairfax County Circuit Court | Deposition |
| 6/18/2005 | Zimmerman | Injury | Montgomery County Circuit | Deposition |
| 7/25/2005 | Padget | Death | Arlington County Circuit | Trial |
| 7/26/2005 | Jenrette | Injury | Prince Georges County Circuit | Deposition |
| 7/25/2005 | Pagent | Injury | Arlington County Circuit | Trial |
| 7/28/2005 | Silver | Wrongful Termination | Martinsburg WV | Deposition |
| 7/28/2005 | Nolan | Wrongful Termination | Willmington Delaware | Deposition |
| 8/24/2005 | Henderson | Injury | DC Superior Court | Deposition |
| 8/24/2005 | Stout Deposition | Injury | Baltimore City Circuit | Deposition |
| 8/26/2005 | Kelly | Injury | Baltimore City Circuit | Deposition |
| 8/29/2005 | Schmitt | Injury | Baltimore City Circuit | Deposition |
| 8/30/2005 | Murdock | Injury | Baltimore City Circuit | Deposition |
| 9/7/2005 | Alston | Injury | DC Superior Court | Deposition |
| 9/8/2005 | Korzag | injury | Alexandria Federal Court | Trial |
| 9/19/2005 | Wyvill | Wrongful Termination | Prince Georges County Circuit | Trial |
| 9/20/2005 | Ring | Injury | Baltimore City Circuit | Deposition |
| 9/21/2005 | Zimmerman | Injury | Montgomery County Circuit | Trial |
| 9/26/2005 | Feldman | Injury | Baltimore City Circuit | Deposition |
| 9/26/2005 | Kisamore | Injury | Montgomery County Circuit | Deposition |
| 9/30/2005 | Sisis | Injury | Anne Arundal Circuit Court | Trial |
| 10/4/2005 | Hurley | Injury | Prince Georges County Circuit | Deposition |
| 10/11/2005 | Riley | Injury | Prince Georges County Circuit | Deposition |
| 10/18/2005 | Mabini | Death | Fairfax County Circuit Court | Trial |
| 10/26/2005 | Diacount | Injury | Prince Georges County Circuit | Deposition |
| 11/1/2005 | Madden | Death | Baltimore City Circuit | Deposition |
| 11/4/2005 | Grimstead | Death | Baltimore City Circuit | Trial |
| 11/8/2005 | Clay | Death | DC Superior Court | Trial |
| 11/9/2005 | Ballerini | Injury | Montgomery County Circuit | Trial |
| 11/9/2005 | Maybin | Injury | DC Superior Court | Trial |
| 11/11/2005 | Shemenski | Injury | Jefferson County | Trial |
| 11/11/2005 | Hall | Injury | Baltimore City Circuit | Trial |
| 11/16/2005 | Spiro | Death | Baltimore County Circuit | Deposition |
| 11/21/2005 | Goodarzi | Death | Montgomery County | Deposition |
| 12/5/2005 | Hood | Injury | Baltimore City | Deposition |

Fedrule

| DATE | CASE | TYPE | JURISDICTION | EVENT |
|---|---|---|---|---|
| 12/6/2005 | Computer Application Sevices | Lost Profits | Montgomery County | Deposition |
| 12/9/2005 | Bystry | Injury | Baltimore City | Trial |
| 12/13/2005 | Ziegler | Injury | DC Superior Court | Trial |
| 12/20/2005 | Wilson | Injury | Montgomery County | Deposition |
| 1/12/2006 | Touzelin | Injury | Baltimore City | Deposition |
| 1/18/2006 | Levy | Injury | Baltimore Federal | Deposition |
| 1/30/2006 | Offutt | Injury | Prince Georges County Circuit | Deposition |
| 2/1/2006 | Fleming | Death | DC Superior Court | Trial |
| 2/2/2006 | Coleman | Injury | DC Superior Court | Deposition |
| 2/7/2006 | Murdock | Injury | Baltimore City | Deposition |
| 2/8/2006 | NIE | Lost Profits | Prince Georges County Circuit | Trial |
| 2/14/2006 | Levy Trial | Injury | Baltimore Federal Court | Trial |
| 2/22/2006 | McCauley | Injury | Prince Georges County Circuit | Trial |
| 3/30/2006 | Wright | Death | Frederick County Circuit Court | Trial |
| 3/31/2006 | Miller | Termination | Wilmington Delaware Federal | Trial |
| 4/6/2006 | Coleman | Injury | DC Superior Court | Trial |
| 4/21/2006 | Smoot | Injury | DC Superior Court | Deposition |
| 5/9/2006 | Tarquini | Injury | Fairfax County Circuit Court | Trial |
| 5/19/2006 | Foraker/Price/Warren | Termination | Wilmington Delaware Federal | Trial |
| 5/23/2006 | Fleming | Death | DC Superior Court | Trial |
| 5/25/2006 | Wenz | Death | Baltimore City Circuit | Trial |
| 5/30/2006 | Cofield | Injury | Montgomery County Circuit | Trial |
| 6/8/2006 | Conley | Emp. Discrimination | Wilmington Delaware Federal | Trial |
| 6/14/2006 | Kerr | Injury | DC Superior Court | Trial |
| 6/24/2006 | Canales-Higgins | Injury | DC Superior Court | Trial |
| 6/28/2006 | WIlson | Injury | Greenbelt Federal Court | Trial |
| 6/28/2006 | Herlinger | Death | Howard County  Circuit Court | Trial |
| 7/24/2006 | Loney | Injury | Prince Georges County Circuit | Deposition |
| 7/31/2006 | Loney | Injury | Prince Georges County Circuit | Trial |
| 8/18/2006 | McDonough | Death | Montgomery County Circuit | Depositon |
| 8/31/2006 | Mendez | Death | Berkley County Circuit | Trial |
| 9/6/2006 | Tsaknis | Death | Federal Court DC | Deposition |
| 9/26/2006 | Smith | Injury | Montgomery County Circuit | Deposition |
| 10/9/2006 | Goodwin | Injury | Montgomery County Circuit | Deposition |
| 10/12/2006 | Lucabaugh | Injury | Baltimore City | Trial |
| 10/19/2006 | Garcia-Sanchez | Injury | Prince Georges County Circuit | Deposition |
| 11/9/2006 | Wright | Death | Warrenton Virginia Circuit | Trial |
| 11/29/2006 | Hartman | Death | DC Superior Court | Trial |
| 12/11/2006 | Sealock | Injury | Federal District Court DC | Deposition |
| 12/12/2006 | Carlson | Death | Federal District Court, Richmond | Trial |
| 12/13/2006 | Long | Employment | Federal District Court, DC | Trial |
| 12/18/2006 | Smallenberg | Death | Newport News Circuit | Deposition |
| 12/21/2006 | Carver | Injury | | Deposition |
| 1/9/2007 | Williams | Injury | DC Superior Court | Trial |
| 1/9/2007 | Blue | Injury | DC Superior Court | Deposition |
| 1/11/2007 | Minter | Death | DC Superior Court | Trial |
| 1/12/2007 | Euzagable | Injury | Baltimore County Circuit | Deposition |
| 1/23/2007 | Baxter Jenkins | Injury | Washington County Circuit | Trial |
| 1/24/2007 | Layton | Injury | Anne Arundal Circuit Court | Trial |
| 1/24/2007 | Roth | Injury | Federal District Court, Greenbelt | Deposition |
| 2/7/2007 | Daniels | Injury | Prince Georges County Circuit | Deposition |
| 2/19/2007 | Daniels | Injury | Prince Georges County Circuit | Trial |
| 2/22/2007 | Toledo | Injury | DC Superior Court | Deposition |
| 2/23/2007 | Casamento | Injury | Prince Georges County Circuit | Deposition |

Fedrule

| DATE | CASE | TYPE | JURISDICTION | EVENT |
|------|------|------|--------------|-------|
| 2/26/2007 | Saunders | Injury | Arlington County Circuit | Deposition |
| 3/7/2007 | Toledo | Injury | DC Superior Court | Trial |
| 3/19/2007 | Williams | Death | Fairfax County | Trial |
| 3/26/2007 | Simms | Injury | Baltimore City | Deposition |
| 3/27/2007 | Hedricks | Injury | DC Federal Court | Trial |
| 4/5/2007 | Blosis | Wrongful Termination | Wilmington Delaware Federal | Deposition |
| 4/17/2007 | Zambrana | Injury | Prince Georges County Circuit | Trial |
| 5/2/2007 | Flores | Injury | Fairfax County Circuit | Trial |
| 5/9/2007 | Raymond | Injury | Fairfax County Circuit | Trial |
| 5/10/2007 | Holcomb | Termination | Baltimore County Circuit | Deposition |
| 5/15/2007 | Weadon | Injury | DC Superior Court | Deposition |
| 5/16/2007 | Beuchamp | Injury | Charles County | Deposition |
| 5/22/2007 | Howes | Injury | Baltimore City | Deposition |
| 5/31/2007 | Jaindl | Injury | Montgomery County Circuit | Trial |
| 6/5/2007 | Holcomb | Termination | Baltimore County Circuit | Hearing |
| 6/12/2007 | Gaters | Injury | Baltimore City | Deposition |
| 6/13/2007 | Wilburn | Injury | Anne Arundal County | Deposition |
| 6/20/2007 | Torres | Injury | Florida/Jamaica | Deposition |
| 6/22/2007 | Williams | Injury | Baltimore City | Deposition |
| 7/12/2007 | Croom | Injury | Prince William County Circuit | Deposition |
| 7/17/2007 | Balmford | Injury | Allegany County | Deposition |
| 7/27/2007 | Wise, Watts, Muse | Injury | Baltimore City | Deposition |
| 7/27/2007 | Warwick | Injury | Charles County Circuit | Trial |
| 8/7/2007 | Meechum | Discrimination | Martinsburg WV Circuit | Deposition |
| 8/17/2007 | Biles | Injury | Baltimore City | Deposition |
| 9/4/2007 | Brierley | Injury | Baltimore City | Deposition |
| 9/11/2007 | Gary | Injury | Baltimore City | Trial |
| 9/26/2007 | Gallimore | Injury | Baltimore City | Deposition |
| 10/1/2007 | Kolan | Injury | Fairfax Circuit Court | Trial |
| 10/2/2007 | Torres | Injury | Federal Court, Palm Beach Florida | Trial |
| 10/3/2007 | Singleton | Injury | Baltimore City | Deposition |
| 10/9/2007 | Kaufman | Injury | DC Surperior Court | Trial |
| 10/17/2007 | Balmford | Injury | Washington County Circuit | Trial |
| 10/18/2007 | Hottman | Injury | DC Superior Court | Deposition |
| 10/19/2007 | Cooney | Injury | Providence Rhode Island | Deposition |
| 10/23/2007 | Housain | Death | Fairfax County Circuit | Deposition |
| 10/25/2007 | Marx | Death | Frederick Circuit Court | Trial |
| 11/6/2007 | Housain | Death | Fairfax County Circuit | Trial |
| 11/7/2007 | Cosgrove | Injury | Baltimore County Circuit | Deposition |
| 11/14/2007 | White | Injury | Baltimore City | Deposition |
| 11/15/2007 | Wardell | Injury | DC Superior Court | Deposition |
| 11/15/2007 | Harris | Injury | Montgomery County Circuit | Deposition |
| 11/16/2007 | Hottman | Injury | DC Superior Court | Deposition |
| 11/28/2007 | Evans | Injury | DC Superior Court | Trial |
| 12/11/2007 | Davey | Injury | Baltimore County Circuit | Deposition |
| 12/21/2007 | White | Injury | Fairfax County Circuit | Deposition |
| 1/3/2008 | Atkinson | Injury | Montgomery County Circuit | Deposition |
| 1/11/2008 | Mathews | Injury | Baltimore County Circuit | Deposition |
| 1/14/2008 | Morris | Injury | Fairfax County Circuit | Deposition |

**THOMAS C. BORZILLERI, Ph.D.**
Economic Consultant
Three Democracy Center
6701 Democracy Boulevard
Suite 300
Bethesda, Maryland 20817

Telephone: (202) 862-3630
Fax: (202) 862-3634
E-Mail tcb1011@verizon.net
August 28, 2008

To: Whom It May Concern

From: Thomas C. Borzilleri

Re: Cotton Matter

1) My reports of August 28, 2008 contain a complete statement of all opinions I hold at the present time.

2) I have no publications

3) I have no plans to use exhibits to support my opinions.

4) My charge for the preparation of the earning loss report was $1,850. My charge for the valuation of the future medical expenses was $1,312.50 based on $375 per hour. My hourly rate for all additional work involved in this matter will be $375 per hour.

5) My charge for a trial appearance or deposition is $750, with time beyond 2.00 hours, portal to portal from Bethesda, Maryland, billed at the rate of $375 per hour.

6) My Federal Tax ID is 52-1723564.

# EXHIBIT B

# COASTAL VOCATIONAL SERVICES, INC.

*"Your Experts In Vocational Rehabilitation"*

| | | |
|---|---|---|
| 355 Crawford Street | P.O. Box 7308 | North Carolina Address: |
| Suite 510 | Portsmouth, Virginia 23707 | 1851 W. Ehringhaus Street #253 |
| Portsmouth, VA 23704 | (757) 393-2100 | Elizabeth City, NC 27909 |
| Facsimile (757) 397-5556 | | 1-800-671-9197 |

# *SENT VIA FACSIMILE AND MAIL*

August 25, 2008

Ron Simon, Esquire
Simon & Associates
1707 N Street, NW
Washington, DC 20036

RE:   Your Client:   Nancy Cotton
　　　CVS No.:   PLS 4328-D

Dear Mr. Simon:

I met with Nancy Cotton for a vocational evaluation on June 20, 2006 and have
met with her several times since then. The purpose of the vocational evaluation
is to determine future vocational options and wage earning capacity. Wage
earning capacity is defined as a person's ability to earn money.

In preparing this report, I utilized the United States Department of Labor
publications, the *Dictionary of Occupational Titles*, and the *Occupational Outlook*
Handbook. I used the OASYS computer program, the *NonProfit Times* 2007
salary survey, the Virginia Employment Commission, reviewed medical records,
school transcripts, and have spoken with Ms. Cotton's daughter, Alicia Mordach;
her husband, Gary Cotton; her doctor, Joseph Liberman, a neurologist; her family
physician, Dr. Peter Basch, and Miriam Beadle-Lindsay, a psychologist. I have
reviewed social security and employment records. I also met with Dr. Harris-
O'Brien, Ms. Cotton's advisor and mentor at Trinity College.

## MEDICAL UPDATE

Ms. Cotton suffered from an electrical shock while at work on July 26, 2005. As
a result, she has been diagnosed with post traumatic stress disorder. According
to the University of Chicago's Electrical Trauma Program, survivors of electrical
injury may be faced with long term muscular pain and discomfort, fatigue,
programs with peripheral nerve conduction and sensation, inadequate balance
and coordination, and can lead to problems with neurocognitive function. This

**RON SIMON, ESQUIRE**
**AUGUST 25, 2008**

**RE: NANCY COTTON**
**PAGE 2**

effects speed of mental processing, attention, concentration, and memory and
can result in post-traumatic psychiatric disorders.

I met with Dr. Liberman on May 1, 2007, and he said that Ms. Cotton is not to
work due to her PTSD and brain injury. I met with him again on April 16, 2008,
and he referred Ms. Cotton for a complete re-testing neuropsychological
evaluation, and said that she is still not able to work.

I met with Dr. Beadle-Lindsay, who is treating Ms. Cotton for the psychological
effects of her injury on May 1, 2007. Dr. Beadle-Lindsay said that Ms. Cotton is
unable to work due to the injuries she suffered in the electrical shock incident. I
met with her again on April 16, 2008, and she reiterated that Ms. Cotton is not
able to work, and is treating her every two weeks. Dr. Beadle-Lindsay's
diagnostic impressions are cognitive disorder, major depressive disorder, and
chronic adjustment disorder with anxiety as a result of the electrocution. She
stated in a letter dated September 29, 2006, that "Ms. Cotton cannot return to her
job full time and retiring on disability may be a good option for her because of her
cognitive deficits and continued psychiatric problems.

Dr. Raphael Minsky, a rehabilitation psychologist, evaluated Ms. Cotton on June
2, 2008. In his report dated August 20, 2008, Dr. Minsky concluded that Ms.
Cotton "has experienced significant cognitive decline following the electrocution
injury." He said that the "combination of cognitive, neuropsychological, and
emotional impairments significantly impact on Ms. Cotton to the extent that her
injuries are permanent and that she will never be competitively employable."

Ms. Cotton was evaluated by Dr. Gregory O'Shanick, a neuropsychiatrist, on
September 4, 2007. Dr. O'Shanick indicated on October 11, 2007, that Ms.
Cotton suffered an electrical brain injury and the cognitive impairments are
permanent. He said his prognosis is guarded given the persistent symptoms.

I met with Dr. Peter Basch, Ms. Cotton's primary care physician on August 3,
2007. Dr. Basch said that he agreed with Dr. Liberman and Dr. Beadle-Linsay
that she had suffered a brain injury in the electrocution injury on July 26, 2005.
Dr. Basch said that he had noticed a significant different in Ms. Cotton, citing
anxiousness, disorganization, and problems with normal daily activities.

Ms. Cotton reports that despite a left heel surgery in December 1996 and Type II
diabetes, she was in good health. She returned to work after the surgery and did
not have any restrictions. Since the injury, Ms. Cotton experiences severe
headaches, feels "different," has difficulty learning new things, concentrating,
expressing herself, getting organized and paying attention. She said that she is
more emotional than usual, feels "out of control", loses her temper more easily,
and has buzzing in her ears. She is more forgetful, becomes fatigued easily,

**RON SIMON, ESQUIRE**                                        **RE: NANCY COTTON**
**AUGUST 25, 2008**                                                         **PAGE 3**

thinks and responds more slowly, has problems sleeping, repeats herself, and
has balance problems.

Ms. Cotton said that she has loss off feeling in her left upper extremity, difficulty
reaching and gripping with her left hand.

## FAMILY AND SOCIAL BACKGROUND

Ms. Cotttton was born in Shreveport, Louisiana and has lived at her current
location in Washington, DC since 1997. She is married and has a daughter in
her early thirties. Prior to her injury, Ms. Cotton enjoyed playing the piano,
shopping, working, taking care of her home and family, and going to school. She
has had to decrease all of her activities due to her ongoing symptoms.

## EDUCATIONAL BACKGROUND

Ms. Cotton graduated from Fair Park High School in Shreveport, Louisiana in
1968. She then attended Louisiana State University studying history education
from 1968 to 1971. She took a secretarial course at Ayer's Business College in
Shreveport from 1971 to 1972. From 1972 to 1973, she took a course in
sociology at Anne Arundel Community College in Arnold, Maryland. From 1989
to 1990, Ms. Cotton attended Louisiana State University again taking business
and education coursework.

Ms. Cotton earned a bachelor of arts in human relations, graduating with honors
in May 2001, from Trinity College in Washington, DC. She went on to earn a
masters degree in business administration in May 2004 from Trinity College. I
met with Ms. Cotton's advisor at Trinity College on August 2, 2007, Dr. Deborah
Harris-O'Brien, who said that Ms. Cotton was one of her very best students, and
ranked in the top 10% of students she has taught in 17 years in terms of
competency, skill and potential. Dr. Harris-O'Brien said that Ms. Cotton's
vocational options in her chosen field of study were unlimited.

## VOCATIONAL BACKGROUND

Ms. Cotton was working as a reference technician at the National Archives in
Washington, D.C. at the time of her injury. She processed customer requests for
military records from the Revolutionary War until the beginning of the 20th
Century. She began this job in December 1997, and attempted to return to work
after her injury, but was unable to handle the duties, even on a part time basis,
due to her myriad symptoms from the electrical shock.

Prior to working at the National Archives, Ms. Cotton worked as an administrative
assistant to the executive director at the Anne Arundel County Association for
Retarded Citizens. From 1983 to 1984, she worked for K & B Drugs in

**RON SIMON, ESQUIRE**                                          **RE: NANCY COTTON**
**AUGUST 25, 2008**                                                         **PAGE 4**

Shreveport, Louisiana as a cashier. From 1979 to 1983, she worked as an order
taker at the NL Baroid Petroleum Services in Bossier City, Louisiana. From 1972
to 1973, Ms. Cotton worked for the Illinois Institute for Technological Research in
Annapolis, Maryland as a secretary.

### PRE-INJURY

Prior to her injury, Ms. Cotton had recently completed her master's degree in
business administration and planned to seek out employment in that field.
According to her instructor and mentor at Trinity College, Dr. Harris-O'Brien, her
vocational options were unlimited.

Ms. Cotton's vocational options with her master's degree included positions such
as fundraising director, community organization director, sheltered workshop
manager, non-profit manager, program director, or development director.
A review of the 2007 salary survey done by the *NonProfit Times* notes that
average salaries in the mid-Atlantic region range from $76,312 to $130,448 per
year for Ms. Cotton's pre-injury vocational options.

Based on the research I have done into the salaries for graduates of such
programs and my evaluation, it is my opinion that Ms. Cotton had a pre-injury
wage earning capacity of $100,000 per year.

She earned high praise from her supervisors at the National Archives, being
called thorough, outstanding, and timely.

I spoke with Mr. Gary Cotton, Ms. Cotton's husband of over thirty years, and he
said that his wife was competent in all areas of life prior to this injury. He said
that she handled family, home, work, and school all with ease and efficiency.
Her daughter, Alicia Mordach, said that her mother was very active pre-injury,
and was planning to put her master's degree to work in an executive position
prior to her injuries.

### POST-INJURY

Since her injury, Ms. Cotton has suffered numerous physical and psychological
deficits which continue to be symptomatic today. All of her doctors have said that
she is no longer capable of handling competitive employment. Her husband said
that she continues to suffer but is able to handle her symptoms somewhat better
now that she is not trying to work beyond her post-injury capacity.

Mr. Cotton said that she continues to have memory problems, crying spells,
social withdrawal, difficulty retaining anything she reads, and increased temper.

**RON SIMON, ESQUIRE**
**AUGUST 25, 2008**

**RE: NANCY COTTON**
**PAGE 5**

Ms. Cotton's daughter, Alicia Mordach, said that her mother now seems like a
different person, an "old lady," and has memory problems that are obvious.

Based on my evaluation, it is my opinion that Ms. Cotton's present wage earning
capacity is zero (0).

I base my opinion on the following factors:

- Ms. Cotton cannot perform her regular occupation as a reference
  technician as she did prior to her accident.

- Ms. Cotton has lost vocational access to other types jobs in the labor
  market that could utilize her education.

- Ms. Cotton can no longer compete in the labor market as she could prior
  to the injury.

- Ms. Cotton has suffered a diminution of her capacity to labor.

The following chart represents the loss of wage earning capacity from age 55 at
the time of the accident, until retirement at age 67, in 2008 dollars, without
consideration for merit increases, promotion, inflation, or fringe benefits:

|  | Wage Earning Capacity | Worklife To age 67 | Worklife In Dollars |
|---|---|---|---|
| Pre-Injury | $100,000 | 12 | $1,200,000 |
| Post-Injury | $0 | 12 | $0 |
| NET LOSS | $100,000 | 12 | $1,200,000 |

It is my opinion that Ms. Cotton's vocational difficulties stem directly from the
accident of July 26, 2005 and will continue for the remainder of her life.

I reserve the right to amend this report upon receipt of additional medical or
vocational information.

**RON SIMON, ESQUIRE**
**AUGUST 25, 2008**

**RE: NANCY COTTON**
**PAGE 6**

If you have any questions regarding this information do not hesitate to contact me.

Sincerely,

Charles DeMark, MS, CRC, CCM
Certified Rehabilitation Counselor
Certified Case Manager

**CURRICULUM VITAE**

*Francis Charles DeMark, Jr.*
*Coastal Vocational Services, Inc.*
*E-mail; cdemark371@aol.com*

*355 Crawford Street, Suite 510*
*Portsmouth, Virginia 23707*
*(757) 393-2100*

## EDUCATION

1971 - 1973   Master of Science Degree, Rehabilitation Counseling
Virginia Commonwealth University, Richmond, Virginia

1964 - 1968   Bachelor of Arts Degree, Political Science
Lynchburg College, Lynchburg, Virginia

## PROFESSIONAL CERTIFICATIONS AND AFFILIATIONS

### Certified Rehabilitation Counselor
National Commission on Rehabilitation Counselor Certification
Chicago, Illinois
Certified Counselor since 1982, #14693

### Certified Rehabilitation Counselor
United States Department of Labor, Office of Workers' Compensation Division of Vocational Rehabilitation, Norfolk, Virginia
OWCP Rehabilitation Counselor since 1983, #25-18

### Diplomate, American Board of Vocational Experts
Aptos, California
Member is good standing since 1992, #181681

### Certified Case Manager
Certification of Insurance Rehabilitation Specialists Commission
Rolling Meadows, IL
Member in good standing since 1993, #15019

### Certified Rehabilitation Provider
Commonwealth of Virginia
Department of Health Professionals
Certified since 1995
License #0715-000479

### Licensed Professional Counselor
North Carolina Board of Licensed Professional Counselors
Licensed since 1995
License #2050

## OTHER PROFESSIONAL ACTIVITIES

08/97 – 06/03   In August of 1997, I was certified by the Circuit Court of Norfolk, Virginia as *Guardian* of a person who suffers from the effects of a traumatic brain injury. I remained Guardian until June, 2003. (Chancery No. C97-1208)

06/99 - 09/00   In June of 1999, I was certified by the Circuit Court of Virginia Beach, Virginia as *Conservator* for a married couple, both of whom are diagnosed with psychiatric/mental health difficulties. I remained Conservator until September, 2000. (Chancery Nos. 99-1705 and 99-1706)

## WORK EXPERIENCE

1996 - Present   Certified Rehabilitation Counselor, President and Vocational Consultant
Coastal Vocational Services, Inc., Portsmouth, Virginia

My duties as Rehabilitation Counselor involve the planning, development and supervision of rehabilitation plans and programs to assist physically injured individuals to return to productive employment. In this capacity, I work with the client's physician to identify appropriate vocational options for possible career alternatives and employment. I administer and interpret vocational relevant tests to determine interests, skills and abilities; consult with employers and industry officials to analyze jobs and suggest modifications which will help them retain valued employees; confer with doctors and medical professionals to review feasibility of rehabilitation plans; counsel with clients about job placement skills and arrange training when indicated. After job placement, I follow-up to confirm return to work.

Medical problems I work with include orthopaedic, carpal tunnel syndrome, neurological deficits, brain injury, amputation, spinal cord, upper and lower extremity injuries, vision problems, psychiatric/psychological difficulties, asbestosis, respiratory difficulties, and other disease processes.

My duties as Rehabilitation Consultant and Vocational Expert involve conducting labor market surveys to determine the availability of specific occupations and the skills needed to secure those occupations; expert testimony at various proceedings regarding an individual's vocational options and the vocational impact of his injuries; and direction of professional staff under my supervision. I have been qualified as a Vocational Expert in state courts in Virginia, federal courts in Virginia, North Carolina and the District of Columbia and cases involving Social Security, workers' compensation and divorce.

1989 - 1996    Certified Rehabilitation Counselor, President and Vocational Consultant
Atlantic Rehabilitation Services, Inc., Norfolk, Virginia

My duties at Atlantic Rehabilitation Services, Inc., were the same as described in my position at Coastal Vocational Services, Inc.

1986 - 1989    Director of Rehabilitation, Comprehensive Medical Rehabilitation Center, Chesapeake, Virginia

My duties as Director of Rehabilitation involved the planning, development and supervision of rehabilitation plans and programs to assist physically injured individuals to return to productive employment.

1985 - 1986    Rehabilitation Coordinator, OccuSystems, Inc., Chesapeake/Hampton, Virginia

As Rehabilitation Coordinator, I was responsible for planning and developing individual rehabilitation programs to help physically injured persons return to work. This involved job placement, rehabilitation/medical planning and labor market contacts. I performed appropriate vocational tests for evaluations and testified as a vocational expert.

1980 - 1985    Vocational Consultant, Crawford Rehabilitation Services, Norfolk, Virginia

My duties as Vocational Consultant were the same as described in my position with OccuSystems.

## OTHER WORK

1976 - 1986    Instructor (Part-time), Tidewater Community College, Portsmouth, Virginia

As College Instructor, I taught classes in substance abuse and coordinated the first-offender drug education program for the Portsmouth General District Court Services Unit.

1974 - 1980    Program Director, Portsmouth Drug Free Center, Portsmouth, Virginia

As Director, I developed, planned and supervised the development of rehabilitation and program services for residential and out-patient clients; evaluated clients for rehabilitation criteria; and supervised the professional staff. I also provided direct liaison between the program and other community resources and referral agencies. I was also responsible for all administrative duties. I testified as rehabilitation expert in various city and state courts regarding rehabilitation opinions for substance abusers.

1973 - 1974    Executive Director, NARCO of Tidewater, Inc., Portsmouth, Virginia

As Executive Director, the majority of my time was spent developing and planning a residential and out-patient drug rehabilitation program for the City of Portsmouth. As a result of this work, the Drug Free Center was established and I was made Director.

1970 - 1972    Disability Determination Specialist, Virginia Department of Vocational Rehabilitation, Richmond, Virginia

As Disability Determination Specialist, my job involved the review and evaluation of medical, social and vocational information to determine eligibility for Social Security Disability claims.

1968 - 1970    Claims Adjuster, Liberty Mutual Insurance Company, Roanoke, Virginia

As a Claims Adjuster, I investigated various types of claims files for losses.

*REFERENCES AND TRIAL TESTIMONY LIST FURNISHED UPON REQUEST*

# COASTAL VOCATIONAL SERVICES, INC.

*"Your Experts In Vocational Rehabilitation"*

| 355 Crawford Street | P.O. Box 7308 | North Carolina Address: |
|---|---|---|
| Suite 510 | Portsmouth, Virginia 23707 | 1851 W. Ehringhaus Street #253 |
| Portsmouth, VA 23704 | (757) 393-2100 | Elizabeth City, NC 27909 |
| Facsimile (757) 397-5556 | | 1-800-671-9197 |

## VOCATIONAL EXPERT FEE SCHEDULE

PROFESSIONAL SERVICES .......................................................................... $140.00 per hour

Injured worker counseling, injured worker evaluation, employer consultation, attorney consultation, trial preparation, research, reports, job descriptions and vocational analysis.

NON-PROFESSIONAL SERVICES .................................................................... $90.00 per hour

Travel time and clerical services.

MILEAGE FEE ............................................................................................. $.48 per mile

COURT APPEARANCE AS EXPERT WITNESS .................................................... $600.00

DEPOSITION .............................................................................................. $600.00
(Each additional hour over four (4) will be billed at the professional rate, plus expenses.)

COMPUTER GENERATED TRANSFERABLE SKILLS ANALYSIS ............................. $250.00

VOCATIONAL TESTING, ASSESSMENT AND REPORT ....................................... $140.00 per hour

PHOTOCOPIES .......................................................................................... $10.00 Search Fee,
plus $0.50 per page for the first 50 pages, and $0.25 for each page thereafter.

LATE NOTIFICATION OF TRIAL OR DEPOSITION CANCELLATION ...................... $300.00

This fee will be charged if the expert is not notified of trial or deposition cancellation two (2) working days prior to scheduled trial date. Cancellation on the date of trial or deposition will result in a full charge.

**EXPENSES**

Actual expenses reasonably and necessarily incurred such as travel, subsistence and lodging; long distance telephone charges; professional support requirements; etc. are additional to any fees and will be billed at cost.

**TERMS**

1. Because Coastal Vocational Services provides expert services, our charges cannot be contingent upon the outcome of the case or the testimony performance of the expert at trial. All fees and expenses are the obligation of the attorney, regardless of the financial condition of the client or the prospects of reimbursement by the client. Once deposit is depleted, additional charges will be invoiced. Any unused deposits will be returned.

2. New accounts shall be initiated with deposit in advance of $1,500.00. Charges will be billed against deposit on a 60-day basis until conclusion of case or until funds are depleted.

3. Accounts are billed bi-monthly and payable thirty days from date of invoice. After thirty days, the unpaid balance will be subject to a late payment charge on the unpaid balance of 2.0% per month. Time incurred as the result of overdue accounts in collections will be billed at the non-professional rate. Delinquent payment over 90 days will be submitted for collection to Dun and Bradstreet.

# ADDENDUM TO THE RESUME
# OF
# F. CHARLES DEMARK

"A Listing of any other cases in which the witness has testified as an expert at trial or by deposition within the last seven years."

## 2000

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 02/10/00 | T | M. Halliwell | P | J. Suit | JA |
| 02/21/00 | D | L. Dennis | P | R. Walsh<br>Deposed By: J. Mesnard | LS |
| 03/02/00 | T | E. Gallup | P | S. Smith | PI |
| 03/20/00 | D | A. Coggins | D | B. Schempf<br>Deposed By: C. Eveleigh | PI |
| 04/03/00 | T | D. Riggins | P | A. Riggins | SS |
| 04/11/00 | D | M. Shepherd | P | B. Smircina<br>Deposed By: J. Norris | PI |
| 04/25/00 | T | M. Davis | P | G. Camden | LS |
| 04/28/00 | D | J. Marshall | P | R. Tavss<br>Deposed By: B. Stillman | PI |
| 05/10/00 | D | C. Hawkins | P | G. Camden<br>Deposed By: C. Hedrick | LS |
| 05/16/00 | T | W. Gorman | P | J. Klein | LS |
| 05/25/00 | T | B. Sutton | P | G. Camden | LS |
| 06/05/00 | D | E. Noel | P | S. Smith<br>Deposed By: S. Webster | PI |
| 06/15/00 | T | J. Maydosz | D | D. Truitt | DIV |
| 06/29/00 | D | E. Brogden | P | P. Kelly<br>Deposed By: S. McCallum | PI |
| 07/19/00 | T | M. Shepherd | P | B. Smircina | PI |
| 07/20/03 | T | E. Brogden | P | M. Heikes | PI |
| 08/30/00 | T | J. Speight | P | A. Sebok | PI |
| 09/05/00 | T | F. McDermott | D | B. Taylor | DIV |

**2000**

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 09/22/00 | A | J. Russell | P | J. Zydron | PI |
| 09/27/00 | T | D. French | P | S. Smith | PI |
| 09/29/00 | D | L. Lathrop | P | J. Drescher<br>Deposed By: D. Filetti | PI |
| 10/10/00 | T | A. Cole | P | J. Flora | PI |
| 10/26/00 | T | D. Clark | P | S. Smith | PI |
| 11/15/00 | T | W. Parks | P | J. Tatum | LS |
| 11/29/00 | T | L. Lathrop | P | J. Drescher | PI |
| 11/30/00 | T | S. Frye | D | W. Sprinkle | DIV |
| 12/18/00 | T | T. Askew | P | R. Walsh | LS |

## 2001

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 01/18/01 | T | S. Archer | P | J. Zydron | PI |
| 02/05/01 | D | H. Lewis | P | R. Shapiro<br>Deposed By: R. Adams | RR |
| 02/13/01 | T | C. Creighton | P | S. Smith | PI |
| 02/27/01 | T | F. Bietler | D | J. Rosen | PI |
| 03/02/01 | T | J. Daniels | P | G. Camden | LS |
| 03/14/01 | T | W. McCready | P | D. Horne | SS |
| 03/27/01 | D | T. Brooks | P | F. Hajek<br>Deposed By: K. Mottley | RR |
| 05/07/01 | T | J. Sotack | P | D. Miller | DIV |
| 05/16/01 | T | S. Pope | D | D. Berrett | DIV |
| 05/23/01 | T | H. Perry | P | C. Wilson | LS |
| 05/29/01 | T | L. Myers | P | T. Shuttleworth | JA |
| 06/20/01 | T | A. Janow | P | S. Smith | PI |
| 07/18/01 | T | M. Fariss | D | W. Sprinkle | DIV |
| 08/09/01 | T | D. Goode | P | A. Riggins | SS |
| 08/29/01 | T | R. Orndorff | P | S. Swain | PI |
| 09/19/01 | D | J. Blau | P | S. Smith<br>Deposed By: T. Cabell | PI |
| 09/25/01 | T | R. Puddester | P | H. Howell | PI |
| 10/09/01 | T | J. Biggs | P | R. Donaldson | LS |
| 10/10/01 | T | N. Boxx | D | F. Moschel | DIV |
| 10/17/01 | T | F. Nerdahl | P | T. Kelly | PI |

## 2002

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 01/09/02 | D | C. Cox | P | S. Smith<br>Deposed By:  S. Darling | PI |
| 01/31/02 | T | C. Danchak | P | M. Heikes | SS |
| 02/06/02 | D | E. Futrell | P | K. Moore<br>Deposed By:  K. Mottley | RR |
| 04/12/02 | T | P. Conant | P | G. Albiston | PI |
| 04/24/02 | T | G. McKinney | P | R. Donaldson | LS |
| 04/25/02 | T | S. Lotemple | P | R. Mills | PI |
| 05/07/02 | T | J. Shelton | P | J. Klein | SS |
| 05/10/02 | D | B. Duncan | P | M. Imprevento<br>Deposed By:  J. Radd | PI |
| 05/21/02 | D | P. Bear | P | S. Smith<br>Deposed By:  M. Pace | PI |
| 06/13/02 | T | J. Carballo | P | R. Aufenger | PI |
| 06/19/02 | T | P. Gunn | P | J. Klein | SS |
| 07/17/02 | D | K. Hammaker | P | B. Zeigler<br>Deposed By:  K. Vaquera | PI |
| 07/18/02 | T | P. Bear | P | S. Smith | PI |
| 08/12/02 | D | D. Llewellyn | P | G. Albiston<br>Deposed By:  D. Turrietta | PI |
| 08/26/02 | D | J. Anderson | P | C. Montagna<br>Deposed By:  N. Billisoly | LS |
| 09/04/02 | T | J. Imhoff | P | R. Whittemore | PI |
| 11/05/02 | D | P. White | P | D. Horne<br>Deposed By:  P. Bishop | PI |

**2002**

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 12/31/02 | T | L. Jackson | P | W. Sprinkle | DIV |

**2003**

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|---|---|---|---|---|---|
| 01/02/03 | T | D. Collins | P | W. Sprinkle | DIV |
| 01/09/03 | D | W. Schieber | P | L. Richardson | PI |
| 01/31/03 | D | J. Hardee | P | J. Millman | PI |
| 02/28/03 | M | W. Schieber | P | S. Smith | PI |
| 03/13/03 | T | A. Jaques | P | S. Smith | PI |
| 03/17/03 | T | A. Jaques | P | S. Smith | PI |
| 03/18/03 | T | G. Gorbea | P | R. Donaldson | SSA |
| 03/18/03 | T | S. Crisp | P | R. Donaldson | SSA |
| 03/31/03 | D | J. Kenley | P | C. Bennett<br>Deposed By: M. Dix | PI |
| 04/10/03 | T | C. Boone | P | G. West | LS |
| 04/22/03 | D | S. Kline | P | R. Boyd<br>Deposed By: M. Swicegood | PI |
| 05/06/03 | T | J. Brumskin | P | G. Camden | LS |
| 05/20/03 | T | H. Jackson | P | G. West | LS |
| 06/04/03 | D | J. Kenley | P | C. Bennett<br>Deposed By: M. Dix | PI |
| 06/05/03 | T | D. Adams | D | H. Dail | SS |
| 06/16/03 | T | J. Kenley | P | C. Bennett | PI |
| 06/17/03 | T | R. Snowden | D | J. Rosenblatt | DIV |
| 07/18/03 | D | A. Redford | P | S. Smith<br>Deposed By: T. Graves | PI |
| 07/23/03 | D | L. Vallecillo | P | S. Smith<br>Deposed By: V. Devine | PI |

## 2003

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 07/24/03 | T | Sims | P | B. Koch | DIV |
| 08/18/03 | T | J. Whitmore | P | M. Kraft | LS |
| 08/18/03 | T | J. Barth | P | M. Kraft | LS |
| 08/27/03 | T | K. Clayton | P | J. Cooper | PI |
| 09/09/03 | T | K. Brown | P | B. Breit | |
| 10/02/03 | T | C. Harris | P | G. Camden | SSA |
| 10/03/03 | T | J. Brumskin | P | G. Camden | WC |
| 10/06/03 | D | D. Dameron | P | S. Smith Deposed By: R. Baker | PI |
| 10/14/03 | T | R. Snowden | D | J. Rosenblatt | DIV |
| 10/20/03 | T | W. Joyner | P | G. Camden | LS |
| 10/28/03 | D | J. Whitmore | P | M. Kraft Deposed By: J. Barrett | LS |
| 10/30/03 | D | J. Whitmore | P | M. Kraft Deposed By: M. Kraft | LS |
| 10/31/03 | D | J. Helwig | P | M. Imprevento Deposed By: E Spivey | PI |
| 11/13/03 | D | W. Joyner | P | G. Camden Deposed by: G. Camden | LS |
| 11/19/03 | D | B. Greene | P | J. Flax Deposed by: C. Zaleski | PI |
| 12/22/03 | D | A. Parker | P | S. Smith Deposed by: B. Trybus | PI |

## 2004

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 01/16/04 | D | S. Kline | P | R. Boyd | PI |
| 01/20/04 | T | J. Jones | P | B. Scott | LS |
| 01/21/04 | D | R. Everett | P | J. Fletcher<br>Deposed by: M. Melis | PI |
| 01/28/04 | D | R. Everett | P | J. Fletcher<br>Deposed by: M. Melis | PI |
| 02/10/04 | D | J. Dunn | P | C. Bennett<br>Deposed by:A. Gnapp | PI |
| 02/11/04 | D | B. Vandyke | P | M. Imprevento<br>Deposed by: S. Bucci | PI |
| 03/30/04 | T | R. Bolt | P | G. Camden | LS |
| 04/19/04 | T | B. Harris | P | S. Smith | PI |
| 04/26/04 | D | B. Lambert | P | S. Smith<br>Deposed by: J. Neale | PI |
| 05/03/04 | T | R. Thompson | P | C. Brown | LS |
| 05/12/04 | T | J. Weaver | P | M. Kraft | LS |
| 05/24/04 | T | A. Hughes | P | J. Suit | PI |
| 06/15/04 | T | D. Kirsch | P | W. Sprinkle | DIV |
| 06/29/04 | T | A. Christian | P | R. Donaldson | SSA |
| 07/08/04 | T | R. Bolt | P | G. Camden | LS |
| 07/09/04 | T | J. Myrick | P | R. Donaldson | LS |
| 07/12/04 | T | G. Gorbea | P | L. Stoneburner | PI |
| 08/05/04 | T | K. Paulin | P | R. Donaldson | SSA |
| 08/05/04 | T | L. Conklin | P | C. Bennett | PI |

## 2004

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 09/08/04 | D | D. Leary | P | A. Riggins<br>Deposed by: B. Cobb | PI |
| 10/07/04 | D | S. Mietus | P | S. Smith<br>Deposed by: D. Winegardner | PI |
| 10/13/04 | T | H. Richardson | P | C. Rutter | PI |
| 10/25/04 | D | P. Underwood | P | G. Camden<br>Deposed by: D. Rosen | LS |
| 11/17/04 | D | S. Ramos | P | O. Gilbert<br>Deposed by: J. Dodd | PI |
| 12/09/04 | T | S. Mietus | P | S. Smith | PI |

**2005**

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 01/18/05 | T | S. Pruitt | P | A. Cahill | DIV |
| 01/31/05 | T | G. Widlacki | P | W. Sprinkle | DIV |
| 02/28/05 | D | S. Jenkins | P | M. Kraftt<br>Deposed by: C. Hedrick | LS |
| 03/01/05 | D | M. Wilson | P | J. Suit<br>Deposed by: D. Bugg | PI |
| 03/16/05 | D | R. Sellet | P | S. Smith<br>Deposed by: C. Hanlon | PI |
| 03/23/05 | D | A. Poole | P | J. Zydron<br>Deposed by: K. Imbrogno | PI |
| 04/12/05 | T | N. Barnum | P | B. Basnight | DIV |
| 04/25/05 | T | D. Sears | P | K. Geroe | PI |
| 07/13/05 | T | V. Woods | P | F. Hajek | PI |
| 08/02/05 | D | J. Wood | P | C. Bennett<br>Deposed by: K. Newsome | PI |
| 09/14/05 | T | K. Pendt | P | S. Scott | DIV |
| 10/03/05 | D | T. Leonard | P | S. Smith<br>Deposed by: R. Sinnott | PI |
| 10/12/05 | D | A. Gueye | P | S. Smith<br>Deposed by: S. Vanterpool | PI |
| 10/19/05 | D | P. Thielen | P | R. Mills<br>Deposed by: M. Newcomb | PI |
| 10/24/05 | T | M. Williams | P | M. Kraft | PI |
| 11/01/05 | T | L. Davis | P | C. Burrell | SS |
| 11/01/05 | T | K. Stone | P | W. Sprinkle | DIV |

**2005**

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 11/04/05 | T | J. Wood | P | S. Smith | PI |
| 11/28/05 | T | B. McKee | P | C. Powers | DIV |
| 11/29/05 | D | I. Leonard | P | D. Schieble<br>Deposed by: B. Schneider | PI |

## 2006

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 02/21/06 | D | F. Fortmuller | P | S. Smith<br>Deposed by: J. Young | PI |
| 03/01/06 | D | S. McNair | P | S. Smith<br>Deposed by: A. Marcus | PI |
| 03/14/06 | T | M. Firth | P | L. D'Angelo | LS |
| 04/19/06 | D | E. Grissom | P | M. Davis<br>Deposed by: K. Imbrogno | PI |
| 05/30/06 | D | M. Brown | P | J. Drescher<br>Deposed by: W. Fox | PI |
| 06/01/06 | D | M. Porter | P | C. Bennett<br>Deposed by: R. Reed | PI |
| 06/12/06 | T | P. Thielen | P | R. Mills | PI |
| 06/14/06 | T | M. Porter | P | C. Bennett | PI |
| 06/23/06 | T | E. Grissom | P | M. Davis | PI |
| 07/18/06 | T | A. Gueye | P | S. Smith | PI |
| 07/25/06 | D | M. Heath | P | C. Rutter<br>Deposed by: T. Berkley | LS |
| 08/03/06 | T | C. McLawhorn | P | R. Walsh | LS |
| 08/16/06 | D | R. Rippy | P | C. Huffman<br>Deposed by: D. Whitewater | PI |
| 08/21/06 | D | J. Parker-Shuler | P | R. Walsh | PI |
| 08/22/06 | T | L. Hodges | P | L. Jackson | PI |
| 08/31/06 | D | A. Harris | P | S. Smith<br>Deposed by: L. Roberson | PI |
| 09/08/06 | D | L. Zoll | P | C. Bennett<br>Deposed by: B. Lown | PI |

## 2006

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|-------------------|------|
| 09/11/06 | T | G. Widlacki | P | W. Sprinkle | DIV |
| 09/18/06 | T | D. Dick | P | J. Dias | DIV |
| 10/26/06 | D | R. Conner | P | S. Smith<br>Deposed by: S. Egan | PI |
| 10/31/06 | D | S. Thurmond | P | S. Smith<br>Deposed by: W. McGraw | PI |
| 11/27/06 | D | E. Toledo | P | R. Simon<br>Deposed by: H. Farrell | MM |
| 11/28/06 | T | M. Heath | P | B. Rutter | PI |
| 12/04/06 | D | R. Conner | P | S. Smith<br>Deposed by: S. Egan | PI |

**2007**

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 01/03/07 | D | G. Sutton | P | S. Smith<br>Deposed by: D. Littel | PI |
| 01/23/07 | T | D. Davis | P | H. Schwan | DIV |
| 02/14/07 | T | R. Rayburn | P | R. Cohen | PI |
| 02/28/07 | T | G. Sutton | P | C. Bennett | PI |
| 03/02/07 | T | E. Toledo | P | R. Simon | MM |
| 03/27/07 | D | A. Ritzmann | P | S. Smith<br>Deposed by: K. Keller | PI |
| 03/29/07 | T | C. Johnson | P | C. Bennett | PI |
| 03/30/2007 | D | R. Ruggles | P | G. Camden<br>Deposed by: C. Hedrick | LS |
| 04/19/07 | T | A. Ritzmann | P | S. Smith | PI |
| 06/05/07 | D | T. Boynton | P | J. Fletcher<br>Deposed by: C. Bromfield | PI |
| 07/31/07 | D | K. Rodriguez | P | B. Ziegler | DIV |
| 08/07/07 | D | M. Famiglietti | P | C. Bennett<br>Deposed by: K. Newsome | PI |
| 09/21/07 | D | P. Crocker | P | P. Crocker<br>Deposed by: D. Little | PI |
| 10/10/07 | D | C. Eccleston | P | S. Smith<br>Deposed by: D. Boyce | PI |
| 10/23/07 | D | W. Hutchinson | P | C. Groom<br>Deposed by: V. Priddy | PI |
| 11/13/07 | T | W. Hutchinson | P | C. Groom | PI |
| 12/03/07 | D | I. Merritt | P | J. Suit<br>Deposed by: B. Meals | PI |

**2007**

| DATE | T/D | NAME | P/D | CASE REFERRED BY | TYPE |
|------|-----|------|-----|------------------|------|
| 12/11/07 | T | D. Gumbs | P | M. Beverly | PI |
| 12/19/07 | D | D. McKinzie | P | D. Walker<br>Deposed by: J. Davis | PI |

# EXHIBIT C

# NORMAN V. KOHN MD

**NEUROSCIENCES LTD.**

SUITE 1407
122 SOUTH MICHIGAN AVENUE
CHICAGO, ILLINOIS  60603-6107

TEL   312.443.0099
FAX   312.896.5174
email normankohn@gmail.com

NEUROPSYCHIATRIC EVALUATION

Re:  **Nancy Cotton**

Date of Examination:  3/13/2008

Ms. Nancy Cotton is seen on referral from her attorney, to evaluate her current condition and its potential causes.  Records were reviewed prior to the examination.  I obtained additional history from Ms. Cotton.  In further meeting with her husband, I was able to corroborate and extend some of the information obtained in interview of Ms. Cotton herself.

**Records Reviewed:**

- Joseph Liberman, M.D.  Notes and correspondence.

- Miriam Beadle-Lindsay, Ph.D.  Notes and correspondence.

- Coastal Vocational Services, Inc;  Charles DeMark, MS, CRC, CCM.  Notes and reports.

- Center for Neurorehabilitation Services; Gregory J. O'Shanick, M.D.  Notes dated 09/04/2007.

**Additional records reviewed after the examination:**

- GWU Hospital: Records of 7/26/05

- National Rehabilitation Medical Network

- Neurology Center:  IME (Kenneth Eckmann, MD)

- Peter Basch, MD:  primary care records

- Federal Occupational Health (nursing notes)

- Washington Hospital Center: MRI images dated 9/19/2005

- Raphael Minsky, EdD.  Psychological Evaluation

Norman V. Kohn MD                    – 2 –                    Cotton, Nancy
                                                              3/13/2008

## History:

Ms. Cotton is a 57-year-old woman who had been in her usual state of health until she suffered an electric shock injury, at her workplace, on July 26, 2005. Unbeknownst to her, there was a live wire in contact with a metal door. She reports that she grasped the door, to open it, and was unable to loosen her grip. She thought that her hand was on fire. A circuit breaker tripped, freeing her. She was wearing wooden sandals with cork soles at the time of the incident, and her feet would typically be quite sweaty in the summer heat. There was no frank loss of consciousness, but she has only hazy recollection of the events immediately after. She was taken to a hospital. She recalls a lump in her left wrist initially. She was treated by Dr. Liberman, and was referred to Dr. Beadle-Lindsay on September 29, 2005. Dr. Beadle-Lindsay identified acute stress disorder, depression, anxiety and panic, as well as impaired attention, concentration, judgment, and processing. There were personality changes, with disinhibition of anger and irritability. Ms. Cotton tried returning to work, but did not function as before. Problems included apparent clumsiness or confusion, leading to repeated minor injuries.

Of the days and weeks immediately after the accident, Ms. Cotton has only very hazy recollection. She recalls increased drowsiness during that time. She appears to have been internally preoccupied: she does recall having heard voices after the accident. Her first clear post-accident recollection of events is from a visit to her daughter's house in November. She recalls having had a headache, and remembers a time of inarticulate confusion, on the day when she was to leave her daughter's home.

She describes daily nightmares, with images of death. The frequency of nightmares diminished, in April 2007, when she finally stopped working. She had felt anxious and uneasy over the return to work: she was working in the same building, and in fact at the same desk, as before her injury.

Her recollection of the attempted return to work is that everything took her twice as long. She was unable to write creatively. She was forgetful. She could do only rote tasks. She lacked initiative and could not complete tasks.

Her report of her medical care, of failed attempts to return to work, and of her activities, are consistent with the account in the record.


## Current Complaints:

She describes inability to feel "grounded." Indecisiveness is prominent. She gives an example: agonizing over which brand of paper towel to buy in the store. She does not like changes. She avoids travel, change, and decisions.

Confusion and anxiety are also prominent. Going to a new place, she often asks for a description of what it will look like, inside and outside, before she goes: she finds the information reassuring. She sought such reassurance to facilitate going to her rehabilitation appointment, and prior to coming to see me. Her attorney, who had been to my office once before, described it to her. She reports that she would not have been able to come at all, had her husband not accompanied her.

I asked about the voices. She tends to hear them more when she is tired. She feels at such times as if she is "out of control"; as if she has to catch her breath. The voices often seem to be calling her. A month ago, she recalls an incident when they seemed to wake her from sleep.

Her most recent nightmare was two days ago. She woke, caught her breath, but cannot now recall the content. She typically wakes at 3:30 to 4:30 a.m. each night. She goes back to sleep, after about 15 minutes. She sleeps until 6 a.m.

Norman V. Kohn MD                  – 3 –                  Cotton, Nancy
                                                          3/13/2008

## OTHER MEDICAL HISTORY

She takes medication for diabetes and elevated cholesterol: Glipizide, and a statin (she does not recall which). Rarely, she takes Antivert for vertigo. She had side effects on some psych medications, including GI side effects on Celexa. She is intolerant of many medications (e.g., codeine).

She reports urinary incontinence since the incident, and wears diapers. Her weight has fluctuated. She describes a 23-pound weight loss.

**Family History** includes a psychotic illness in her mother. The mother had lost two children, one in infancy and the other at age 2. When Ms. Cotton was 12, her mother was diagnosed with paranoid schizophrenia. She recalls prolonged and unexpected separation from her mother when her mother was taken away for hospital care. Treatment included ECT. The mother was constantly talking to herself. Ms. Cotton's mother and aunt died two weeks apart, in May of 1994; the year Ms. Cotton's daughter graduated from high school.

She has had two cataract surgeries.

**Marriage, education**: She met her husband in 1968, while both were in college. She ended up dropping out, taking up the roles of wife and mother. She returned to school and obtained her undergraduate degree in 2001. She went on to obtain an MBA in 2004, while working full-time. She had a near 4.0 grade average in her MBA work, and by available accounts did quite well.


## Husband's Observations:

He notes loss of energy, and describes being with her as "like watching a clock run down." She seems to find everything harder to do, even little things. In the past, she would readily drive 30 minutes to visit a friend. Now, she finds crossing the street effortful. She gets easily disoriented. Her sleep has been fitful. He reports episodes, about once a month, when for a couple of days she will be unable to get out of bed, with preserved consciousness but reduced control and capacity. On at least two such occasions, she required ambulance transport to a hospital for evaluation.

By his account, her spells have become less severe overall, but she still has 3-4 days per month when she complains of cramps and weakness. During these times, she also eats very little. I asked him about potential triggers. He was unsure, but identified frustration (for example discussion of housework that she finds difficult) as sometimes seeming to precipitate these spells. During these times, she will have trouble with word-finding: it is as if the words do not come. He describes irritability, and fits of rage. Diminished social engagement is particularly evident in relation to a women's group, which she is reluctant now to meet with. For two years, she was not willing to host the group. Prior to the injury, she had been a regular and full participant.


## Mental Status:

I examined her over two extended sessions on one day, with a break for lunch. She arrived on time for the first session. She was initially anxious, and disorganized in her thinking. With reassurance and increased comfort in the setting, she displayed coherent thought and clear expression, though with some stuttering and hesitation. She has clear recollection of recent news events. She recalls three out of three objects after 5 minutes. I do not find any disorder of memory or cognition. She complains of difficulty reading. I gave her a text to read (an essay in the New York Review of Books). After initially reading a paragraph, she was unable to recall and discuss it. I had her read the paragraph again, out loud. She was distracted by anxious associations and tangential lines of thought. She was able to discuss the material as we read it together. She was able to continue to the end only with discussion and redirection. With that intervention, she displayed age- and education-appropriate understanding of the material.

Norman V. Kohn MD                          – 4 –                          Cotton, Nancy
                                                                          3/13/2008

In extended discussion, she displays full range of affect. Overall, however, her affect is depressed. She experiences herself as damaged. She becomes visibly anxious and more confused in her thought process as we talk about the incident and her experience of illness in its aftermath.

There was some confusion in reconvening after lunch. It developed that she had been anxious and impulsive in trying to identify the shortest route back up to my office, from a cafeteria at ground level. This led her to separate from her husband, with anxious cell phone calls back and forth as they tried to locate each other.

**Cranial Nerves**: The pupils are 2mm, poorly reactive. The visual fields are full. The eye movements are normal, without dysmetria or nystagmus. Facial sensation and movement are intact and symmetric. Hearing, speech, swallow, tongue movement, and shoulder shrug are normal.

**Sensation**: Intact to pinprick, touch, and vibration; in all four limbs.

**Motor**: Power, tone, and bulk are normal. There is no drift of the outstretched arms.

**Gait and Coordination**: Gait is normal (including tandem, Romberg). There is no clumsiness of rapid alternating movements. Finger-to-nose is performed without difficulty.

**Reflexes**: Normal (+2) at the triceps, biceps and knees. The ankle jerks are faint. The plantar responses are flexor.


**Impression and Summary:**

This woman suffered an electric shock injury on July 26, 2005, with current flow from her hand, through her legs and to the floor. Though she wore sandals made of insulating material, they were moistened by sweat from her feet and would have been expected to support some conduction to the floor. There were no witnesses and no further corroboration of the actual path of current is available. A circuit breaker ended the shock. She does not appear to have suffered severe or extended physical injury. She may have suffered a burn injury to the hand or wrist that had been in contact with the live metal door.

After the incident, she displayed changes in behavior and personality. She had nightmares, disorganized and confused thinking, obsessional and fearful thinking, and depressed mood. She continues to have episodes of markedly reduced function, lasting a day or two at a time. Anxiety is the most likely underlying cause of these, but these spells are also consistent with mood fluctuations in a patient with chronic depression.

She suffers from posttraumatic stress disorder, and major depression triggered by her experience of loss (of function, and health). The experience of hearing voices is consistent with psychotic features in major depression. It is not a schizophreniform illness, such as her mother apparently suffered..

Some examiners have diagnosed cognitive deficit. Based on my own examination and record review, I find that her cognitive deficits are the result of disrupted thinking due to severe anxiety, rather than primary loss of brain function. I do not find evidence of any direct or physical injury to the brain.

Her incontinence has not been evaluated medically. It was reported to Dr. Basch, but listed as resolved at a later visit. Incontinence can occur as part of the loss of integrated motor function in a patient with severe depression or uncontrolled anxiety. Because the current path of her injury would have traversed from arm to leg, the spinal cord would have been on the path of that injury. The available clinical data does not support a diagnosis of physical injury to the spinal cord. The thoughts of her gynecologist, and possibly a urologic evaluation, might be relevant to excluding direct physical components. Regardless, her inability to organize the presentation of her problems and pursue their medical evaluation is a functional deficit, and a symptom of psychiatric illness. When the patient

Norman V. Kohn MD                         — 5 —                              Cotton, Nancy
                                                                             3/13/2008

cannot present a clear and coherent complaint, orderly and comprehensive medical care is much less likely to follow.

Loss of a sense of efficacy, destabilization of her metabolism (and diabetes), and disrupted social function are all consequences of her injury. This syndrome of unregulated anxiety response, what we term a "post-traumatic stress disorder," has adversely impacted her ability to understand, to function autonomously consistent with her education and work history, and to full her former roles as wife and mother.

It is conceivable, with benefit of hindsight, that the psychological impact of the event might have been mitigated by prompt early intervention. Evolving experience with post-traumatic stress disorder suggests this to be the case. Such intervention is now practiced in settings, such as mass casualties or war injuries, where experience has led to the expectation of severe anxiety response in some individuals. In this case, where the physical injury was minimal and there were no witnesses, initial treaters did not have a basis for anticipating the severe PTSD that this woman would ultimately suffer.

## Recommendations and Prognosis:

She will require continued treatment by her psychologist, to maintain her present functional plateau. She may need consultation with a psychiatrist, from time to time – nominally, 3-4 times per year -- for consideration of medications. The integration of her care, and monitoring for medical complications that she cannot manage on her own, will require close supervision from her primary physician – nominally, 6 visits/year. Her risk of further medical complications is significant: she cannot reliably muster the awareness and organizational ability to identify and manage medical problems, which will predictably occur in an obese diabetic woman of late middle age. Part of the therapeutic challenge is addressing the experience that her life and health have been permanently impacted. In fact, they have. It is unlikely that she will be able to return to work, or to resume her former role of well-regulated productivity and autonomy. These stark predictions are based not on the severity of physical injury, but on the psychological impact that the injury had upon her.

Norman V. Kohn, MD

# NORMAN V. KOHN, M.D.

### Curriculum Vitae

### April 2008

## PRACTICE ADDRESS

122 South Michigan Avenue, Suite 1300
Chicago, Illinois 60603-6107

Phone:   312-443-0099
Fax:       312-896-5174
Email:    normankohn@gmail.com

## PROFESSIONAL INTERESTS

- Psychiatry and neurology: focus on thinking and feeling
- Psychotherapy,  psychoanalysis; interactions of mind and body, self and other
- Forensic applications:  issues of diagnosis , causation, responsibility, and ethics
- Consulting to individuals, groups, and organizations

## EDUCATION

1972 – 76   MD     Yale University, New Haven, Connecticut
1968 – 72   SB     Massachusetts Institute of Technology, Cambridge, Massachusetts

## FELLOWSHIPS

1979     Neurobehavioral Unit, Veterans Administration Hospital, Boston, Massachusetts
1975     Marine Biological Laboratory, Woods Hole, Massachusetts

**Norman V. Kohn, MD**                          **2**                          **April 2008**

## POSTGRADUATE TRAINING AND EXPERIENCE

| | |
|---|---|
| 2005 – | Core Psychoanalytic Training Program, Institute for Psychoanalysis, Chicago |
| 1980 – | Private practice, Chicago |
| 2001 – 03 | Consulting Neuropsychiatrist, Chicago Institute for Neurosurgery and Neuroresearch |
| 1998 – 00 | Adult Psychoanalytic Psychotherapy Program, Institute for Psychoanalysis, Chicago |
| 1998 – 01 | Director, Neurobehavioral Services, Vencor Hospitals, Chicago |
| 1984 – 97 | Chairman, Department of Neurology, Mount Sinai Hospital Medical Center |
| 1983 – 84 | Director, EMG Laboratory, Mount Sinai Hospital Medical Center |
| 1983 – 84 | Vice Chairman, Department of Neurology, Mount Sinai Hospital Medical Center |
| 1983 – 84 | Attending Physician, Rush Presbyterian-St. Lukes Medical Center EMG Laboratory |
| 1980 – 81 | Neuroimmunology Fellow, University of Chicago |
| 1978 – 79 | Psychiatry Resident, McLean Hospital |
| 1977 – 80 | Neurology Resident, University of Chicago Hospitals |
| 1976 – 77 | Assistant Resident (Medicine) Case Western Reserve University Hospitals |

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 1993 – 99 | Associate Professor of Clinical Psychiatry, Finch University of Health Sciences/ Chicago Medical School |
| 1992 – 99 | Associate Professor of Clinical Neurology, FUHS/CMS |
| 1989 – 92 | Assistant Professor of Clinical Neurology, FUHS/CMS |
| 1989 – 97 | Associate Chairman, Department of Neurology, FUHS/CMS |
| 1987 – 88 | Clinical Associate in Neurology, University of Chicago |
| 1980 – 91 | Instructor in Neurology, Rush Medical College |

## EMPLOYMENT and PRACTICE

| | |
|---|---|
| 1983 – | Neurosciences Ltd., Chicago |
| 1995 – 98 | Mount Sinai Medical Group, Chicago |
| 1980 – 95 | Mount Sinai Hospital, Chicago (teaching and administration) |
| 1980 – 83 | Solo Practice, Chicago |

## CERTIFICATION

| | |
|---|---|
| 1982 | American Board of Psychiatry and Neurology (Neurology) - #20358 |
| 1977 | National Board of Medical Examiners |

## LICENSURE

| | | |
|---|---|---|
| 1983 – | Indiana certificate #01032970A | Exp. 6/30/2009 |
| 1977 – | Illinois certificate #036-055527 | Exp. 7/31/2008 |
| 2000 – 05 | New York certificate #219867 | inactive |
| 2002 – 07 | Minnesota certificate #44452 | inactive |

Norman V. Kohn, MD                          3                          April  2008

## MEDICAL STAFF APPOINTMENTS

(all located in Chicago, Illinois)

| | |
|---|---|
| 2002 – | Illinois Masonic Medical Center |
| 2002 – | Neurologic and Orthopedic Institute |
| 1998 – | Resurrection Saint Joseph Hospital |
| 1998 – | Kindred Hospitals |
| 1993 – 94 | University Psychiatric Hospital |
| 1992 – 95 | Hartgrove Hospital |
| 1986 – | Bethany Hospital |
| 1985 – | Aurora Chicago Lakeshore Hospital |
| 1983 – 85 | Columbus-Cuneo-Cabrini Hospitals |
| 1984 – 06 | Saint Anthony Hospital |
| 1983 – 03 | Schwab Rehabilitation Center |
| 1980 – 05 | Mount Sinai Hospital Medical Center |

## PROFESSIONAL SOCIETIES

| | |
|---|---|
| 2005 – | AK Rice Institute for the Study of Social Systems |
| 2005 – | Chicago Center for the Study of Groups and Organizations |
| 1999 – | American Psychoanalytic Association |
| 1993 – | Behavioral Neurology Society |
| 1992 – | American Neuropsychiatric Association |
| 1991 – 94 | American Sleep Disorders Association |
| 1987 – 94 | American Society of Internal Medicine |
| 1986 – 92 | American Academy of Clinical Neurophysiology |
| 1982 – | Chicago Neurological Society |
| 1981 – 95 | American Association of Electrodiagnostic Medicine |
| 1980 – | American Medical Association |
| 1980 – | Chicago Medical Society |
| 1980 – | Illinois State Medical Society |
| 1978 – | American Academy of Neurology |
| 1975 – 04 | American Association for the Advancement of Science |

## PROFESSIONAL  AND  MEDICAL  STAFF  COMMITTEES

| | |
|---|---|
| 2007 – | American Psychoanalytic Association:  Committee on New Training Facilities |
| 2002 | Saint Anthony Hospital, peer review panel |
| 2001 – 03 | Saint Anthony Hospital, Ethics Committee (Chair) |
| 1999 – 00 | Medical Staff Executive Committee, Vencor Hospitals, Chicago |
| 1995 – 96 | Mount Sinai Medical Group Governance Committee |
| 1989 – 98 | Mount Sinai Hospital, Ethics Committee |
| 1987 – 98 | Mount Sinai Hospital, Grievance and Ethics Committee |
| 1987 – 89 | Saint Anthony Hospital, Ethics Committee (Chair) |
| 1985 – 93 | Mount Sinai Hospital, Research Center Committee |
| 1984 – 97 | Mount Sinai Hospital, Medical Staff Executive Committee |

Norman V. Kohn, MD                              4                              April 2008

1984 – 97    Mount Sinai Hospital, Risk Management Committee
1984 – 85    Mount Sinai Hospital, CME Committee
1984 – 93    Mount Sinai Hospital, Emergency Room Committee
1983 – 97    Mount Sinai Hospital, Bylaws Committee (Chair, 1985 - 97)
1980 – 83    Mount Sinai Hospital, Drug and Therapeutics Committee

## CONSULTANCIES

2001 – 03    Chicago Institute for Neurosurgery and Neuroresearch
1998 – 00    Lakeview Living Center
1987         Camp CHI
1985 – 91    Sidney Hillman Health Center
1985 – 87    Illinois State Medical Society, Physicians' Review and
             Evaluation Panel
1985         National Transportation Safety Board
1983 – 88    Lieberman Geriatric Health Center

## COMMUNITY SERVICE

1996 – 97    University of Chicago Hillel Director Search Committee
1995         Co-chair, University of Chicago Hillel Self-Study Committee
1995 – 02    University of Illinois Hillel Board
1994         Accreditation Site Visitor - Stony Brook Hillel
1991 – 06    University of Chicago Hillel  Board  (chair, 2002-05)
1987 – 95    Solomon Schechter Day School Association Board
1987 – 06    Hillels of Illinois Governing Commission
1986 – 07    Akiba-Schechter Jewish Day School Board (president, 1987 - 95)

## BIBLIOGRAPHY

## Abstracts and Presentations

Anxiety, addiction, and seizures.  Center for Addictive Problems, July 7, 2004

Which symptoms to treat?  Center for Addictive Problems, April 21, 2004

Treating the patient with chronic pain.  Kindred Hospital, Jan. 15, 2004

Myofascial pain.  State Farm Insurance Corporate Counsel, June 21, 2003

Psychosomatic considerations in office practice. St. Anthony Hospital, Chicago, IL;  March 20, 2003

Pain after injury.  State Farm Insurance, Jan. 21, 2003

Epilepsy Update.  CMS Medicine Grand Rounds, September 11, 1997

B12 and the Central Nervous System.  University of Chicago Neurology Grand Rounds, March 1991

Computer applications in neurology.  American Academy of Neurology annual meeting, New Orleans, April 1986

Neurological diseases affecting the lower extremity.  American Academy of Ambulatory Foot Surgery Seminar, Chicago, December 1985

Antel J, Bernstein A, Hendrichson B, Rosenkoetter P, Kohn N, Stefansson K. Evaluation of human neurons by monoclonal antibody.  Neurology 33:107 [Suppl 2], 1983

Ross VN,.  Cohen LB, Salzberg BM, Kohn N, Grinvald A. Extrinsic birefringence and dichroism changes in squid giant axons.  Biol.  Bull. 149:444, 1975

**Chapters**

Kohn N. Neurologic diseases. *in* Gleicher N, *et al.*  Principles and practice of medical therapy in pregnancy, third edition, 1997

**Letters**

Kohn N. Let's consider before rushing into drug testing.  The New York Times 9/24/86

# NORMAN V. KOHN MD

NEUROSCIENCES LTD.

SUITE 1300
122 SOUTH MICHIGAN AVENUE
CHICAGO, ILLINOIS 60603-6107

TEL   312.443.0099
FAX   312.896.5174
email normankohn@gmail.com

February 2008

Expert Witness Cases

| Date | Case (client) name | Law Firm/atty | P/D | CMT | Written | Fee |
|------|-------------------|---------------|-----|-----|---------|-----|
| **EXPERT REVIEW, NO TESTIMONY** | | | | | | |
| 2004 | Kaufman | Meshbesher & Spence | P | M | | 1250 |
| 2006 | Catherine Graham v. Baily Brinn | James M Hoffman & Associates | D | T | | 1000 |
| 2006 | Prott v. Marberger et al | Simon Passanante, PC | P | M | | 9500 |
| 2007 | (no suit) | Snyder Weltchek & Snyder | P | M | | 1500 |
| 2007 | Carle Clinic | | D | M | | 3000 |
| 2007 | Hernandez | Clark | D | T | | |
| 2007 | (aa etoh) | | D | T | | |
| 2007 | Stephens | Gruel Mills | P | M | | 2500 |
| 2007 | Faso | Racuglia | P | M | | 3500 |
| 2007 | Bainbridge | Faso | P | | | 400 |
| 2008 | Ulloa | Santos & Seeley | P | T | | 5000 |
| **DEPOSITION** | | | | | | |
| 1987? | Percy Conrad May | French Kezelis | D | M | | ? |
| 1999 | Pastirik | Travelers Ins | D | T | | 525 |
| 2003 | Wetzell V. Binkley No. 02-L-16ST | Pool, Leigh & Fabricius | D | T | | 3000 |
| 2003 | Cotto v. Illinois Masonic Medical Center | Goldberg & Goldberg | P | M | | 8150 |

Norman V. Kohn MD                  – 2 –                    Expert Cases
                                                           November 2007

| | | | | | | |
|---|---|---|---|---|---|---|
| | et al. | | | | | |
| 2003 | Stanton v. South Suburban Hospital, et al | Goldberg & Goldberg | P | M | | 4550 |
| 2003 | Gallagher (WC) | Mike Radke | P | T | | 750 |
| 4/27/04 | Rosa Davis (CTA) | | D | T | | 2500 |
| 6/16/04 | Lewis and Livingston v. PDV America, Inc. et al | Brady & Jensen | P | T | Y | 2000 |
| 6/18/04 | Carmona v. Midway Aluminum | Morici, Figlioli | P | T | | 1000 |
| 9/8/04 | Fornelli | State Farm | D | T | | 3150 |
| 2004 | McGraw v. Northwest Airlines | | D | T | | 7590 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2005 | Worley v. Pace | Querry & Harrow | D | T | Yes | 16700 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2006 | Pace v. Ridge Tahoe Property | Osborne, Ohlson & Hall, Chartered | P | T | | 5000 |
| 2006 | Edgar Toledo | Simon & Associates | P | M | Y | 1500 |
| 2006 | Terran v Value City | Kelly & King | D | T | | 4500 |
| 2007 | Rodriguez v Gooden | Brenner, Ford | D | T | | 3500 |
| 2007 | Barber v. Bartkowicz | Kopka, Pinkus, Dolin & Eads | D | T | Y | 4000 |
| 2007 | Montell Johnson | Sonnenschein | P | T | Y | 0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **TRIAL TESTIMONY** | | | | | | |
| 1999 | Regalado v. City of Chicago | Horwitz | P | T | | 14250 |
| 2003 | Ortiz | Julie Aimen | D | C | | 2250 |
| 2004 | Dresher | J. Cottrone | D | C | | 23125 |

Norman V. Kohn MD                    – 3 –                    Expert Cases
                                                             November 2007

| 2005 | Bell v. City of Chicago | | D | T | | 4500 |
|------|-------------------------|-------------------------|---|---|---|------|
| 2006 | May-Carmen v. Walmart Stores et al | Gardere Wynne Sewell LLP | D | T | | 7200 |
| 2007 | Edgar Toledo | Simon & Associates | P | M | | 12948 |
| 2007 | Jaquez | Brenner, Ford | D | T | Y | 7000 |

P/D = Plaintiff/Defendant

C/M/T = Criminal/Medical Malpractice/Civil Tort not med-mal

# NORMAN V. KOHN MD

NEUROSCIENCES LTD.

SUITE 1300
122 SOUTH MICHIGAN AVENUE
CHICAGO, ILLINOIS  60603-6107

TEL   312.443.0099
FAX   312.896.5174
email normankohn@gmail.com

May  2007

## IME and Consulting Services

*27 years of experience in clinical neurology and clinical psychiatry*

Education and training at leading institutions
MIT – SB 1968-72
Yale – MD 1972-76
Case Western Reserve University – PGY 1 (medicine) 1976-77
University of Chicago – Neurology 1977-80
Chicago Institute for Psychoanalysis – Adult Psychoanalytic Psychotherapy 1998-00
Chicago Institute for Psychoanalysis – Psychoanalytic Core Program 2005 -

Teaching and leadership experience
Chair, Department of Neurology, Mount Sinai Medical Center of Chicago 1984-97
*Neurology Chair at a Level I trauma center and teaching hospital*

Academic experience
Instructor, Rush Medical College, 1980-91
Clinical Associate, University of Chicago, 1987-88
Associate Chairman, Neurology, Chicago Medical School, 1989-97
Assistant Professor of Clinical Neurology, Chicago Medical School, 1989-92
Associate Professor of Clinical Neurology, Chicago Medical School, 1992-99
Associate Professor of Clinical Psychiatry, Chicago Medical School, 1993-99

Professional experience includes:

o  Extensive clinical experience.  Active in full-time clinical practice.  Experience in epilepsy, trauma, stroke, alcoholism and addiction;  complex medical illness;  neuropsychiatry and psychotherapy;  treatment impasses;  psychosomatic medicine;  doctor-patient relationship and ethics;  boundary issues.

o  IME and consulting:  approx. 1000 IME's;   consulting for plaintiff and defense in civil and criminal matters

o  Deposition, administrative hearings, and state and federal court  testimony

o  Consultant to local and national government agencies

o  Disability, fitness-for-duty, causation, and standard of care issues

o  Disciplinary and peer review panels

# NORMAN V. KOHN MD

NEUROSCIENCES LTD.

SUITE 1300
122 SOUTH MICHIGAN AVENUE
CHICAGO, ILLINOIS 60603-6107

TEL  312.443.0099
FAX  312.896.5174
email normankohn@gmail.com

July  2007

## Medicolegal Fees

| | |
|---|---|
| Medicolegal Consultation.  File review, trial preparation, reports | $500/hr |
| Record review | $500/hr, min. 500.  Rule of thumb: 250/inch |
| IME (up to 1" records) | $1500 |
| Extended time in IME's .  Typical sources:<br><br>- complex issues; diagnostic issues not anticipated in the records<br>- conflict among treaters<br>- extensive records | 500/hr |
| Deposition | $500/hr  min: 2000 |
| Court Time.  Video deposition. | Local:  3000 half-day, 5000/day.<br>Overnight:  7000/day (plus expenses) |
| Emergency and weekend surcharge, turnaround <4 business days | Up to 50%  (ask first) |
| Prepayment | Deposition, court time, IME's:  2 weeks. |
| Cancellation:  reflects the cost to me of blocking time that cannot be used due to short notice | IME, local court and depositions:  3 business days.  Out of town:  5 business days.  Preparation and travel expenses, if already incurred, are not refundable. |

A service charge of 1.5%/month will be added to outstanding balances.

Norman V. Kohn, MD
**Neurosciences, LTD.**
FEIN 36-3217824

# EXHIBIT D



# EXHIBIT E

Raphael Minsky, Ed.D., P.C.

Rehabilitation Psychology

The Christopher Condominium

Suite 101

4808 Moorland Lane

Bethesda, Maryland 20814

Telephone 301-654-2787

Telecopier 301-654-2791

Confidential                                                                    August 20, 2008

### PSYCHOLOGICAL EVALUATION

Name:              Cotton, Nancy

Address:           723 G St., N.E., Washington, DC 20002

Telephone:         202-543-0111

Gender:            Female

Date of Birth:     July 9, 1950

Age at Evaluation: 57 11/12 years

Preferred Hand:    Right

Education:         Graduated high school in Louisiana, 1968; B.A., Trinity College, 2001;
                   MBA, Trinity College, 2004.

Children:          One daughter, Alicia, birth date 2/21/75.  (Q)  "Just started college in
                   Lawrenceville, Massachusetts.  Has one child, four years of age."

Marital Status:    Married; husband Gary Cotton, birth date 1/4/50, CA 58 6/12 years.  Was
                   married May 20, 1972.  Education:  High school in Louisiana; BFA, Lou-
                   isiana Tech; military, U.S. Marines, 1969-1979, E5 (Sergeant); USAF Re-
                   serves, 1985-1996, retired; employed as photography technician at Library
                   of Congress.

Psychological Evaluation
August 20, 2008
Page 2
Re: Nancy Cotton

| Vocational History: | 12/97-present, National Archives, 7th & Pennsylvania Ave., Washington, D.C., GS 6-5, $36,157/year, reference technician with the Old Military and Civil Records Branch, NWCTB; 7/91-6/97, Anne Arundel County Association of Retarded Citizens, 931 Spa Rd., Annapolis, Maryland, administrative assistant for the executive director, $9.50/hr.; 9/83-9/84, K&B Drugs, Shreveport, Louisiana, drug clerk and liquor clerk; 3/83-9/89, N.L. Baroid Petroleum Services, Bossier City, Louisiana, clerk and dispatcher; 6/72-8/73, Illinois Institute for Technological Research, North Severn Naval Station, Annapolis, Maryland, secretary. |
|---|---|
| | ("During many of my employment years, I worked as a temporary while I was raising a family and also while I was being a military wife, and also while my husband was in college. We often traveled, and with a small child, it was difficult to make a working salary in some places where we either lived or where we were stationed.") |
| Medications: | (1) Precose (delays glucose absorption and digestion of carbohydrates for diabetics; (2) Glipzide (promotes the release of insulin from beta cells of pancreas); (3) Metformin (anti-hyperglycemic). |
| Dates of Evaluation: | June 18 and 19, 2008, Office, Bethesda, Maryland |

I.    REASON FOR REFERRAL:

Nancy Cotton was referred for comprehensive psychological evaluation and damages assessment by the law offices of Simon & Associates, 1707 N St., N.W., Washington, DC 20036, on June 2, 2008, for the purpose of determining Mrs. Cotton's current psychological status and determination of residual effects related to the electrical injury of 7/26/05. I was also asked to recommend necessary services and associated costs for plaintiff litigation purposes.

Psychological Evaluation
August 20, 2008
Page 3
Re: Nancy Cotton

II.     SOURCES OF INFORMATION:

A.  Anne Arundel Community College records, Arnold, Maryland

B.  Miriam Beadle-Lindsay, Ph.D., Psychologist, evaluation and therapy records, 1996-2007

C.  Center for Neurorehabilitation Service, Midlothian, Virginia, Gregory J. O'Shanick, M.D.

D.  Department of Education records, Baton Rouge, Louisiana

E.  Federal Occupational Health Nurse records, 7/26/05

F.  The George Washington University Hospital, Washington, D.C., 7/26/05, emergency room records

G.  Dr. Liberman medical records, Neurodiagnostic Associates, Washington, D.C.

H.  National Archives and Records Administration, Washington, D.C.

I.  National Rehabilitation Medical Network, Washington, D.C.

J.  The Neurology Center, IME of 5/23/07 by K.W. Eckman, M.D.

K.  Occupational Therapy-Neurological Evaluation, April Shaffer, M.S., OTR/L and Ann Markotif, OTR/L

L.  Trinity College records, Washington, D.C.

M.  Washington Primary Care Physicians, Washington, D.C.

Psychological Evaluation
August 20, 2008
Page 4
Re: Nancy Cotton

III.    SUMMARY OF PERTINENT PRESENTED RECORDS:

A. OWCP Occupational Health Nurse Sitko, National Archives:

1.  7/26/05-8/1/05: ". . . grabbed door handle to a room on 19E2 and briefly unable to let go of handle.  Felt shock throughout her body.  Claims a shower of sparks fell down on her -- felt a tingling in her teeth fillings . . . feels slightly tingly all over . . . saw an exposed live wire; accompanied by her supervisor, Cynthia Fox, who confirms exposed wire sticking out of a conduit pipe above door frame."

2.  Sitko, R.N., 6/26/05, federal OWCP, occupational health nurse: "On 8/11/05, reported suffering from PTSD . . . her doctor feels memory loss normal for this type of injury . . . referred to a neurologist and psychologist therapist; primary care physician Peter Basch, M.D."

B.  George Washington University Hospital, Emergency Room, Washington, DC, 7/26/05: "Chief complaint:  shocked by electricity.  Live wire was in contact with door handle she touched.  Mild first-degree burn to left hand.  History of diabetes.  Neurological:  GCS is 15.  No focal motor deficits or sensory deficits.  Psychiatric:  oriented x3, normal affect.  No treatment.  Discharged to home."

C.  Washington Primary Care Physicians, Peter Basch, M.D., 1/22/02-2/1/08, presented diagnoses:

1.  8/11/05 diagnosis:  "Severe electrical shock, post-traumatic stress due to electrical shock."

2.  9/26/06 diagnosis:  "Has been determined to have chronic diffuse brain injury by her psychologist, and she will likely be retiring on medical disability soon."

Psychological Evaluation
August 20, 2008
Page 5
Re:  Nancy Cotton

    3.   Other reported diagnoses:

        a.   "Accident due to electrical current."

        b.   "Hyperlipidemia."

        c.   "Diabetes, uncomplicated type II."

        d.   "Alopecia."

        e.   "Fibrocystic breast disease."

        f.   "Glaucoma."

        g.   "Cataract, left."

        h.   "Uterine fibroid."

        i.   "Shoulder pain, right; no significant past history."

        j.   "Possible concurrent URI and UTI."

        k.   "Bee-sting allergy."

        l.   "Cellulitis with abscess that has been drained (breast)."

        m.  "Postmenopausal bleeding; thickened endometrium by ultrasound, 12/7/05;

            anterior uterine body myoma."

        n.   "Obesity."

        o.   "Bacterial vaginosis."

        p.   "Iron-deficiency anemia."

        q.   "Flexible sigmoidoscopy normal."

        r.   "Minor edema, left leg."

        s.   "Bronchitis, acute."

Psychological Evaluation
August 20, 2008
Page 6
Re:  Nancy Cotton

       t.  "Moderate dupytrens contracture on right hand."

       u.  "Epithelial cell abnormality re cytopathology (cervical)."

D.  Center for Neurorehabilitation Services, Midlothian, Virginia 23113, Gregory J. O'Shanick, M.D., 9/4/07 evaluation:

    1.  Diagnostic impressions include PTSD, NIDDM, neurolinguistic, and balance.

    2.  Symptoms reported include "severe head pain; unable to read and remember; felt pop in head that threw her forward.  Had 22 nights straight of death dreams.  Also:  muscle pain, weakness in hand, feels jumpy, stopped having periods at the time of electrocution.  More aggressive, used curse words not used before.  Fear about crossing street; not sleeping well; can't make decisions; lose track of time; can't think of words (two cataract surgeries in 1998, 2002 (cyst on breast removed two times)."

E.  National Rehabilitation Medical Network, Washington, D.C., NRH Regional Rehabilitation:

    1.  OT initial evaluation date:  10/23/06.  Referred by J. Liberman, M.D.:

       a.  "Medical diagnosis:  Electrocution and cognitive deficit."

       b.  "Rehabilitation goals:  (1) Utilize organizational aids to manage daily activities and work tasks; (2) utilize lists and planners for increasing management of appointments and schedules; (3) utilize lists for increasing management and organization of work tasks, responsibilities."  Signed Ann Markotic, OTR/L.

Psychological Evaluation
August 20, 2008
Page 7
Re:  Nancy Cotton

    2.   Occupational therapy discharge evaluation 5/31/07:

        a.  "Employed at National Archives, working approximately five hours per day."

        b.  "Ten visits for episode of care."

        c.  "Services provided:  cognitive, visual, perceptual skills training, physical therapy, education in the context of communication and work reintegration."

        d.  "Attendance:  consistent and full participation in process."

        e.  "No further OT intervention indicated at this time."

        f.  "Diagnosis:  854.00, BI unspecified; secondary diagnosis: 781.99, symptoms of nervous and muscular system."

        g.  "Dates of service:  10/23/06-12/22/06."

F.  Miriam Beadle-Lindsay, Ph.D., Neuropsychologist:

    1.  Assessment and follow-up treatment on 9/29/05, 10/5/05, 10/12/05, 10/20/05.

Prior to 7/26/05, completed MBA, no reported cognitive or emotional difficulties since 7/26/05 (summary of notes):

        a.  "Difficulty with attention, concentration, and memory."

        b.  "Depressed, moody, and anxious."

        c.  "Localized pain on upper right side of head."

        d.  "Walks with cane, feels she may lose balance."

        e.  "Every couple of weeks, becomes physically ill with nausea and localized head pain.  Sleeps up to 30 hours at a time after these episodes."

        f.  "Risperdal for apparent auditory hallucinations."

Psychological Evaluation
August 20, 2008
Page 8
Re: Nancy Cotton

    g.  "Initially highly anxious and depressed."

    h.  "Mood labile, ability to stay on topic poor."

    i.  "Difficulty remembering information."

    j.  "Cried easily and pessimistic toward future."

    k.  "Energy level consistently poor."

    l.  "Initiation and motivation poor."

2.  "Diagnosis: 293.83, mood disorder due to electrocution, with major depression-like episode, severe; 308.3, ASD secondary to electrocution; 309.24, adjustment disorder with anxiety, moderate to severe; rule out 294.9, cognitive disorder secondary to above."

3.  4/7/06, neuropsychological evaluation performed by Dr. Beadle-Lindsay:

    a.  "Significant difficulty with visual memory."

    b.  "Significant difficulty with visual-spatial functioning."

    c.  "Executive function ability average when problem-solving less complex. With complexity, severely impaired range."

    d.  "Low resistance to cognitive stress."

    e.  "Tendency to persevere and difficulty with cognitive flexibility, planning, processing speed and decision-making."

    f.  "Lateralized fine motor functioning mildly impaired for left hand."

    g.  "Difficulties consistent with diffuse cerebral injury with more right- than left-sided hemisphere impairment."

    h.  "Mood: anxiety and dysphoria."

Psychological Evaluation
August 20, 2008
Page 9
Re:  Nancy Cotton

       i.   "Sleep, appetite, and energy were variable and chronically disrupted."

4.   "Diagnostic impression:

       a.   "Electrocution."

       b.   "Cognitive disorder NOS secondary to #1 (visual memory, visual-spatial, complex executive functioning, mental speed and efficiency)."

       c.   "Mood disorder secondary to #1:  major depression, typical episode, chronic."

       d.   "Adjustment disorder with anxiety secondary to all of the above."

5.   9/24/07, letter to Ms. Meochia Clayton, OWCP District Claims Office, 800 North Capitol St., N.W., Room 800, Washington, DC 20217; pertinent points:

       a.   "Difficult time reintegrating into the work environment."

       b.   "Speed, accuracy, and efficiency which she previously performed was significantly reduced."

       c.   "Significant level of anxiety and fear experienced post-injury."

       d.   "Mrs. Cotton had reached maximum cognitive improvement."

       e.   "Past year consistently struggled to keep up with the demand of her job."

       f.   "The type of neuropsychological deficits experienced [mine] indicates she was unable to fulfill the demands of any job."

       g.   "It appears deficits are permanent in nature."

Psychological Evaluation
August 20, 2008
Page 10
Re:  Nancy Cotton

G.  Neurodiagnostic Associates, P.C., Joseph Liberman, M.D., Neurologist:

Office evaluations based on records were provided on the following dates:  8/8/05, 10/7/05, 11/18/05, 1/5/06, 3/7/06, 4/4/06, 5/8/06, 7/14/06, 10/3/06, 11/14/06, 1/16/07, 4/6/07, 6/7/07; total of 13 visits over 22.0 months.

Within two weeks post-injury to approximately one year ago, Mrs. Cotton interacted on a professional basis with the neurologist, Dr. J. Liberman, 13 times.  Dr. Liberman opined during this time period that Ms. Cotton experienced as a result of the electrocution residual severe post-traumatic stress disorder causing anxiety, inability to concentrate, poor memory, right-sided headaches, and left-handed numbness.  She was placed on a trial of Resperdal, 1 mg., for anxiety.

The summary presented diagnostic comments and impressions covering the time period 11/7/05 to 6/7/07 per Dr. Liberman are stated below:

1.  10/7/05:

    a.  "Hand weakness and numbness improved."

    b.  "Anxiety a little better."

    c.  "Risperdal did not help."

    d.  "Celexa helps a little."

    e.  "Saw a psychologist, Dr. Lindsay, and it helped."

    f.  "Still has right-sided headaches."

    g.  "Cries frequently."

    h.  "Still thinks a lot about her electrocution."

Psychological Evaluation
August 20, 2008
Page 11
Re: Nancy Cotton

2. 11/18/05:

    a. "Feeling better but still had some flashbacks and nightmares."

    b. "Trouble describing the injury."

    c. "Anxiety and startles easily."

    d. "Still depressed, right-sided headache."

3. 1/5/06:

    a. "Stopped Celexa."

    b. "Feels more energetic."

    c. "Memory is better but not normal."

    d. "Less flashbacks and nightmares."

    e. "Tires very easily."

    f. "Barely manages to continue her current work schedule."

    g. "Left side still numb."

    h. "Recommended neuropsychological testing."

4. 3/7/06:

    a. "Improving, but rate of improvement has slowed."

    b. "Memory better, but still has trouble understanding things."

    c. "Trouble with math."

    d. "Works five hours per day."

    e. "Trouble making decisions."

    f. "Left hand less numb and a little weak."

Psychological Evaluation
August 20, 2008
Page 12
Re:  Nancy Cotton

5.  5/8/06:

    a.  "Still complains of problems with reading and comprehension."

    b.  "Handles stress poorly."

    c.  "Neuropsychological testing 4/06 showed poor visual memory and executive functioning."

    d.  "Referred to outpatient rehabilitation program at NRH."

6.  7/14/06:

    a.  "Doesn't handle stress or new situations very well."

    b.  "Testing by Dr. Beadle-Lindsay reveals signs of diffuse cerebral injury."

    c.  "Trouble at airport recently when she flew alone and couldn't find her way."

    d.  "Referred to outpatient cognitive rehab program at NRH."

7.  10/3/06:

    a.  "Trouble with anything new."

    b.  "Takes her longer to do things than it used to."

    c.  "Has trouble reading and retaining information."

    d.  "Has not improved since January."

    e.  "Dr. Lindsay feels she has a major depressive disorder due to the electrocution."

8.  1/16/07:

    a.  "No improvement.  She still has trouble learning new information."

    b.  "Fatigues easily."

Psychological Evaluation
August 20, 2008
Page 13
Re: Nancy Cotton

      c.  "Still has flashbacks and nightmares about injury and dying."

  9.  6/7/07:

      a.  "Feeling less stressed and less frustrated being off work."

      b.  "Trouble remembering what she reads."

      c.  "Mood has improved."

      d.  "Executive functioning appears impaired."

      e.  "She is to see Dr. O'Shanick in September for cognitive evaluation."

      f.  "Continue on total disability."

  10.  Evaluations:

      a.  8/18/05:  "Auditory Evoked Potential normal."

      b.  8/23/05:  "EEG (awake) normal."

      c.  8/30/05:  "Nerve conduction studies.  Upper extremities normal."

      d.  9/21/05:  "MRI, Brain:  Unremarkable."

  H.  Independent Medical Evaluation, The Neurology Center, Kenneth W. Eckmann,

M.D., Wheaton, Maryland 20902, 5/23/07:

    A summary of the defense IME by Dr. Eckmann follows:

    1.  "Patient presented as an inarticulate and largely incomprehensible historian."

    2.  "Totally disabled from 6/26/05 to 12/12/05.  Worked five hours daily until 4/07;

unemployed since."

Psychological Evaluation
August 20, 2008
Page 14
Re: Nancy Cotton

3. "Neurological examination: Presentation characterized by frequent emotional outbursts with histrionic components and by ongoing and virtually uninterrupted tearfulness and crying."

4. "Language is fluent and grammatical and she showed no signs of encephalopathy or confusion."

5. "Cranial nerves normal."

6. "Motor overt giveaway weakened of all muscles in all four limbs associated with protestations of great pain. Sensory: No deficit to light touch or joint position since."

7. "Became hysterical with efforts to perform pinprick exam, which was terminated."

8. "Ambulates with cane, which appears unnecessary."

9. "Deep tendon reflexes are hypoactive."

10. "Impression:"

    a. "I do not find persuasive evidence of any covert neurological injury that is responsible for current status."

    b. "No overtly neurological reason that the claimant cannot perform work as an archives reference technician or engage in similar employment."

    c. "No physical limitations."

    d. "No evidence of work-related neurological disability associated with date of injury, 7/26/05."

Psychological Evaluation
August 20, 2008
Page 15
Re: Nancy Cotton

11. "Examination of presented academic work at Trinity College for a B.A. and M.B.A, enrollment in Psi Chi National Honor Society, or transcripts reveal other than an able student. Earlier academic performances at Louisiana State University and Anne Arundel Community College not of the same quality as work at Trinity College. It is to be noted that Ms. Cotton graduated cum laude from Trinity College on 5/20/01 for her bachelor's degree. She attended LSU from '68 to '70. High school record is spotty, with grades ranging from A to C, earning 22 credits: A=3, B=10, C=9."

"Review of work samples provided indicate a high level of conceptual and written language skills."

IV.    <u>INTERVIEW</u>:

**6/18/08, Office, Bethesda, Maryland:**

In response to my questions, Mrs. Cotton identified the following problems related to the 7/26/05 electrical injury:

1. "I can't remember anything I read."

2. "My balance is worse."

3. "Three surgeries to eyes after that, itch and retina bleeds."

4. "Developed 102°F temperature. (Q) About once every six weeks. (Q) Last one May."

5. "Incontinence -- urinary."

Psychological Evaluation
August 20, 2008
Page 16
Re: Nancy Cotton

6. "I wake up in middle of night screaming. (Q) Sometimes as many as three times per night. (Q) Last time yesterday morning, 4 a.m., and couldn't go back to sleep. Numerous death dreams."

7. "Hearing in right ear not as good."

8. "I remember better what I hear than read."

9. "Difficult time with new learning."

10. "Loud noises affect me badly. (Q) E.g., in Safeway, somebody dropped big cardboard box. I screamed and thought I was going to pass out."

11. "Can't remember people's faces. (Q) People I have occasional contact with."

12. "Anxiety related to crossing streets, driving, walking in mall, my balance worse than before. I feel comfortable if I have something to hold on."

13. "More aggressive, a change in personality."

14. "Don't have the drive I had before. Went to school full-time and worked full-time four years ago. I still managed to graduate with almost a 4.0."

15. "I don't read newspapers anymore because I can't remember what I read. I listen to radio, not TV."

16. "Scary movies don't scare me anymore, not like supposed to. Have not had a good belly laugh in three years. I can't seem to laugh in a hearty manner."

17. "Critical decision-making. Can't decide what I want to buy stuff I need."

Psychological Evaluation
August 20, 2008
Page 17
Re: Nancy Cotton

18. (Q) Biggest problem: "I don't know, all wrapped up together. Electricity in hair when thunderstorms, you can feel electricity. When bone scan, felt tingling all over. I don't have to look to feel where it was going. It was weird!"

Injury, 7/26/05: "Received shock opening door at 19th floor, National Archives. Working with records of Civil War. Couldn't get loose, sparks and fire. Circuit breaker blew. I don't remember much. I was confused. Didn't know where I was. They said I shouldn't be alive. (Q) Don't know time. All I know is fire everywhere. I could smell smoke. I was terrified, and hair singed. Insides hurt and head hurt. (Q) My husband took to hospital, G.W. University Hospital -- outpatient. Sent me home after several hours and told to go to my doctor."

Typical Daily Schedule:

| | |
|---|---|
| 6:00-7:30 a.m. | "I get up, downstairs, Diet Coke or iced tea, take pills, go to computer and check e-mails and take care of messages." |
| 7:30-9:00 a.m. | "Eat breakfast. (Q) Scrambled eggs, bagel, if in house, 30-minute biscuits, cantaloupe or melon or yogurt." |
| 9:00-10:00 a.m. | "Get dressed. If take shower, 45-60 minutes. (Q) No, I can get dressed." |
| 10:00-11:30/12:30 p.m. | "Do laundry, dishes. (Q) Dishwasher. Make a couple of phone calls." |
| 12:30-3:00 p.m. | "Eat lunch. (Q) I eat Chinese if available, nothing in particular. Lately, eat meat, never ate before. (Q) I was fairly close to vegan in past. I ate fish and chicken." |

Psychological Evaluation
August 20, 2008
Page 18
Re: Nancy Cotton

| | |
|---|---|
| 3:00-3:10 p.m. | "Husband home at 3:00-3:10 p.m.  (Q)  Ten minutes to get home, eight blocks away.  Don't know what I do." |
| 5:00-6:00 p.m. | "Dinner.  (Q)  Whatever normal American dinner.  Harris Teeter grocery store.  They have salad bar and Chinese food bar and pasta." |
| 6:00-8:00 p.m. | "Sit downstairs, computer or watch TV, but don't watch much TV now, maybe four hours per week.  I fall asleep.  (Q)  I just spent seven years in school.  I don't have time to watch TV." |
| 8:00-10:00 p.m. | "I crash.  (Q)  I consider TV a waste of time.  I have no concept of time.  If in a dark room, don't know what time it is.  I have to get a timer if I have a lot to do so as not to spend too much time on any one thing.  Right now I'm not caught up.  (Q)  I get up two times a night to go to the bathroom since this happened; 3:45 a.m., I wake up every morning at 3:45.  In p.m., accident happened.  (Q)  Three to four times, awaken, startle, bad dreams. (Q)  I had 28 consecutive days of death dreams during April last year." |

<u>Additional Questions Regarding Health Service Providers, Etc.</u>:

1.  Dr. Beadle-Lindsay:  "Referred by Dr. Liberman.  Initial date 9/05, every other week for therapy, supportive.  Diagnosis:  brain injury and PTSD.  Saw one time per week initially.  (Q)  Don't remember.  She administered tests for four to five hours.

Psychological Evaluation
August 20, 2008
Page 19
Re: Nancy Cotton

    2.  (Q) "History of head injury.  I don't know.  It was hot right there (right temporal).  Still gets warm in that place.  Diagnosis and history of brain injury came from Dr. Beadle-Lindsay.

    3.  (Q) "Dr. Basch, M.D., internal medicine.  See every three months.  I've been seeing him for 11 years.  (Q) I see Dr. Liberman, a neurologist, for administration of an EEG.  Don't know when.  Prescribed Paxil yesterday.  Saw since injury."

**Interview, Gary Cotton, Husband:**

    Mr. Cotton informs me that his is a photographic lab technician with the Library of Congress since 1997.  He is a GS-7 and has a BFA in photography from Louisiana Tech University in 1981.  He was in the Marines from 1969 to 1979, E5 sergeant; and Air Force reserves, 1985-1996, when retired.  His health is "generally okay."  His birth date is 1/4/50.

    I asked Mr. Cotton if he would describe his wife pre-injury in comparison to post-injury.  He provided me with the following information:

Pre-Injury (prior to 7/26/05):

1. "Smart."

2. "Handle herself in any situation."

3. "Not afraid of voicing opinion."

4. "Always concerned with daughter."

5. "Went to college and got B.A. and M.B.A. after daughter graduated high school."

6. "Always active politically and socially."

Psychological Evaluation
August 20, 2008
Page 20
Re:  Nancy Cotton

7.  "Keeps in touch with a lot of people, relatives (cousins).  She is an only child and parents gone."

8.  "Garrulous, active, went where she wanted, pretty independent."

9.  "1996, slipped and broke heel (right).  Wouldn't go to doctor unless dying.  Diagnosed diabetic plus overweight."

10.  "Daughter and baby, kept active."

11.  "Healthy for age and situation."

Post-Injury Characteristics (after 7/26/05):

1.  "Personality, irritated easily."

2.  "Physically eats more."

3.  "Gained maybe 100 pounds.  Don't know if diabetic or injury."

4.  "Health has gone down."

5.  "Injury to right arm and bladder infections.  Had to call ambulance two times to take by ambulance to hospital.  (Q)  '06, URI's, whole body shut down, runs out of energy."

6.  "Has been depressed.  All those meetings with doctors and lawyers wears her out. Days when doesn't get out of bed except for bathroom.  (Q)  Anywhere from a half day to three days.  (Q)  A combination of both.  Doesn't like being helpless and dependent on others."

7.  "Has limited driving areas.  (Q)  Laurel, Maryland, plus circle of friends plus Alexandria.  No, I haven't gone to doctors.  She can't negotiate road.  Now, I have to drive.  (Q) Driving cut back 60 percent, goes only if certain where to go.  (Q)  Takes buses to psychologist

Psychological Evaluation
August 20, 2008
Page 21
Re: Nancy Cotton

and lawyer.  Able to navigate areas she has gone and knows for a long time.  Will take a taxi if

has to.  She is anxious about crossing the street."

    8.  "Tries to be independent, but difficult for her."

    9.  "Percentage change overall since injury, health, mental, physical, 40 percent more

dependent."

    10.  "Only able to do housework when has the energy.  Might be several weeks."

    11.  "Biggest negative change:  more dependent physically."

    12.  "Stumbles over words, has conversation, stops, and tries to think of words to say.  (Q)

Can't remember the words; the words don't want to come up to the surface.  Trouble holding

onto words."

    13.  "Doesn't sleep at night, up constantly.  Bladder wakes up too."

    14.  "More sensitive to noise."

    6/19/08:  "One day she will do anything she needs to do, and the next I have to drive to

her women's group and she used to go off by herself."


V.    BRIEF SUMMARY OF OBSERVATIONS IN OFFICE ON 6/18/08 AND 6/19/08:

    1.  Presented for appointments accompanied by husband.

    2.  Ambulates with retractable cane, walks slowly and cautiously.

    3.  Very friendly, cooperative, verbose, at times hyperverbal, likable.

    4.  Spotty test performance alternating between very abstract to very concrete thinking

and problem-solving.

Psychological Evaluation
August 20, 2008
Page 22
Re: Nancy Cotton

    5.   Easily distracted by extraneous noises.  Otherwise, able to attend and concentrate on task at hand, but stimulus-bound.

    6.   Facetious at times but has good sense of humor.

    7.   Eager for conversation, enjoys discussing politics and life events.

    8.   Frequent personal references.

    9.   Moderately dependent on husband.

   10.   Very concerned about negative changes physically and behaviorally post-injury.

   11.   Labors re word-finding in response to test items.

   12.   Expresses considerable mental energy and endurance when motivated.

   13.   Extremely sensitive to perceived weaknesses and inability to process information accurately.

   14.   Somewhat impulsive and hurried in response to test items -- some perseveration noted.

VI.    <u>TESTS ADMINISTERED</u>:

    **6/18/08, Office, Bethesda, Maryland:**

    A.  Basic Achievement Skills Inventory (BASI), Comprehensive Test

    B.  Detailed Assessment of Post Traumatic Stress (DAPTS)

    C.  Family Environment Scale, 3rd Edition (FES-III)

    D.  Finger Oscillation Test (FOT)

    E.  Hand Dynamometer Test (HDT)

Psychological Evaluation
August 20, 2008
Page 23
Re: Nancy Cotton

    F.  Health Problems Checklist (HPCL)

    G.  Human Activity Profile (HAP)

    H.  Reitan-Indiana Aphasia Screening Test (RIAST)

    I.  Rey Auditory-Verbal Learning Test (RAVLT)

    J.  Rey-Osterreith Complex Figure Test (ROCFT)

    K.  State-Trait Anger Expression Inventory (STAXI)

    L.  Trail-Making Test:  A/B

**6/19/08, Office, Bethesda, Maryland:**

    A.  Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-II)

    B.  Wechsler Adult Intelligence Scale, 3rd Edition (WAIS-III)

VII.  <u>TEST SCORES AND INTERPRETATIONS</u>:

**Intellectual/Cognitive Functioning:**

    A.  <u>Wechsler Adult Intelligence Scale, 3rd Edition (WAIS-III)</u>:  This test assesses intelligence.  It is comprised of 11 subtests divided into two major categories, yielding a Verbal I.Q., a Performance I.Q., and a Full-Scale I.Q. for persons age 16 and older.  The Verbal scale consists of six subtests, and the Performance or non-verbal section of the test consists of five subtests.  Various units of the test require verbal responses, and others require the ability to manipulate test materials to demonstrate performance ability.  A scaled score of 10 is considered to be average.  The I.Q. distributions were constructed to have a mean of 100 and a standard

Psychological Evaluation
August 20, 2008
Page 24
Re: Nancy Cotton

deviation of 15 I.Q. points. An I.Q. of 100 defines the performance of the average adult. About

two-thirds of all adults obtain I.Q.s between 85 and 115.

Wechsler Adult Intelligence Scale, 3rd Edition
(WAIS-III)

| Subtests | Raw Score | Std. Score |
|---|---|---|
| Picture Completion | 17 | 8 |
| Vocabulary | 49 | 12 |
| Digit Symbol-Coding | 52 | 8 |
| Similarities | 27 | 13 |
| Block Design | 12 | 4 |
| Arithmetic | 15 | 11 |
| Matrix Reasoning | 15 | 11 |
| Digit Span | 14 | 9 |
| Information | 24 | 14 |
| Picture Arrangement | 11 | 9 |
| Comprehension | 24 | 12 |
| Symbol Search | 27 | 10 |
| Letter-Number Sequencing | 9 | 10 |
| Object Assembly | --- | |

Verbal I.Q. = 112 (High Average)
Performance I.Q. = 86 (Low Average)
Full-Scale I.Q. = 100 (Average)

Verbal Comprehension Index = 116
Perceptual Organization Index = 86
Working Memory Index = 99
Processing Speed Index = 93

Mrs. Nancy Cotton attained a Verbal I.Q. of 112 (High Average), a Performance I.Q. of

86 (Low Average), and a Full-Scale I.Q. of 100 (Average) on the WAIS-III. The overall WAIS-

III test profile reveals considerable variability of test scores.

The highest scaled subtest scores obtained on the WAIS-III were found for Information,

which is a measure of range of factual knowledge, fund of information, and acquired knowledge;

Psychological Evaluation
August 20, 2008
Page 25
Re:  Nancy Cotton

Similarities, which measures verbal comprehension, verbal concept formation, language development, and the ability to separate essential from non-essential details in long-term memory; and Vocabulary, also a measure of verbal comprehension, language development, word knowledge, learning ability, fund of information, concept formation, long-term memory, and verbal fluency.

The lowest scaled subtest score of 4 was found on Block Design, which is a measure of perceptual organization, visual-motor coordination, spatial visualization, visual processing, abstract conceptualizing ability, and speed of mental processing.

The range of scores on the WAIS-III extended from a low of 4 for the Block Design subtest to a high of 14 for the Information subtest.  A scaled score of 10 is considered to be average.

With regard to the composite scores, the Verbal Comprehension Index of 116 was the highest score obtained.  The Verbal Comprehension Index relates to those subtests which measure verbal comprehension; application of verbal skills and information to the solution of new problems; verbal ability; the ability to process verbal information; and the ability to think with words.

The lowest composite score was found for Perceptual Organization, which is the ability to think in terms of visual images and manipulate them with fluency, flexibility, and relative speed; the ability to interpret or organize visually perceived material within a time limit; nonverbal ability; and the ability to form relatively abstract concepts and relationships without the use of words.  The Low Average score obtained on the POI refers to poor perceptual organization; lack

Psychological Evaluation
August 20, 2008
Page 26
Re:  Nancy Cotton

of alertness to detail; poor nonverbal reasoning ability; lack of persistence; inability to work

quickly and efficiently; and poor spatial ability.  It is to be noted that there is a highly significant

difference of 30 points between the Verbal Comprehension Index and the Perceptual

Organization Index.

Mrs. Nancy Cotton was a member of the Honor Society, graduated cum laude at the

bachelor's level, and completed all coursework successfully for a master's degree in business

administration from Trinity College.  It is surprising to note that she attained a Verbal I.Q. of

112, a Performance I.Q. of 86; and a Full-Scale I.Q. of 100, which may be considered unusual for

the achievement-oriented pattern of behavior characterizing Mrs. Cotton's academic work

performance.  It is my impression that there is a diminution in cognitive functioning in terms of

expected verbal attainment, and most certainly for the low and unexpected score for Perceptual

Organization and Performance I.Q.  When comparisons are made between the WAIS-III and the

neuropsychological screening instruments administered, there can be no question regarding

neuropsychological impairment, which may be accounting for the diminished WAIS-III scores

obtained.  It is important keep in mind that early learning is what is most preserved, and it is not

unexpected that the highest scores obtained would be in the verbal domain.


B.  <u>Basic Achievement Skills Inventory (BASI) (Comprehensive Test)</u>:  The Basic

Achievement Skills Inventory (BASI) is a series of multilevel group or individually administered

norm-referenced achievement tests that measure reading, written language, and math skills

among children and adults.  The BASI is designed to be convenient to use, broad in coverage,

Psychological Evaluation
August 20, 2008
Page 27
Re: Nancy Cotton

and well suited to a variety of applications. The BASI measures vocabulary, spelling, language

mechanics, reading comprehension, and math application. There are four levels and eight

different test booklets: Level 1 for grades 3-4; Level 2, grades 5-6; Level 3, grades 7-, and Level

4 for grades 9-12.

| Composite | Std. Score | Percentiles | Grade Equiv. | Age Equiv. | Performance |
|---|---|---|---|---|---|
| Reading Total | 81 | 10 | --- | --- | Below Avg. |
| Vocabulary | 83 | 13 | <3.0 | <8-0 | Below Avg. |
| Reading Comprehension | 81 | 10 | <3.0 | <8-0 | Below Avg. |
| Written Language Total | 91 | 27 | --- | --- | Below Avg. |
| Spelling | 93 | 32 | <3.2 | <8-0 | Below Avg. |
| Language Mechanics | 89 | 23 | <3.0 | <8-0 | Below Avg. |
| Math Total | 75 | 5 | --- | --- | Average |
| Computation | 70 | 2 | <3.1 | <8-0 | Below Avg. |
| Application | 87 | 19 | 12.7 | <8-0 | Average |

The BASI was administered to Mrs. Nancy Cotton for the purpose of obtaining an

accurate measure of her academic achievement levels at the present time. Composite scores in

reading, written language, and mathematics resulted in Below Average performance for all

composites, with the exception of Math Total and Math Application. Equivalents of less than the

third grade were found for Vocabulary, Reading Comprehension, and Language Mechanics; and

the second month of the third grade for Spelling, and the first month of the third grade for

Computation.

A breakdown of the achievement areas and performances on the BASI revealed Below

Average achievement in similar words, synonyms, antonyms, prefixes, suffixes, and roots with

regard to Vocabulary.

Psychological Evaluation
August 20, 2008
Page 28
Re: Nancy Cotton

On Reading Comprehension, literal comprehension, plot, main idea, topic, sentences, and relevant details were all Below Average. Below Average scores were found on inferential comprehension for cause-effect and inferences and conclusions. With regard to Spelling, the second month of the third grade was found, with considerable areas of impairment. On Language Mechanics, grammar, subject, and verb agreement were Below Average; nouns, pronouns, and articles were Average. Adjectives and adverbs were Below Average. On syntax, ending punctuation was found to be Below Average. Capitalization and internal punctuation were also Below Average.

On Math Computation, word problems and exponents, whole numbers, fractions, decimals, order of operations, and percents were Below Average. Geometry was Average; Algebra was Above Average; and Statistics and Probability was found at the Average performance level.

It is to be noted that Mrs. Nancy Cotton graduated with a bachelor's degree cum laude and successfully obtained an MBA. It is highly improbable that this achievement level would be obtained if experienced cerebral dysfunction pre-injury.

It is difficult to ascertain what factors contribute to the severe academic underachievement scores obtained on the BASI given that a Verbal I.Q. of 112, in the High Average classification of intelligence, was obtained on the WAIS-III. The area of greatest impairment on the WAIS-III was found for Performance I.Q., yet in response to the BASI Math Total, the Application aspect of the math achievement problems resulted in a grade equivalent of 12.7, in the Average performance category. It is quite probable that the one-on-one and considerable

Psychological Evaluation
August 20, 2008
Page 29
Re:  Nancy Cotton

structure involved in processing the WAIS-III tasks, in comparison to the open-ended, independent response in performance of the BASI, accounts for the difference.  It is understandable that individuals with cerebral dysfunction, when placed in a highly structured environment, perform at a higher level than when given complete independence to respond at levels dependent on speed and motivation.  However, Mrs. Cotton did not ask any questions during the administration of the BASI and appeared to be motivated and performing at an expected level and within the time constraints required for each of the subtests.  In the event that the BASI is truly representative of Mrs. Cotton's ability to process academic type tasks consistent with her pre-injury I.Q. and academic achievement, it is safe to assume that significant cognitive decline has occurred.

It is necessary for the reader to keep in mind that an achievement test is designed for the specific purpose of assessing prior learning, whereas an intelligence test is designed to measure cognitive functions such as reasoning, comprehension, and judgment.


**Neuropsychological Screening:**

Seven well-validated neuropsychological tests were administered to Mrs. Nancy Cotton to assist in identifying neuropsychological deficits which may account for the problems reported to me at the time of the interview and with regard to the records reviewed with the referral of this case.

Mrs. Nancy Cotton was referred for psychological assessment and follow-up treatment by her neurologist, Dr. Liberman, in referral to Dr. Beadle-Lindsay, who indicated on October 20, 2005, that, in addition to a mood disorder, acute stress disorder, and adjustment disorder, there

Psychological Evaluation
August 20, 2008
Page 30
Re: Nancy Cotton

was a cognitive disorder secondary to the primary diagnoses. Mrs. Cotton was also referred for neuropsychological testing by Dr. Liberman, and she was evaluated on 4/7/06. That evaluation reported that auditory memory ability fell within the Average to High Average range for simple and complex verbal material, but that Mrs. Cotton experienced Average immediate auditory memory ability and High Average delayed auditory memory. Working Memory and General Memory also fell within the Average range. Recognition Memory, or memory assisted by cuing, fell within the Superior range. These results suggested that ". . . information was adequately being encoded into memory. The patient had difficulty with efficiently decoding the information out of memory. . . ." Attention and concentration fell within the Average range, as well as Verbal Fluency, and Visual Scanning and Laterlized Fine Motor Functioning was Average for the right-dominant hand. Abstract Ability was Average.

    Weaknesses were reported with Visual Memory, indicating a Borderline score or Moderate Impairment on Immediate Visual Memory Recall, and a score of Low Average, Mild Impairment on Delayed Visual Memory Recall. ". . . Significant difficulty with visual-spatial functioning. Executive Functioning ability was found to be Average when problem-solving was less complex . . . as the Executive Functioning tasks became more complex, patient's ability fell to the Severely Impaired range . . . . Lateralized Fine Motor Functioning was Mildly Impaired for her left hand . . . Patient's ability to process and store visual information as well as visual-perceptual processing was poor . . . . Her difficulties were consistent with diffuse cerebral injury with more right- than left-sided hemispheric impairment." According to Dr. Beadle-Lindsey.

Psychological Evaluation
August 20, 2008
Page 31
Re: Nancy Cotton

A. <u>Wisconsin Card Sorting Test (WCST)</u>:  The Wisconsin Card Sorting Test was developed to assess abstract reasoning ability and the ability to shift cognitive strategies in response to changing environmental contingencies.  It is considered to be a measure of executive function, requiring the ability to develop and maintain an appropriate problem-solving strategy across changing stimulus conditions in order to achieve a future goal.  The WCST is used as a potential measure of executive function among school-age children and adults and is often referred to as a measure of frontal or pre-frontal functioning with regard to the highly complex structures of the frontal lobes of the brain.

|  | Raw Scores | Std. Scores | T-Scores | Classification |
|---|---|---|---|---|
| Trials Administered: | 128 | --- | --- | |
| Total Correct: | 85 | --- | --- | |
| Total Errors: | 43 | 79 | 36 | Mild |
| Percent Errors: | 34% | 81 | 37 | Mild |
| Perseverative Responses: | 17 | 89 | 43 | Below Average |
| Percent Perseverative Responses: | 13% | 92 | 45 | Average |
| Perseverative Errors | 17 | 87 | 41 | Below Average |
| Percent Perseverative Errors: | 13% | 90 | 43 | Below Average |
| Non-Perseverative Errors: | 26 | 73 | 32 | Mild-Moderate |
| Percent Non-Perseverative Errors: | 20% | 76 | 34 | Mild-Moderate |
| Conceptual-Level Responses: | 74 | --- | --- | --- |
| Percent Conceptual-Level Responses: | 58% | 82 | 38 | Mild |
| Categories Completed: | 2 | --- | --- | 6-10% |
| Trials to Complete First Category: | 30 | --- | --- | 2-5% |
| Failure to Maintain Set: | 6 | --- | --- | <1% |
| Learning to Learn: | -15.61 | --- | --- | 2-5% |

The Wisconsin Card-Sorting Test measures the ability to form abstract concepts, to shift and maintain set, and to use feedback in problem-solving.

The total number of errors placed Mrs. Cotton in the Mildly Impaired category.  Perseverative Responses were found to be Below Average; Perseverative Errors, Below Average;

Psychological Evaluation
August 20, 2008
Page 32
Re: Nancy Cotton

Non-Perseverative Errors in the Mild-Moderate classification; and the Percent Conceptual-Level

Responses were also in the Mildly Impaired category of cerebral dysfunction.  The Categories

Completed were 2, in the 6-10% category.  Compared with normals, frontal-lobe impaired

patients make more perseverative errors and achieve the fewest categories.


   B.  <u>Rey Auditory-Verbal Learning Test (RAVLT)</u>:  This is a test of verbal learning and

memory in which 15 words are repeated individually during five trials in order to memorize as

many words as possible in a 1-1/2-minute time period.

| Trials | <u>1</u> | <u>2</u> | <u>3</u> | <u>4</u> | <u>5</u> |
|--------|----------|----------|----------|----------|----------|
|        | 5        | 7        | 9        | 9        | 11       |

Immediate Memory:   5
Best Learning:          11
Total Learning:         41
Mean:                      8.2 words

   Results of the RAVLT reveals a mild Immediate Memory problem, a diminished Best

Learning score, and a Mild-Moderate Total Learning score. Learning and Memory problems are

very likely to exist, particularly in view of an individual who was a cum laude undergraduate and

who achieved at a level to obtain an MBA in graduate school at Trinity College.


   C.  <u>Rey-Osterreith Complex Figure Test (ROCFT)</u>:  This is a test of visuo-motor

integration in which individuals are required to copy a complex geometric design from a model,

and to copy it from memory one hour later.  It is also a measure of visual memory.

Psychological Evaluation
August 20, 2008
Page 33
Re: Nancy Cotton

Copy from Model:     28.0
Recall, 30 Minutes:    10.5

Responses to the ROCFT using norms for individuals 50 to 59 years of age yielded a

visual memory deficit.

D.  Trail-Making Test:  The Trail-Making Test consists of two parts, A and B.  In A, the

individual is required under time pressure to connect the numbers 1 to 15 arranged on a page.

The requirements are essentially similar in Part B except that it is necessary to alternate between

the numeric and alphabetic series.  The scores recorded are the number of seconds required to

finish each part.  The number of errors made on each part is also recorded.

A = 27 seconds (no errors)
B = 70 seconds (2 errors)

The Trail-Making Test, which measures speed for attention, sequencing, and mental

flexibility, revealed some confusion in completion of Part B, without any significant impairment

noted.

E.  Finger Oscillation Test (FOT):  The Finger Oscillation or Finger Tapping Test

requires the individual to tap as rapidly as possible with the index finger on a small lever which

is attached to a mechanical counter.  The individual is given five consecutive 10-second trials

with both the preferred and non-preferred hand.  The scores on the test are the average number of

taps in 10 seconds for both the dominant and the non-dominant hand.  This test is basically one

Psychological Evaluation
August 20, 2008
Page 34
Re: Nancy Cotton

of simple motor speed, although some degree of coordination is required.  Fifty or less taps in 10

seconds by the dominant hand is considered to be below the cut-off point.

|  | Mean |
|---|---|
| Dominant Hand (Right) | 37.6 taps/10 seconds |
| Non-Dominant Hand | 30.8 taps/10 seconds |

Dominant and Non-Dominant means for females within the 55- to 70-year-old range

showed significant discrepancy from the norms and revealed bilateral impairments in the Mild to

Moderate range.

F.  Hand Dynamometer Test (HDT):  The Hand Dynamometer Test is a measure of

strength of grip and a simple measure of motor strength.

|  | Mean |
|---|---|
| Dominant Hand (Right): | 21.0 kg. |
| Non-Dominant Hand | 12.0 kg. |

Dominant and Non-Dominant means were both significantly below age and gender norms

with regard to upper extremity and grip strength.

G.  Reitan-Indiana Aphasia Screening Test (RIAST):  The Reitan-Indiana Aphasia

Screening Test measures aphasia and sensory perceptual deficits in children aged 5 to 14 years,

identifying deficits common to both learning-disabled and brain-damaged children.

Psychological Evaluation
August 20, 2008
Page 35
Re: Nancy Cotton

Administration of the AST revealed symmetry in the copying of the cross; and reference to the triangle as a rectangle, but then corrected, saying, "I'm sorry, it's a triangle." With regard to the request to write "clock," said "timepiece" initially. Repeating "Massachusetts" resulted in a slight slurring of the word. When asked to draw a key, Mrs. Cotton asked, "Old-fashioned or modern?" The test results did not indicate any clear-cut symptoms of aphasia.

**Personality/Emotional Functioning:**

A. <u>Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-II)</u>: This test was administered to Nancy Cotton to assess individual personality characteristics from an actuarial approach. The MMPI is a 567-item, true-false test composed of ten clinical factors of personality: (1) hypochondriasis, (2) depression, (3) hysteria, (4) psychopathic deviate, (5) masculinity-femininity, (6) paranoia, (7) psychasthenia, (8) schizophrenia, (9) hypomania, and (0) social introversion. Scores are also obtained on four validity scales: Question (?), Lie (L), Validity (F), and Defensiveness (K). The uniform T-score of 50 is assigned the mean value, and the scores 70 and 30 represent two standard deviations from the mean in upper and lower directions respectively. A T-score of 65 and above is clinically interpretable. A normal MMPI personality profile is one which has no scaled scores outside these limits.

There are now MMPI-II content scales (anxiety, fears, obsessiveness, depression, health concerns, bizarre mentation, anger, cynicism, anti-social practices, type A, low self-esteem, social discomfort, family problems, work interference, and negative treatment indicators).

Psychological Evaluation
August 20, 2008
Page 36
Re:  Nancy Cotton

| Validity Scales | Raw Scores | T-Scores |
|---|---|---|
| VRIN | 4 | 46 |
| TRIN | 8 | 58 |
| L | 5 | 57 |
| F | 6 | 58 |
| K | 24 | 61 |
| Fb | 0 | 42 |
| Fp | 0 | 41 |
| S | 35 | 61 |

| Clinical Scales | | Raw Scores | T-Scores |
|---|---|---|---|
| 1 | Hypochondriasis | 14 | 73 |
| 2 | Depression | 34 | 79 |
| 3 | Hysteria | 36 | 82 |
| 4 | Psychopathic Deviate | 21 | 66 |
| 5 | Masculinity-Femininity | 33 | 57 |
| 6 | Paranoia | 9 | 45 |
| 7 | Psychasthenia | 13 | 61 |
| 8 | Schizophrenia | 15 | 65 |
| 9 | Hypomania | 12 | 43 |
| 0 | Social Introversion | 17 | 40 |

| Content Scales | Raw Scores | T-Scores |
|---|---|---|
| ANX | 9 | 55 |
| FRS | 4 | 43 |
| OBS | 4 | 46 |
| DEP | 8 | 55 |
| HEA | 13 | 64 |
| BIZ | 2 | 52 |
| ANG | 4 | 45 |
| CYN | 4 | 42 |
| ASP | 1 | 36 |
| TPA | 2 | 36 |
| LSE | 3 | 47 |
| SOD | 3 | 41 |
| FAM | 0 | 32 |
| WRK | 8 | 50 |
| TRT | 2 | 43 |

Psychological Evaluation
August 20, 2008
Page 37
Re:  Nancy Cotton

| Restructured Clinical Scales | | Raw Scores | T-Scores |
|---|---|---|---|
| RCd | Demoralization | 6 | 53 |
| RC1 | Somatic Complaints | 8 | 62 |
| RC2 | Low Positive Emotions | 9 | 70 |
| RC3 | Cynicism | 1 | 38 |
| RC4 | Antisocial Behavior | 0 | 35 |
| RC6 | Ideas of Persecution | 0 | 43 |
| RC7 | Dysfunctional Negative Emotions | 2 | 40 |
| RC8 | Aberrant Experience | 2 | 52 |
| RC9 | Hypomanic Activation | 5 | 38 |

| PSY-5 Scales | Raw Scores | T-Scores |
|---|---|---|
| AGG | 5 | 44 |
| PSYC | 2 | 46 |
| DISC | 6 | 39 |
| NEGE | 8 | 45 |
| INTR | 17 | 65 |

The MMPI-II was administered directly to Mrs. Nancy Cotton and scored by Pierson Assessments using the Extended Score Report.  The MMPI resulted in a valid profile.  It was essentially a 3-2-1-4-8 profile.  Individuals manifesting responses to the MMPI-II resulting in these scale elevations are characterized as follows:

1.  Feels overwhelmed.

2.  May report feeling sad, depressed, and anxious at times.

3.  Reports lack of energy, feeling worn out, with sleep disturbance.

4.  Frequently receive diagnosis of conversion disorder, somatoform disorder, or pain disorder.

5.  React to stress by developing physical symptoms.

6.  Display depressive symptoms, feel hopeless and pessimistic about the future.

Psychological Evaluation
August 20, 2008
Page 38
Re: Nancy Cotton

7. Agitated, tense, and fearful.

8. Report physical complaints.

9. Have excessive bodily concerns.

10. Preoccupied with health problems.

11. See themselves as physically ill.

12. Impatient and have limited frustration tolerance.

13. Talkative, active, adventurous, spontaneous.

14. May feel empty, bored, and depressed.

15. Judged by others to be intelligent and self-confident.

16. May be in acute psychological turmoil.

17. May be reporting unusual symptoms.

18. Experience apprehension and generalized anxiety.

19. Very interested in achievement, status, and power.

20. Lowered level of efficiency for prolonged periods.

21. Resists psychological formulation of their problems.

22. Tolerate a great deal of unhappiness.

23. Report severe somatic symptoms.

24. Socially extraverted.

25. Dissatisfied and pessimistic in outlook.

26. Distrustful of other people.

27. World is seen as threatening and rejecting.

Psychological Evaluation
August 20, 2008
Page 39
Re: Nancy Cotton

28. Strong needs for attention and affection.

29. May indulge in excessive fantasies.

The Restructured Clinical Scales result in an elevated RC2, Low Positive Emotions. Individuals with this profile have a lack of positive emotional engagement in life. They are unhappy and demoralized, lack energy to deal effectively with the demands in their lives, find it difficult to take charge or make decisions and get things done, feel helpless and hopeless.

The PSY-5 elevation, Introversion and Low Positive Emotionality, reveals little capacity to experience joy and pleasure, reports somatic symptoms, often feels anxious and pessimistic about the future.

The Content Scales of the MMPI-II reveal one elevation, Health Concerns, in which Mrs. Cotton denies good health and is preoccupied with bodily functioning.

The Harris-Lingoes subscales reveal subjective depression, mental dullness, psychomotor retardation, lassitude-malaise, and lack of ego mastery.

B. <u>Detailed Assessment of Post-Traumatic Stress (DAPS)</u>: The Detailed Assessment of Post-Traumatic Stress is a 104-item test of trauma exposure and post-traumatic response designed for use with individuals who have undergone a significant psychological stressor. The DAPS has two validity scales that evaluate a range of trauma-relevant parameters, including the following: lifetime exposure to traumatic events; immediate cognitive, emotional, and dissociative responses to a specified trauma. The symptoms of post-traumatic stress disorder (PTSD) and acute stress disorder (ASD) as defined by the *Diagnostic and Statistical Manual of*

Psychological Evaluation
August 20, 2008
Page 40
Re: Nancy Cotton

*Mental Disorders*, Fourth Edition, Text Revision, DSM-IV-TR, American Psychiatric

Association, 2000, include the likelihood of a PTSD or ASD diagnosis and three associated

features of PTSD, post-traumatic dissociation, suicidal thoughts and behaviors and substance

abuse.

| Validity Scales | Raw Score | T-Scores |
|---|---|---|
| Positive Bias (PB) | 2 | 41 |
| Negative Bias (NB) | 9 | 54 |
| Trauma Specification Scales | | |
| Relative Trauma Exposure (RTE) | 3 | 49 |
| Peri-Traumatic Distress (PDST) | 34 | 71 |
| Peri-Traumatic Disassociation (PDIS) | 29 | 88 |
| Post-Traumatic Stress Scales | | |
| Re-experiencing (RE) | 41 | 105 |
| Avoidance (AV) | 46 | 109 |
| Hyperarousal (AR) | 49 | 116 |
| PTST-Total (PTS-T) | 136 | >100 |
| Post-Traumatic Impairment (IMP) | 24 | 1039 |
| Associated Feature Scales | | |
| Trauma Specific Dissociation (T-DIS) | 13 | 114 |
| Substance Abuse (SUB) | 10 | 47 |
| Suicidality (SUI) | 12 | 53 |

The DAPS was administered to Mrs. Nancy Cotton in that she reports clinical symptoms

of PTSD and has been diagnosed by both Dr. Liberman and Dr. Beadle-Lindsay as having Post-

Traumatic Stress Disorder.

Mrs. Cotton presented valid responses to the DAPS. There were no elevations in the

positive- or negative-bias scales with regard to the Trauma Specification Scales.

Psychological Evaluation
August 20, 2008
Page 41
Re:  Nancy Cotton

Eight of the 13 scales comprising the DAPS were elevated.  The PTSD Scale, the Peri-Traumatic Distress Scale, was elevated, which measures the extent of distress experienced at the time of the trauma.  The Peri-Traumatic Dissociation Scale was also elevated and indicates the degree of association at the time of the trauma as well as depersonalization or de-realization experienced.  On the Peri-Traumatic Stress Scales, the Re-experiencing scale was elevated, which means re-experiencing the symptom cluster of PTSD and ASD, flashbacks and memories.  The Avoidance scale was elevated, relating to avoidance of people, places, conversations, and situations that might trigger intrusions.  The Hyperarousal scale was elevated, which measures tension, sleep problems, irritation, attention and concentration difficulties, hypervigilance, hypovigilance, and startle responses.  The Post-Traumatic Stress Total scale revealed a very high T-score of greater than 100 and is the sum of the Re-experiencing, Avoidance, and Hyperarousal scales.  The Post-Traumatic Impairment scale was elevated, which relates to psychosocial impairment associated with PTSD.

With regard to the Associated Feature scales, the Trauma Dissociation scale was elevated, which evaluates dissociative responses that are directly linked to the traumatic event.  It taps those de-realization, depersonalization, and detachment symptoms that often follow exposure to overwhelming trauma.

On the basis of the results of the DAPS, Mrs. Nancy Cotton meets the test criteria for a diagnosis of PTSD.  However, the diagnosis itself involves a more extensive clinical evaluation.

Psychological Evaluation
August 20, 2008
Page 42
Re:  Nancy Cotton

    C.  State-Trait Anger Expression Inventory, Second Edition (STAXI-II):  This inventory measures the type and expression of anger.  It is used as a screening and outcome measure in psychotherapy and stress management programs, with particular application in behavioral medicine.  This test is used with individuals at risk for heart disease, chronic pain sufferers, and individuals suffering from other psychosomatic and behavioral disorders.  It is a 44-item, paper-pencil Likert-type test assessing anger along six scales:  state anger, trait anger, anger expression, anger control, and subtypes of trait anger (angry temperament and angry reaction).  Age norms are available for individuals between 13 and 65 years.

| Subscales | Raw Scores | Percentiles |
|---|---|---|
| State Anger (S-ANG) | 15 | 50 |
| Feeling Angry (S-ANG/F) | 5 | 50 |
| Feeling Like Expressing Anger Verbally (S-ANG/V) | 5 | 50 |
| Feeling Like Expressing Anger Physically (S-ANG/P) | 5 | 50 |
| Trait Anger (T-ANG) | 14 | 25 |
| Angry Temperament (A-ANG/T) | 6 | 60 |
| Angry Reaction (T-ANG-R) | 4 | 4 |
| Anger Expression-Out (AX-O) | 21 | 97 |
| Anger Expression-In (AX-I) | 12 | 25 |
| Anger Control-Out (AC-O) | 16 | 3 |
| Anger Control-In (AC-I) | 16 | 10 |
| Anger Expression Index (AX Index) | 49 | 90 |

    The STAXI-II was administered to Mrs. Nancy Cotton for the purpose of determining to what extent anger may play in her current personality functioning.

    Two of the 12 scales comprising the STAXI-II were elevated:

    1.  Anger Expression-Out (AX-O):  Individuals with high AX-O scores frequently express their anger in aggressive behavior directed toward other persons or objects in the environment.  The anger may be expressed in physical acts such as assaulting other persons or

Psychological Evaluation
August 20, 2008
Page 43
Re: Nancy Cotton

slamming doors, or it may be expressed verbally in the form of criticism, sarcasm, insults, threats, and the extreme use of profanity. Individuals with high AX-O scores expend a great deal of energy in monitoring and preventing the outward experience and expression of anger

2.    The Anger Expression Index (AX Index): Individuals with this elevated score experience intense angry feelings which may be suppressed or expressed in aggressive behavior, or both.

D.    Beck Depression Inventory, 2nd Edition (BDI-II): This inventory is a 21-item test presented in multiple-choice format which measures the presence and degree of depression in adolescents and adults. Each of the BDI items attempts to assess a specific symptom or attitude specific to depressed patients and consistent with descriptions of depression contained in the existing literature. The 21 items measure the following symptoms and attitudes: sadness, pessimism, discouragement, sense of failure, dissatisfaction, guilt, expectation of punishment, self-dislike, self-accusation, suicidal ideation, crying, irritability, social withdrawal, indecisive-ness, body image distortion, work retardation, insomnia, fatigability, anorexia, weight loss, somatic preoccupation, loss of libido. A score of 0 to 9 is in the normal range; 10-15 relates to mild depression; 16-19 relates to mild to moderate depression; 20-29 relates to moderate to severe depression; 30-63 relates to severe depression.

Total Score = 24

Mrs. Nancy Cotton endorsed 24 items of the BDI-II, placing her in the Moderate classification of clinical depression. The following items were endorsed:

Psychological Evaluation
August 20, 2008
Page 44
Re: Nancy Cotton

1.  I feel sad much of the time.

2.  I feel more discouraged about my future than I used to be.

3.  I have failed more than I should have.

4.  I get very little pleasure from the things I used to enjoy.

5.  I am disappointed in myself.

6.  I am more critical of myself than I used to be.

7.  I cry more than I used to.

8.  I feel more restless or wound-up than usual.

9.  I have lost most of my interest in other people or things.

10.  I have much greater difficulty in making decisions than I used to.

11.  I feel more worthless as compared to other people.

12.  I have less energy than I used to have.

13.  I sleep somewhat less than usual.

14.  I am much more irritable than usual.

15.  My appetite is somewhat greater than usual.

16.  It's hard to keep my mind on anything for very long.

17.  I get more tired or fatigue more easily than usual.

**Health Concerns:**

A.  Human Activity Profile (HAP):  This profile is comprised of 94 self-report items. Each item represents a common activity requiring a known amount of average energy expenditure (metabolic equivalent or MET).  The respondent answers each item with one of three possible responses:  still doing this activity, have stopped doing this activity, or never did this activity.  Ninety-four items contained in the HAP cover a range of 10 METs.  The HAP can be

Psychological Evaluation
August 20, 2008
Page 45
Re: Nancy Cotton

administered to individuals ranging in age from 20 to 79 years with reading ability equivalent to the fourth-grade level required to complete items without assistance. This scale may also be used with adolescents. MAS (Maximum Activity Score) is the highest oxygen-demanding activity that the respondent still performs. AAS (Adjusted Activity Score) is a measure of usual daily activities. Activity Age is the age at which 50 percent of healthy adults of a given age and sex surpass a given MAS. Fitness Classification is a general classification of the respondent's level of fitness. Activity Classification is a general classification of the respondent's level of activity. Energy analysis is the expected energy potential (EEP), a measure of average oxygen consumption based on population studies. LEC (Lifestyle Energy Consumption) is a measure of current oxygen consumption. Dyspnea Scale (DS) provides a measure of problems with shortness of breath.

| Primary Scale | Score | Percentile |
|---|---|---|
| MAS | 58 | <1 |
| AAS | 47 | <1 |

Activity Age: 70+ years
Fitness Classification: Low
Activity Classification: Impaired

The scores of the HAP revealed a Maximum Activity Score (MAS) at less than the 1st percentile, indicating it is the best estimate of the respondent's highest level of energy expenditure in comparison with peers of same age and gender. The Adjusted Activity Score (AAS) was also found at less than the 1st percentile, representing an estimate of respondent's average level of energy expression in comparison with peers of same age and gender. An Activity Age of 70+ was identified, which is an age equivalent for the respondent's activity level. The Fitness

Psychological Evaluation
August 20, 2008
Page 46
Re:  Nancy Cotton

Classification, which is a general classification of fitness level in comparison with peers of same age and gender, was found as Low.  The Activity Classification found Mrs. Nancy Cotton in the Impaired classification of activity level.

B.  <u>Health Problems Checklist (HPCL)</u>:  Nancy Cotton endorsed 16.53 percent of the presented items (39/236).  Eleven, or 28 percent, of the items related to the neurological and urinary categories.  The following items were endorsed:

1.  Recent change in health.

2.  Trouble sleeping.

3.  Loss of strength.

4.  Texture of skin has changed.

5.  Skin drying out.

6.  Change in vision.

7.  Trouble seeing at night.

8.  Change in hearing in one ear.

9.  Change in sense of smell.

10.  Swelling of legs or ankles.

11.  High blood pressure.

12.  Frequent stomach cramps.

13.  Change in bowel movements.

14.  Constipation.

Psychological Evaluation
August 20, 2008
Page 47
Re:  Nancy Cotton

15.  Bone pain.

16.  Muscle cramps.

17.  Balance problems.

18.  Headaches.

19.  Having trouble keeping track of time.

20.  Having trouble concentrating.

21.  Having trouble reading or writing.

22.  Having problems following a conversation.

23.  Frequent urination loss or leak urine.

24.  Sudden and urgent need to urinate.

25.  Menstrual periods have stopped.

26.  Changes of life.

27.  Rarely exercise.

28.  Have a poor diet.

29.  Eat three meals a day.

30.  Always see doctor for yearly checkup.

31.  Have not had checkup in last year.

32.  Am currently being treated by physician.

33.  Have not seen dentist in last year.

34.  Am taking medication prescribed by my doctor.

35.  Do not drink alcohol.

Psychological Evaluation
August 20, 2008
Page 48
Re:  Nancy Cotton

36.  Do not smoke cigarettes.

37.  History of head injury.

38.  History of diabetes.

**Family Constellation:**

Family Environment Scale, 3rd Edition (FES-III):  The third edition of the FES provides normative new normative data and new information about the clinical and research applications of the Family Environment Scale (FES).  The third edition includes new normative data, extensive new information on the clinical, consulting, and program evaluation uses of the FES, and an updated and expanded review of the research.

The FES is composed of 10 subscales that measure the actual, preferred, and expected social environments of families.  These subscales assess three underlying sets of dimensions: Relationship, Personal Growth, and System Maintenance.  Form R describes the current family as perceived.  It is used to understand individual's perceptions of their nuclear families; to formulate clinical case descriptions, and to understand the impact on family adaptation; to monitor change and promote improvement in families describing family climates, and contrast partner's perceptions or parents' and children's perceptions; predict and measure the outcome of treatment; and focus on how families adapt to life in transitions and crises; and to understand the impact of the family on children and adolescents.

Psychological Evaluation
August 20, 2008
Page 49
Re:  Nancy Cotton

Family Environment Scale, 3rd Edition
(FES-III)

| Scale | Raw Score | Standard Score |
|---|---|---|
| 1.  Cohesion | 8 | 59 |
| 2.  Expressiveness | 5 | 47 |
| 3.  Conflict | 2 | 44 |
| 4.  Independence | 5 | 37 |
| 5.  Achievement Orientation | 6 | 53 |
| 6.  Intellectual-Cultural Orientation | 7 | 58 |
| 7.  Active Recreational Orientation | 8 | 64 |
| 8.  Moral-Religious Emphasis | 5 | 51 |
| 9.  Organization | 5 | 48 |
| 10.  Control | 5 | 54 |

The three highest scores obtained on the FES-III were the Active Recreational Orientation, Cohesion, and Intellectual-Cultural Orientation, indicating high participation in social and recreational activities; a high degree of commitment, help, and support provided by the family; and a high interest in political, intellectual, and cultural activities.

The lowest score was found for Independence, with a low degree of assertiveness, self-sufficiency, and decision-making.  The second-lowest score was found for a low amount of openly expressed anger and conflict; and the third lowest related to an average degree of expressiveness, or the extent of encouragement to express feelings directly; the fourth lowest related to the importance placed on clear organization and structure in planning family activities and responsibilities.

All scores were within the normal range.

Psychological Evaluation
August 20, 2008
Page 50
Re:  Nancy Cotton

VIII.    FINDINGS, OPINIONS, AND RECOMMENDATIONS:

A.        At the time of initial contact on 6/18/08, Mrs. Nancy Cotton was a 57-year-old Caucasian female residing with her husband, Gary, at 723 G Street, N.E., Washington, D.C.  The Cottons have been married 36 years, and this has been their only marriage.  The Cottons have one married daughter, Alicia, who is 33 years of age and resides with her husband and four-year-old daughter in Lawrence, Massachusetts.  The daughter is a teacher's aide in a local school and has begun college this year to obtain a teaching degree.  Alicia's husband, David, is a swimming pool contractor.  Mr. Cotton is employed as a photographic laboratory technician at the Library of Congress, where he has worked for the past 11 years.  He earned a bachelor of fine arts from Louisiana Technical University in 1981, and served in the U.S. Marines for 10 years as an E5 (sergeant) and 11 years in the USAF Reserve, from which he is retired following 21 years of active and reserve duty in the military.  He is 58 years old and reportedly in good health.

B.  Mrs. Nancy Cotton was referred for comprehensive psychological evaluation and damages assessment by the law offices of Simon and Associates, 1707 N Street, N.W., Washington, D.C. 20036, on 6/2/08 for plaintiff litigation purposes.

C.  Mrs. Nancy Cotton experienced a work-related electrocution injury while employed by the United States National Archives, where she was employed from December 1997 to April 2007 as a GS-6-5, reference technician, with the old Military and Civil Records Branch, prior to non-formal retirement due to disability.  Mrs. Cotton's vocational history also includes employment from 7/91 to 6/97 as an administrative assistant to the executive director of the Anne Arundel County Association for Retarded Citizens, earning $9.50 per hour.  Other employment

Psychological Evaluation
August 20, 2008
Page 51
Re:  Nancy Cotton

includes cashier for K&B Drugs in Shreveport, Louisiana, for one year; employment as a

secretary and dispatcher with North Carolina Petroleum Services, Rossier City, Louisiana, from

9/89 to 3/03; and from 6/72 to 8/73 as a technical typist for the Institute for Technical Research,

Naval Station, Maryland.

     D.  Mrs. Nancy Cotton earned a bachelor of arts *cum laude* in human relations from

Trinity College, Washington, D.C., in 2001; and a master's of business administration from

Trinity College in 2004.  There can be no question regarding Mrs. Cotton's pre-injury intellectual

status, which is clearly in the superior range of cognitive ability with reference to academic

performance at Trinity College.

     E.  On 7/26/05, approximately 35 months ago, while an employee of the U.S. National

Archives, Mrs. Cotton received 115-120 volts electrical shock when she attempted to open a

metal door that was in contact with a verified live wire at work.  It was reported in the National

Archives occupational health nurse records that ". . . she grabbed door handle to a room on 19E2

and was briefly unable to let go of handle . . . she felt shock throughout her body . . . claims a

shower of sparks fell down on her . . . felt tingling in her teeth fillings . . . feels slightly tingly all

over . . . ."

     F.  The records of George Washington University Hospital Emergency Room of 7/26/05

identified mild first-degree burns to left hand.  There was a Glasgow coma score of 15, with no

reported focal, motor, or sensory deficits reported on examination.  Mrs. Cotton was found to be

oriented to time, place, and person, with normal affect, and discharged to her home.

Psychological Evaluation
August 20, 2008
Page 52
Re:  Nancy Cotton

An 8/1/05 office visit to her primary care physician, Peter Basch, M.D., an internist, reported that ". . . she was shocked so severely that she couldn't let go of the door until the circuit breaker tripped . . . in the interim, her hair started to catch on fire . . . she was told at the ER . . . that she would have died had she not been wearing rubber-soled shoes."

[Mrs. Cotton] "She is still very frightened, not sleeping well, afraid to return to work, and gets frequent flashbacks of being electrocuted.  She is having pain in her scalp and arms."

Dr. Basch diagnosed Mrs. Cotton with severe electrical shock and post-traumatic stress disorder due to the electrical shock.  The 9/26/06 notes of Dr. Basch state that "Mrs. Cotton has been determined to have chronic diffuse brain injury by her psychologist, and she will likely be retiring on medical disability soon."

Miriam Beadle-Lindsay, Ph.D., neuropsychologist, who has counseled, treated, and evaluated Mrs. Cotton from 9/29/05 to 9/24/07, based on presented records, presented diagnoses of (a) mood disorder, major, severe, depression-like episodes due to electrocution; (b) acute stress disorder secondary to electrocution; (c) adjustment disorder, moderate to severe; and (d) rule out cognitive disorder secondary to above.  Dr. Beadle-Lindsay provided a neuropsychological evaluation of Mrs. Cotton on 4/7/06, and provided a diagnosis of cognitive disorder NOS secondary to electrocution; mood disorder secondary to electrocution; major depression, chronic; adjustment disorder with anxiety secondary to above.  She also reported visual memory, visual spatial, complex executive function, and mental speed and efficiency deficits.  In a 9/24/07 letter to OWCP Claims Office, National Archives, Dr. Beadle-Lindsay opined that ". . . it appears the deficits are permanent in nature. . . ."

Psychological Evaluation
August 20, 2008
Page 53
Re: Nancy Cotton

Follow-up visits with Joseph Liberman, M.D., neurologist, between 8/8/05 and 6/7/07 support significant emotional and cognitive deficits post-injury.

A 9/4/07 neurological evaluation by G.J. O'Shanick, neurologist, presented diagnostic impressions of post-traumatic stress disorder, NIDDM, neurolinguistic deficits and balance problems.

Mrs. Cotton underwent outpatient occupational therapy services at NRH between 10/23/06 and 5/31/07, with presented diagnoses of brain injury, unspecified, secondary diagnostic symptoms of nervous and muscular system.

A Workman's Compensation-initiated IME by K.W. Eckman, M.D., neurologist, on 5/23/07 found ". . . no persuasive evidence of any covert neurological injury that is responsible for current status. . . ." and found that claimant can perform work as an archivist reference technician.

In a telephone conference with Joseph Liberman, M.D., neurologist, on 8/6/08, I discussed my findings with Dr. Liberman, and in response to my questions provided the following information:

1.  "Mrs. Cotton should see a neurologist two times a year." (Life)

2.  "Psychiatric treatment should be continued."

3.  "If husband passes away, will be in trouble."

4.  "Assisted living five years earlier than usual may be expected."

5.  "Tried on Zoloft and on low-dose Paxil."

Psychological Evaluation
August 20, 2008
Page 54
Re: Nancy Cotton

6.  "Mrs. Cotton saw a psychiatrist not too long ago who recommended an SSRI, 10 mg. of Zoloft, but her tongue became swollen plus other symptoms, and she was taken off that medication.  I have recommended 10 mg. of Paxil, which she will probably need for life."

7.  "Mrs. Cotton is depressed and anxious."

8.  "No question regarding the sincerity of her complaints."

9.  "Very consistent with symptoms."

10.  "Not competitively employable."

11.  "Not surprised at degree of impairment you found."

12.  (Q)  "MRI showed atrophic changes, but didn't tell anything.  No evidence of CNS dysfunction."

13.  "I thought problems would last for a few months or so, but she didn't change."

14.  "I have known since 2005, for three years."

G.  The June comprehensive psychological evaluation of Mrs. Nancy Cotton is summarized as follows:

1.  Full-Scale WAIS-III I.Q. of 100, 26 points difference between Verbal and Performance I.Q.'s, which were 112 and 86, respectively.

2.  Basic Skills Inventory (Achievement) revealed Reading and Written Language grade equivalents at the early elementary level, as well as Math, with the exception of Math Applications at the college level.

3.  Executive functioning, which involves abstract reasoning ability along with the ability to shift cognitive strategies in response to changing environmental contingencies and to

Psychological Evaluation
August 20, 2008
Page 55
Re:  Nancy Cotton

develop and maintain appropriate problem-solving strategies across changing stimulus conditions, resulted in below average to mild to moderate impairments.

4.   Auditory learning scores revealed a mild deficit.

5.   Visual memory revealed a mild deficit.

6.   Neuropsychological testing in general, using age and gender norms where available, found numerous weaknesses and deficits.

7.   The three highest MMPI-II clinical scale elevations were found for hysteria, hypochondriasis, and depression.  The highest elevation on the Restructured Clinical Scales was found for Low Positive Emotions.  A PSY-5 scale elevation was found for Introversion and Low Positive Emotionality.

8.   The diagnosis of post-traumatic stress disorder was supported by the Detailed Assessment of Post Traumatic Stress elevated scales, indicating a high level of distress, dissociation at time of trauma, reexperiencing of symptom clusters, avoidance, hyperarousal, and psychosocial impairment.

9.   Expends a great deal of energy in monitoring and preventing the outward experience and expression of anger.

10.   Beck Depression Inventory-II yielded a total score of 24, in the Moderate classification.

11.   Multiple health concerns.  Suffers from high blood pressure and diabetes.

12.   Human Activity classification of Impaired, with an activity age of 70.

Psychological Evaluation
August 20, 2008
Page 56
Re: Nancy Cotton

13.    The family environment is cohesive, low in conflict, achievement oriented, with a high interest in political, intellectual, and cultural activities and participation in social and recreational activities.

H.  It is my opinion, with a high degree of psychological probability, that Mrs. Nancy Cotton has experienced significant cognitive decline following the electrocution injury.  Mrs. Nancy Cotton manifests in her cognitive style a significant difference between Verbal and Performance I.Q. of 26 points, in addition to extremely low grade-equivalent scores on an individual test of academic achievement.

Intelligence involves the ability to deal with abstractions, the ability to learn, and the ability to cope with new or novel situations.  An intelligence test is designed to measure cognitive functions such as reasoning, comprehension, and judgment.  An achievement test is designed for the specific purpose of assessing prior learning.  At the present time, Mrs. Cotton is able to present sufficient cognitive flexibility to obtain a High Average score with regard to the verbal I.Q. and a Low Average score on Performance or nonverbal functioning.  Her academic achievement levels are exceptionally low, and all at the Below Average range, with grade equivalents at the third grade level, with the exception of Mathematics Applications.

Although Mrs. Cotton is able to present I.Q. scores between the High Average and Low Average range, she is unable to use information effectively, as she can't recall and process previously learned information successfully, as demonstrated by the low scores obtained on the BASI (Basic Skills Inventory).  Additionally, executive functioning is impaired.  Executive functions are a collection of processes that are responsible for guiding, directing, and managing

Psychological Evaluation
August 20, 2008
Page 57
Re: Nancy Cotton

cognitive, emotional, and behavioral functions, particularly during active, novel problem-solving activities. It is necessary to keep in mind that Mrs. Cotton was a *cum laude* undergraduate and was able to obtain a master's degree successfully a few short years ago. At the present time, her memory functions have been weakened and show deficit with regard to storing information and retrieving knowledge. Memory contributes to almost every aspect of higher nervous system functions, including perception, recognition, language, planning, problem-solving, and decision-making. If cognition, executive functions and emotions are is significantly impaired, all activities of daily living are negatively impacted by these deficits. This represents the current situation, in my opinion, which negatively impacts on Mrs. Cotton's adjustment to life as a result of the sole identifiable stressor of sufficient magnitude to account for the dramatic changes in pre- and post-injury behavior and adjustment to life.

I.  It is my opinion, with a high degree of psychological probability, that the combination of cognitive, neuropsychological, and emotional impairments significantly impact on Mrs. Cotton to the extent that her injuries are permanent and that she will never be competitively employable. It is my opinion, with psychological certainty, that Mrs. Nancy Cotton is a vulnerable and high-risk individual for additional injury owing to her cognitive impairments, executive function deficits, and high level of emotional distress. She requires careful monitoring, continuing neurological, psychiatric, and psychological support, as well as assistance with some activities of daily living, especially as they relate to activities of daily living including house-cleaning, shopping, and driving.

Psychological Evaluation
August 20, 2008
Page 58
Re: Nancy Cotton


     I reserve the right to amend this report in the event that additional information is

presented and requires review and has the potential for revising the opinions herewith presented.

     J.   The attached recommendations for services are based on the current evaluation and

the analysis, synthesis, and interpretation of all data presented for review in preparing this report.



Raphael Minsky, Ed.D.
Rehabilitation Psychologist


RM:gs

Attachment

Cottom, Nancy

Life Expectancy: 26.4 yrs. Remaining[i]
--------------------------------

**Recommendations and Costs of Implementing Necessary Services**

| Services/Item | Freq | Age at Initiat. | Durat. | Unit$ | Ann.$ |
|---|---|---|---|---|---|
| **I.    Medical Services** | | | | | |
| a) Neurologist | 2x/year | now | life | $380-610/o.v. | $760-1,220 |
| b) Psychiatrist (medication/ monitoring | 1x/week 1x/month | now 59 years | 1 year life | $200/sess. $200/sess. | $10,400 $2,400 |
| c) Psychologist (individual psychotherapy) | 2x/month 1x/month | now 59 years | 1 year 2 years | $150/sess. $150/sess. | $3,600 $1,800 |
| **II.   Evaluations** | | | | | |
| a) Neuropsychological | 1x/cost | 60 years | ---- | $2,500/eval. | |
| b) MRI: Brain | 1x/cost | 65 years | ---- | $2,750/eval. | |
| c) Blood Monitoring: Paxil or other antidepressant | 3x/year | now | life | $60/eval. | $180 |
| **III.  Medications** | | | | | |
| a) Paxil or other antidepressant | 10 mg/day | now | life | $3.33/day | $1,215.45 |
| **IV.   Attendant Care** | | | | | |
| a) Homemaker Services: House Cleaning Crew | ev. 3 weeks | now | till age 80 | $85/cleaning | $1,473.33 |
| Shopping/Trips to Health Service Providers | 6 hours/week | now | till age 80 | $19.50/hour | $6,084 |
| b) Probable Assisted Living | 365 days | 80 years | life | $7,900-10,000/ month | $94,800-120,000 |
| **V.    Transportation** | | | | | |
| a) Travel for Treatment | 2,000 miles/yr. 1,000 miles/yr. 500 miles/yr. | now 58 years 60 years | 1 year 2 years 1 year | $.58/mile $.58/mile $.58/mile | $1,160 $580 $290 |

[i] /Source: National Vital Statistics Report, Vol. 54, No. 14, April 19, 2006, United States Life Tables, 2003.

Dr. Raphael Minsky, P.C.
Rehabilitation Psychology
The Christopher Condominium
Suite 101
4808 Moorland Lane
Bethesda, Maryland 20814

## VITAE

**Education/Certification**

Ed.D. – Human Development Psychology --- University of Maryland, 1969
National Register of Health Service Providers in Psychology
Licensed Psychologist – Washington D.C., Lic. # PSY 574; Maryland, Lic. # 737
Certified as Supervisor of Psychological Services – MD State Department of Education

**Employment History**

Rehabilitation psychologist, private practice (full time)

Consulting psychologist, Maryland Department of Vocational Rehabilitation; Prince George's County; Montgomery County, Division of Vocational Rehabilitation

Consulting Psychologist and Team Leader, Diagnostic and Professional Support Team, Office of Associate Superintendent, Montgomery County Public Schools, Rockville, MD

Supervisor, Division of Psychological Services, Montgomery County Public Schools, Rockville, MD

Coordinator, Office of Mental Retardation Planning, Maryland State Board of Health and Mental Hygiene, Baltimore, MD

Psychologist, Junior Village – District of Columbia Department of Public Welfare, Health and Welfare Council, Washington, D.C. (NIMH Project)

Psychologist, Naval Personnel Research and Development Laboratory, Department of the Navy, Washington, D.C.

Research Associate in Psychology, Georgetown University Medical Center, Department of Psychiatry and Psychology, Washington, D.C.

Clinical Psychology Traineeship, Georgetown University Medical Center, D.C. General Hospital, Washington, D.C.

Teacher, Montgomery County Public Schools, Rockville, MD

Social Worker, District of Columbia Department of Public Works & Welfare, Washington, D.C.

Vitae
Raphael Minsky, Ed.D.
Page: 2

## Faculty Positions

1967 – 1968    Assistant Professor, Coppin State University, Baltimore, MD, Department of Special Education

1979 – 1982    Adjunct Professor, Howard University School Psychology Program, College of Education, Washington, D.C.

1991 – Present    Adjunct Assistant Professor of Psychiatry, Georgetown University School of Medicine, Washington, D.C.

## Professional Memberships

American Psychological Association
  Co-Chairman, Board of Professional Affairs
  Committee on Promoting Public Interest Activities, 1973-1978

Journal of Psychology in the Schools, Consulting Editor, 1970-1988

Fellow, Maryland Psychological Association
  Ethics and Professional Practices Committee, 1971-1976
  Chairperson, 1974-1976
  Chairperson, Nominations and Elections, 1976-1977

Maryland School Psychology Association
  President, 1975-1976

## Selected Publications

Levy, B.I. and Minsky, R., Manual for Assessment of the Accuracy of Drawings of Human Figures, Washington, D.C.: B.I. Levy, 1962

Levy, B.I., Lomax, J. and Minsky, R., An Underlying Variable in the Clinical Evaluation of Drawings Of Human Figures. Journal of Consulting Psychology, 1963, 27, 508-512

Miller, A.I., D'Agostino, A., and Minsky, R., Effects of Combined Chlordiazepoxide and Alcohol in Man, Quarterly Journal of Studies on Alcohol, 1963, 24, 9-13

Minsky, R., (principal author) Maryland State Comprehensive Mental Retardation Plan, Maryland State Board of Health and Mental Hygiene, Baltimore, MD, 1965

Minsky, R., Hypothetical Constructs and Intervening Variables Influencing the Development of Mental Retardation Planning. Maryland State Department of Mental Hygiene. Current Developments in Research and Programs, 1965, pp.51-59

Minsky, R., Problems Encountered in Job Maintenance with the Mentally and Emotionally Disabled. Journal of the Maryland Rehabilitation Association, Summer 1977, vol. 11, no. 1, pp. 25-30

Vitae
Raphael Minsky, Ed.D.
Page: 3


## Selected Presentations

The Meaningfulness of Comprehensive Mental Retardation Planning, Maryland Association for Retarded Children. Baltimore, MD, April 1965

Psychological Assessment of Indochinese Refugees. Paper presented at annual meeting of the American Psychological Association, September 1980

The Defense Assessment of Damages in Children, lecture, The National Insurance Defense Conference & Seminar, West Palm Beach, FL, November 1990

Catastrophic Injury Claims, lecture panelist, The National Insurance Defense Conference & Seminar, West Palm Beach, FL, November 1990

Cost Saving in Long-term Care Claims, lecture panelist, The National Insurance Defense Conference & Seminar, Jackson Hole, WY, July 1990

Post-Traumatic Stress Disorder, clinic panelist, The National Insurance Defense Conference & Seminar, West Palm Beach, FL, November 1991

Catastrophic Injury Claims, The Detection of Inflated Life-Care Plans and use of Rehabilitation Analysis, The National Insurance Defense Conference and Seminar, Los Angeles, CA, July 1992

Georgetown University School of Medicine: Program in Law and Psychiatry. The National Conference on Psychological Injury Claims and Litigation, Palm Beach, FL, June 1993, The Forensic Examination of Injured Children

American College of Legal Medicine Conference on Brain Function and Impairment, San Antonio, TX, October 1993. The Analysis of Damages in Pediatric and Catastrophic Head Injury Cases.

Insurance Conference on Psychological Injury Claims: Georgetown University School of Medicine, October 20-22, 1994. Palm Coast Sheraton Resort, Palm Coast, FL. The Evaluation of Catastrophic Injury Claims.

Insurance Conference on Psychological Injury Claims: Georgetown University School of Medicine, October 16-18, 1995. Grand Traverse Village, Michigan. The Evaluation of Catastrophic Injury Claims.

Insurance Conference on Psychological Injury Claims: Georgetown University School of Medicine, October 21-23, 1996. Antlers Doubletree Hotel, Colorado Springs, Colorado. The Evaluation, Assessment and Control of Damages in Personal Injury Claims.

Association of Practicing Psychologists, Montgomery-Prince George's Counties, Inc., November 3, 1996, Quality Hotel, Silver Spring, Maryland, Stretching the Conscience of the Expert Witness.

Insurance & Law Conference on Psychological and Neurological Injury Claims: MEDPsych Corp., September 25-27, 1997, Palm Coast Harborside Resort, Palm Coast, FL. The Evaluation, Assessment and Control in Personal Injury Claims.

Vitae
Raphael Minsky, Ed.D.
Page: 4

Insurance & Law Conference on Psychological & Neurological Injury Claims: Insurance Claim Managers and Defense Counsel, MEDPsych Corp., July 13-15, 1998, Elkhorn Resort, Sun Valley, Idaho. The Evaluation and Control of Damages in Personal Injury Cases.

Insurance & Law Conference on Psychological & Neurological Injury Claims: Insurance Claim Managers and Defense Counsel, MEDPsych Corp., June 14-16, 1999, Le Meridien Hotel, New Orleans, LA. The Evaluation and Control of Damages in Personal Injury Cases.

Keynote Speaker: United States Air Force European Trial Advocacy Course, February 20, 2008, USAF Base Ramstein, Germany. Selecting Prospective Jurors through the Identification of Personality Traits

## Professional Interests and Skills

Forensic Psychology

Evaluation of Children, adolescents and adults; development of personal, social, academic and vocational profiles; design of comprehensive life plans related to developmental disability and treatment recommendations; identify short and long-term life needs and prepare cost statement based on current figures; testify in court as expert.

Expert Skills

Diagnosis and evaluation of disability occurring at all age levels and across full range of disabling conditions; the relationship of handicapping conditions to educational treatment; special education regulations governing the placement of handicapped children in educational settings; matching children to optimal educational environments; identification of residential and treatment programs on a national basis for children in age from birth to twenty-one years of age; recommending related services; knowledge of hospital residential treatment and day care centers for the handicapped; individual, group and family psychotherapy; mediation of conflict situations; management of stress related conditions.

07/08

Dr. Raphael Minsky, P.C.
Rehabilitation Psychology
The Christopher Condominium
Suite 101
4808 Moorland Lane
Bethesda, Maryland 20814

Telephone 301-654-2787                                    Telecopier 301-654-2791

## FEE SCHEDULE

Hourly Rate: $385.00

Out-of-D.C. Metropolitan Area Hourly Rate: $450.00

Deposition Fee: $1,800.00 (up to 4.0 Hours)

Trial Testimony Fee: $2,500.00 (up to 4.0 Hours)

06/01/06

Raphael Minsky, Ed.D., P.C.
Rehabilitation Psychology
The Christopher Condominium
Suite 101
4808 Moorland Lane
Telephone 301-654-2787                    Bethesda, Maryland 20814              Telecopier 301-654-2791

## DEPOSITION AND TRIAL TESTIMONY

### 2003 Depositions

| | | | |
|---|---|---|---|
| 01/30/03 | Robinson, Keith (PL) | Daniel S. Kozma, Esq. Koons, McKenney, Johnson, DePaolis & Lightfoot 2020 K Street, N.W. – Suite 500 Washington, D.C. 20006 | Stephanie Robinson v. Floyd H. Johnson and James H. Taylor, Superior Court of the District of Columbia, Civ. Act. # 97-CA006013 |
| 02/10/03 | Vonceal Yvette Urquheart (PL) | Thomas Cardaro & Associates 201 North Charles Street Suite 1903 Baltimore, MD 21202 | Vonceal Yvette Urquheart, et al. v. Kevin C. Kearney, M.D., et al., Circuit Court for Wicomico County Maryland, Civ. Act. No.: 22-C-02-000019-OC |
| 02/26/03 | Rogers, Gloria (PL) | Thomas Cardaro & Associates 201 North Charles Street Suite 1903 Baltimore, MD 21202 | Gloria Rogers v. David L. Pearle, M.D., et al., Superior Court of the District of Columbia, Civil No.: 00495-01 |
| 04/14/03 | Ford, Khendrick (PL) | Thomas C. Cardaro & Associates 201 North Charles Street Suite 1903 Baltimore, Maryland 21201 | Kedra Ford, et al. v. Shields-Ann Hope, M.D., et al., Circuit Court for Prince Georges County, Maryland, Case # CAL01-27928 |
| 05/13/03 | Boutte, Aniah (PL) | Bruce J. Klores & Associates 915 Fifteenth Street, N.W. Third Floor Washington, D.C. 20005 | Celeste Veronique Boutte vs. Medlantic Healthcare Group, Inc., et al., Superior Court for the District of Columbia, Civil Action No. 02oa000384 |
| 05/13/03 | Boutte, Aujenae (PL) | Bruce J. Klores & Associates 915 Fifteenth Street, N.W. Third Floor Washington, D.C. 20005 | Celeste Veronique Boutte vs. Medlantic Healthcare Group, Inc., et al., Superior Court for the District of Columbia, Civil Action No. 02oa000384 |
| 09/17/03 | McQuity, Dylan (PL) | Bruce Babij, Esq. Dugan, Jakubowski, Babij & Spector, LLC 1966 Greenspring Drive Suite 500 Timonium, Maryland 21093 | Dylan McQuitty v. Franklin Square Hospital Center, Inc., et al., Circuit Court of Maryland for Baltimore County, Civil Case No. 03-C-01-009275 |

Page Four
Raphael Minsky, Ed.D.
Expert Witness Testimony

| | | | |
|---|---|---|---|
| 04/19/05 | Baker, Christal, et al. (DEF) | Paul Brown, Esq. Thompson Coburn, LLP One US Bank Plaza St. Louis, MO 63101 | Christal L. Baker, et al. v. Union Pacific Railroad, Case # 032-652, Div. 1 Circuit Court of the City of St. Louis, State of Missouri |
| 05/17/05 | Swan, Devin (PL) | Cardaro & Peek 201 North Charles Street Suite 1903 Baltimore, MD 21201 | Renee Swann as parent of Devin Swan v. Franklin Weinstein, M.D. Circuit Court of Baltimore County Case # 03-C-03-12696 |
| 05/18/05 | White, Christopher (PL) | Daniel Kozma, Esq. 2120 L Street, N.W. Washington, D.C. 20037 | Christopher White, et al, v. Peter Calomtris, et al, Superior Court for the District of Columbia, Civil Div. Case # 03-1833MW |
| 05/24/05 | Sangraula, Manju (PL) | Bruce Klores & Associates 915 15th Street, N.W. Washington, D.C. 20005 | Manju Sangraula, et al. v. George Washington University, et al., Superior Court for the District of Columbia, Civil Div. # 02-8415 |
| 07/07/05 | Webster, Augustin K. (PL) | Cardaro & Peek 201 North Charles Street Suite 1903 Baltimore, MD 21201 | Katherine Keyes Webster et al. vs. Albert C. Simmons, IV, M.D., et al. United States District Court for the District of Maryland Southern Division, Case No: DKC 03 CV 3306 |

### Trials 2005

| | | | |
|---|---|---|---|
| 06/08/05 | Turner, Thomas (PL) | Robert W. Godwin, Esq. Law Office of Steven Kantor 5800 Main Street Williamsville, NY 14221 | Thomas Turner v. CSX Transportation, Inc., State of New York Supreme Court: County of Erie, Index # I 2003-5759 |

### Depositions 2006

| | | | |
|---|---|---|---|
| 05/16/06 | Samuel, Geno (PL) | Ron Simon, Esq. Law Offices Simon & Associates 1707 N Street, NW Washington, D.C. 20036 | Sharon Samuel v. Eric Flemming Superior Court of the District of Columbia Civil Division, CA No. 05-3578 |
| 09/25/06 | Cibula, Joshua Andrew (PL) | Bruce J. Klores & Associates 1735 20th Street, N.W. Washington, D.C. 20009 | Andrew L. Cibula vs. United States of America, United States District Court for the Eastern District of Virginia |

Page Five
Raphael Minsky, Ed.D.
Expert Witness Testimony

| | | | |
|---|---|---|---|
| 10/30/06 | Wade, Willie Jr.<br>(PL) | Shadoan, Michael & Wells, LLP<br>108 Park Avenue<br>Rockville, Maryland 20850 | Willie Wade, Jr. and Patricia Wade v. Shobha Chidambaram, M.D., et al., Circuit Court for Prince George's Maryland, Case No.: CAL06-01993 |
| 11/02/06 | Mohamed, Ibtihal Ysuph Ali<br>(PL) | Daniel E. Schultz, Esq.<br>1050 17th Street, N.W.<br>Suite 1250<br>Washington, D.C. 20036 | Ibtihal Ysuph Ali Mohamed v. Maria Cecilia A. Rasul, M.D., Superior Court for the District of Columbia, Civ. Act.: 04CA008195 |

<u>Trials 2006</u>

| | | | |
|---|---|---|---|
| 06/14/06 | Orzech, Ryan James<br>(PL) | John Ballow, Esq.<br>The Ballow Law Firm<br>8226 Main Street<br>Buffalo, NY 14221 | State of New York Supreme Court: County of Erie, Ryan James Orzech v. Brain Smith, M.D., OB/GYN Associates of W.N.Y., Mercy Hospital, Catholic Health System, Index No.: 12003-4811 |
| 09/13/06 | Hull, Ta'Bryia Christina<br>(PL) | Cardaro & Peek, LLC<br>201 North Charles Street<br>Suite 2100<br>Baltimore, Maryland 21201 | Doreen Ramseur, et al. v. Joan Redfearn, M.D., et al., Superior Court of the District of Columbia, CA No. 04-004582 |
| 09/21/06 | McQuitty, Dylan<br>(PL) | Bruce J. Babij, Esq.<br>Dugan, Babij, Tolley & Spector<br>1966 Greenspring Drive<br>Suite 500<br>Timonium, Maryland 21903 | Dylan McQuitty v. Franklin Square Hospital Center, Inc., et al., Circuit Court of Maryland for Baltimore County, Civil Case No. 03-C-01-009275 |
| 10/31/06 | Cibula, Joshua Andrew<br>(PL) | Bruce J. Klores & Associates<br>1735 20th Street, N.W.<br>Washington, D.C. 20009 | Andrew L. Cibula vs. United States of America, United States District Court for the Eastern District of Virginia |

<u>Depositions 2007</u>

| | | | |
|---|---|---|---|
| 02/19/07 | Toledo, Edgar<br>(PL) | Ron Simon, Esq.<br>Simon and Associates<br>1707 N Street, N.W.<br>Washington, D.C. 20036 | Edgar Toledo vs. Providence Hospital, et al, Superior Court of the District of Columbia, Civil Action No. 05-00010473 |

**Page Six**
**Raphael Minsky, Ed.D.**
**Expert Witness Testimony**

## Trials 2007

| | | | |
|---|---|---|---|
| 03/07/07 | Toledo, Edgar (PL) | Ron Simon, Esq. Simon and Associates 1707 N Street, N.W. Washington, D.C. 20036 | Edgar Toledo vs. Providence Hospital, et al, Superior Court of the District of Columbia, Civil Action No. 05-00010473 |
| 05/31/07 | Jaindl, Jennifer A. (PL) | John G. Gill, Jr., Esq. Gill, Sippel & Gallagher The B&O Railroad Station Rockville, Maryland 20850 | Jennifer A. Jaindl vs. Adventist Healthcare, Inc, d/b/a Shady Grove Adventist Hospital, et al., Civil Action No. 269300-V |

## Depositions 2008

| | | | |
|---|---|---|---|
| 08/13/08 | Smith, Mekhi V. (PL) | Ron Simon, Esq. Simon and Associates 1707 N Street, N.W. Washington, D.C. 20036 | Arlana Walford v. Cee-Ron Enterprises, Inc, et al., In the Superior Court of the District of Columbia, Case No. 2005 CA 003577 B |

# EXHIBIT
# F

**Date:** August 28, 2008

**Prepared for:**
Simon Associates
1707 N Street NW
Washington, DC 20036
202-429-0094
202-429-0075 (Fax)

**Re: Nancy Cotton v. Grunley Construction Company, Inc. et al.**

**Date of Incident:** July 26, 2005

**NOTE:** The opinions in this document are expressed to a degree of engineering probability being more likely than not and are subject to change or modification as new information may become available.

**Background and Expertise:**

**Summary of Background and Expertise:**

In preparing this report, I rely on my background and expertise in the areas of biomedical and electrical engineering with specific expertise in the area of electric shock injury, the effects of electricity on the human body and electrical safety.

 In support of my expertise, I hold a Ph.D. in engineering from Clemson University with specific focus on bioengineering and a minor in electrical engineering. My undergraduate degree (BS) and master's degree (MS) are in Biomedical Engineering from Tulane University. My master's research dealt specifically with a study of the effects of electricity when applied to living tissue. Since 1985, I have studied, consulted, and published in the area of electrical injury and electric shock. In 1990, I received a patent on a device for providing electrical stimulation to human tissue. I have presented and published much of my work. Recent publications have included multiple refereed journal articles, conference publications, an encyclopedia entry (book chapter), and several trade and professional magazine articles.

For more than I decade, I have been focusing my professional efforts on the study of electrical injury, and the long-term effects of electrical contact. During that time, I have reviewed hundreds of electrical injury cases and have examined and studied the products, environments and designs associated with electrical injury. Much of my effort has been directed toward understanding the cause and prevention of electric shock and toward advancing electrical safety.

For academic year 2001-02 and then in 2008-09, I was granted sabbatical leave from my position at the University of San Diego with the specific purpose of using that time to

study electrical injury. The results of that research from my first sabbatical have been published and presented.

I currently hold the rank of full professor of electrical engineering at the University of San Diego. During my tenure at USD, I have regularly taught classes that have as a focus the discussion of the engineering design process, product and electrical safety, and the effects of electricity on the human body.

As a consultant and expert witness, I have given testimony in many state and federal courts regarding electrical injury, electrical safety, effects of electricity on the human body, pain and suffering from electrical contact, and electromechanical product failure. I also maintain and regularly update an extensive library on the subject of electrical injury, electrical safety, and the effects of electricity on the human body.

**Scenario:**

On July 26, 2005, Nancy cotton, while at work at the National Archives in Washington, DC, opened a metal door (in a location identified as 19.E1). Ms. Cotton was using her left hand to open the door. There was an exposed hot wire from a 120 volt circuit extending from an overhead conduit. The wire extended far enough to contact the door while it was being opened. During the process of opening the door, the exposed lead was pushed far enough (by the door) to contact the obviously grounded conduit, thus causing sparks to rain down from above. This contact between the hot lead and the conduit caused the associated circuit breaker to trip and de-energize the circuit. Shortly prior to the incident, another employee, Jack House, while pushing the door open with a wooden cart, caused the wire to short to the conduit and cause sparking. The first contact did not cause the breaker to trip. It was reported that the door barely cleared the conduit and that the motion of the door pinched the wire to ground.

In the initial medical records, it is noted that Nancy cotton received a 1st degree burn to her left hand. It has been represented to me that the burn was on the inside of her hand where it made contact with the door handle. Burns were reported on Ms. Cotton's dress that would be consistent with damage from the sparks. Ms. Cotton also was injured by the sparks falling on her head.

Subsequent to the shock, Ms. Cotton experienced, left hand numbness, anxiety, muscle cramps, headaches, cognitive losses and memory problems. Ms. Cotton was diagnosed with PTSD.

**Discussion:**

**The electrical contact:**

Due to the lack of an extensive and detailed investigation of the electrical environment, many facts may never be known. Much can be inferred from what is known.

> The burn marks (as noted in photographic evidence provided for my review) on the ceiling, surrounding the end of the conduit, suggest that the energized wire short circuited when it came into contact with the conduit. It would have been expected that the conduit would provide a conductive pathway to ground.

> The lack of obvious and extensive burn marks where the wire contacted the door suggest that the door itself did not provide a pathway (short circuit) to ground.

> The presence of a 1st degree burn (as noted in the medical records) on Ms. Cotton's hand is an absolute indicator of an electrical contact. (Note: It has been represented to me that the burn on Ms. Cotton's left hand was on the inside of the hand where the hand made contact with the door and would not have been exposed to falling sparks during the incident.)

3

From these facts, it can be inferred that more likely than not, the energized wire created an electrical pathway to Ms. Cotton while the door was being opened. That pathway was of sufficient resistance so as not to immediately cause sparks or high enough current flow as to trip the circuit breaker.

When the door opened far enough and the energized wire was pinched to the conduit, a low resistance pathway was created to ground. Such a pathway would have caused the generation of the sparks as noted by Mr. House and then later by Ms. Cotton. Such a low resistance path to ground would have created sufficient current flow to cause the circuit breaker to trip.

During the brief period between the door contact with the wire and the circuit breaker trip, it is more likely than not that the area contacted by Ms. Cotton's left hand was energized to 120 volts. Ms. Cotton became part of the electric circuit and current flowed of sufficient magnitude to cause the burn noted in the medical records.

Unfortunately, lacking further information about the electrical environment, it is impossible to establish with appropriate probability, where the electrical exit point or points were. Lacking such, it is impossible to establish current pathway although it is more likely than not that the current pathway would have involved at the very least Ms. Cotton's left hand and arm as well as her torso.

**Injury:**

It is well known and broadly accepted that any tissue in the pathway of an electrical current can be impacted and injured as the result of the flow of current. The theoretical current path in any electrical contact is between the electrical entry and exit points. As stated, such a path would more likely than not have at the least included Ms. Cotton's left hand and arm. Ms. Cotton's path-related symptomatology is consistent with the electrical contact as described above. In electrical contacts of this type, path-related numbness, weakness, pain, and fatigue are often reported.

Non-path related symptomatology is also reported following electrical contacts. Loss of short term memory, cognitive losses, headaches, and anxiety are among the more common symptoms reported following such contacts. The non-path symptoms reported by Ms. Cotton would thus be consistent with the electrical contact that she received.

Michael S. Morse                    Cotton v. Grunley                    August 28, 2008

**Conclusions:**

The available evidence suggests that Ms. Cotton was subjected to a 120 volt electrical contact involving at the very least her left hand and arm, although it is likely that the current path was far more extensive. The path and non-path related symptomatology reported by Ms. Cotton and as discussed in this report is consistent with and more likely than not, causally linked to the electrical contact.


Signed at San Diego, CA,



Michael S. Morse, Ph.D.
August 28, 2008



**Michael S. Morse, Ph.D.**
P.O. Box 710402
San Diego, CA 92171
(619) 847-3336 Office
(619) 374-1947 Fax
DrMMorse@electricalinjury.com
(Updated: February, 2007)

## EXPERTISE

- *Electric shock injury*
- *Electrical safety*
- *Electrical injury*
- *Effects of electricity on the human body*
- *Human factors as associated with human interaction with electrical systems*
- *Failure at the human/machine interface*
- *Design of Electrical Systems*
- *Biomedical device failure (electro-mechanical)*
- *Electrical accident reconstruction based on burn pattern*
- *Symptomatology of Diffuse Electrical Injury*

## EXPERIENCE

- **Consultation in many <u>electric shock injury, electrocution, electrical safety</u> cases.**
- **Consultation regarding design and manufacturing defects of electrical products.**

## COURT TESTIMONY

- *U.S. District Court (Mobile, AL):* Qualified as both a Biomedical and Electrical Engineering Expert. Permitted to testify as to the <u>effects (physiology and pain) of electricity on the human body.</u> (D)
- *U.S. District Court (Orlando, FL):* Qualified as a Biomedical Engineer and as an expert in "<u>Electrical Technology.</u>" Permitted to testify to the <u>effects of electricity on the human body.</u> (D)
- *U.S. District Court (New Orleans, LA):* Qualified and permitted to testify to the <u>effects of electricity on the human body.</u> (D)
- *U.S. District Court (Portland, OR):* Testified regarding <u>electrical product failure</u> and resultant injury from an <u>electrical connector.</u> (P)
- *California Superior Court:* Testified regarding <u>electrical injury</u> incurred while installing traffic lights. (P)
- *U.S. District Court - (Los Angeles, CA):* Testified regarding <u>injury from an electric arc.</u> (D)
- *Florida State Court - (Jacksonville, Florida):* Testified to the <u>effects of electricity on the human body with particular emphasis on pain and suffering.</u> (4/97 and 7/97) (D)
- *California Superior Court - (Riverside CA)* Testified regarding failure of a "man-lift" with emphasis on <u>design, human factors, and electrical circuitry.</u> (6/97) (P)
- *California Superior Court (Alhambra, CA)* Testified regarding contact with a high voltage power line. (8/97) (P)
- *New Jersey State Court (New Brunswick, NJ):* Testified regarding diffuse injury distal to presumed current pathway resulting from a 110/220v contact. (7/99) (P)
- **California Superior Court (Stockton, CA):** Testified regarding an alleged electrical injury at a

wall switch controlling a compressor in a dentist's office (12/99) (D)
- **California Superior Court (San Diego, CA):** Testified regarding design and accuracy of Red Light Camera System. Qualified as an expert in Electrical Engineering and computer design. (8/2000) (D)
- **Georgia State Court (Forsyth, GA):** Testified regarding effects of electricity on the human body with emphasis on pain and suffering. (3/01) D
- **Georgia State Court (Elbert, GA):** Testified regarding effects of electricity on the human body with emphasis on pain and suffering. (4/01) D
- **U.S. District Court – (Chicago, IL):** Testified regarding fibrillation death in swimming pool from electrical accident involving submersible sump pump. (1/02) P
- **Canadian Court, British Columbia:** Testified regarding 7200V power line contact during line clearing. (2/02) P.
- **California Superior Court (Los Angeles):** Reconstruction of high voltage power line contact by child climbing a tree based on burn pattern analysis. (4/02) P
- **California Superior Court (Santa Ana):** Diffuse injury from high voltage contact between jack hammer and submerged power line. (7/02) P
- **California Superior Court(Santa Ana):** Electrical Injury in bathroom following water leakage – Low voltage Diffuse Electrical Injury (10/03) P
- **Illinois State Court:** Death from contact between ladder and power line while preparing a building to be painted – Pain/suffering and human factors (01/04) P
- **California Superior Court (Vista):** Electical Injury from contact with mis-wired electrical pedestal. (8/05) P
- **U.S. District Court (Los Angeles):** Testified regarding electrical effects and current distribution during E.C.T. (10/05) P
- **U.S. District Court (Los Angeles):** Stun Gun Case (11/2006) (p)


**DEPOSITIONS**

Medical Device Failure (electropapillotome) (p)
Electric Shock Injury from an improperly wired vacuum pump (p)
Accuracy of an IVAC infusion pump (p)
Operation and design of infant apnea monitors (p)
Failure of a Cincinatti Sub-Zero heating/cooling blanket. (p)
Failure of membrane switches on a Hill Rom hospital bed. (p)
Failure of an alarm on a respirator (d)
Electrocution on a scissor lift. (p)
Electric shock injury while using a household pump (p)
Electric shock injury in an industrial environment
Electric shock injury from an outlet near a swimming pool (p)
Electric shock injury -- mis-wired 220v outlet (p)
Electric shock injury – industrial (construction site)
Electric shock injury -- static discharge from treadmill (p). (1996)
Electric shock injury -- contact with overhead power line (p) (1996 and 1997)
Failure of a man-lift hoist for the handicapped. (p) (1997)
Electric shock injury – child contact with a transformer (p) (12/97)
Electric shock injury -- contact between a loader and a submerged power line (p) (7/98)
Electric shock injury -- sump pump (p) (6/99)
Electric shock injury – carousel ride (p) (6/99)
Electric shock injury – feed to a buffet table(d) (9/99)
Electric shock injury – dental office compressor switch(d) (10/99)
Electric shock injury – contact with downed power line (2/2000)
Electric shock injury – 110V contact with frayed power cord in hotel (p) (3/2000)
Electric shock injury – injury at power supply pedestal at a mobile home (p) (1/2001)
Electric shock injury – 110V contact with frayed cord. For adm. Miss. Court(p) (10/2001)
Electric shock injury – power line contact by child in tree(p) (1/2002)

Electric shock injury – burn and compressive wave injury from arc (p) (3/2002)
Electric shock injury – Diffuse injury following jack hammer - power line contact (p) (6/02).
Electric shock injury – Pain and suffering following v-fib after power line fell on a combine. (p) (8/02)
Electric shock injury – Symtomatology following 110 volt electrical injury in a bathroom. (p) (2/03)
Electric shock injury – Symptomatology following electrical injury caused by gas cooktop (p). (2/03)
Electric shock injury – Electrical injury in mobile home park from underground wiring (p) (4/03)
Electric shock injury – Pain and suffering: v-fib from induced current in a 345KV transmission line (p) (8/03)
Electric shock injury – Contact with power line while picking avocados using an aluminum pole (p) (12/03)
Electric shock injury – Pain and suffering associated with induced current in a transmission line (p) (03/04)
Electric shock injury – Reconstruction of electrical accident involving lighting system/power line contact. (d) (4/04)
Physiological effects of electricity on the human body (d) (4/04)
Electric shock injury – Power line/ladder contact – Pain, suffering and human factors (p) (7/04)
Electric shock injury – Power cord short to metal door (d) (9/04)
Electric shock injury – Electrical contact (worker's comp) (3/05)
Electric shock injury – Contact with mis-wired electrical pedestal (p) (4/05)
Physiological Effects of electric current and current pathway during E.C.T. (p) (8/05)
Electric shock injury – Defective trouble/drop light (p) (1/06)
Stun Gun Case –(p) (3/06)
Electric shock injury – Power line contact by a cement pump (p) (3/06)
Electric shock injury -- Oven (p) (4/06)
Electric Shock Injury – V-Fib 120 volts (p) (5/06)
Electric Shock Injury – Roofer contact with overhead power line (p) (6/06)
Electric Shock Injury – Power line contact while moving a building (p) (11/06)
Electric Shock Injury – Power line contact with trailer (p) (11/06)
Electric Shock Injury – 480 volt contact (p) (2/07)

## INTERNATIONAL CONSULTATION
Electrical injury from overhead power line while line clearing (Canada, 2002)
Electrical injury from static discharge (Dublin, Ireland, 1999.)

## POSITIONS
*Professor of Electrical Engineering, University of San Diego*, (September 1990 - Present)
Tenure granted: 5/93, Associate (1996), Full (2004)
-Currently conducting research into symptomatology and nature of electrical injury, current pathway in electrical contact and Diffuse Electrical Injury (DEI)
*Assistant Professor, Electrical Engineering, Auburn University, Auburn, AL*, (September 1987 - September 1990).
- NSF and IEEE initiation grant
- Conducted Speech and Electrical Stimulation research.
*Senior Engineer, General Dynamics, Electronics Division, San Diego*, (October 1985 - June 1987).
*Lecturer, Electrical Engineering, San Diego State University*, (January - May 1987).
-          Taught Digital Computer Design

## EDUCATION
*J.D.,  University of San Diego, San Diego, CA, 1999*
            *(Admitted to CA Bar: 12/99)*
*Ph.D. in Engineering, Clemson University, Clemson, SC, 1985.*

*M.S. in Biomedical Engineering, Tulane University, New Orleans, LA, 1982.*
*B.S. in Biomedical Engineering, Tulane University, New Orleans, LA 1981.*

## HONORS

Tenure Awarded , 1993.
H.K.N. -- Electrical Engineering Honor Society, 1990.
Sigma Xi -- Research Honor Society, 1986.
Tau Beta Pi -- Engineering Honor Society 1981.
Edwards Fellowship - Clemson University, 1983.

## MEMBERSHIPS

IEEE Member
　　　　EMBS – Engineering in Medicine and Biology Society
　　　　Product Safety Group
Sigma Xi

## PATENTS

Multichannel Stimulator for Tuned Stimulation (No. 5041974 - August 1991).

## PUBLICATIONS  (Full List Available on Request)

- **Product Design and the Reasonable Person – Nature versus Nurture,** M.S. Morse, R. Raney Presented at the *IEEE Product Safety Engineering Conference* in Irvine, CA, October 23-24, 2006.
- **Use of the Finite Element Method to Assess Impact of Current on Wrist and Forearm During an Electrical Accident,** M.S. Morse, J.S. Morse, Presented at the 26th *IEEE Engineering in Medicine and Biology Conference*, New York, September, 2006.
- **Don't Discount the Danger of 120 Volts,** Michael S. Morse, *EC&M* (The Magazine of Electrical Design Construction and Maintenance), May 2006.
- **The case of the Shocking Scaffolding Mystery,** Michael S. Morse, *EC&M* (The Magazine of Electrical Design Construction and Maintenance), June 2006.
- **ELECTRIC SHOCK,** Michael S Morse and Jennifer S. Morse, *Chapter in Wiley Encyclopedia of Biomedical Engineering*, April, 2006.
- **Diffuse electrical injury: Comparison of physical and neuropsychological symptom presentation in males and females,** Jennifer and Michael Morse, *Journal of Psychosomatic Research*, Vol 58/1 pp 51-54 (2005).
- **Diffuse Electrical Injury, Study of Sequelae as a function of Gender,** Jennifer Morse, Michael Morse, Presented at the_26[th] *IEEE Engineering in Medicine and Biology Conference*, San Francisco, September, 2004.
- **Diffuse Electrical Injury, A Study of 89 Subjects Reporting Long Term Symptomatology that is Remote to the Theoretical Current Pathway,** Michael S. Morse, Jennifer S. Berg, Rachel Tenwolde, *IEEE Transactions on Biomedical Engineering*, August, 2004, Vol 51, No. 8, pp 1449 – 1459.
- **A Shocking Neurological Rarity,** Jennifer S. Berg and Michael S. Morse, *Practical Neurology*, August, 2004, Vol 4, No 4, pp. 222-227.
- The Risk From Above, Michael S. Morse, *EC&M Magazine*, February, 2004.
- Analysis of Current Density in the Carpal Tunnel Region During an Electrical Accident by way of the Finite Element Method M.S. Morse, J.S. Berg, R.L.TenWolde (Presented at: The 25th IEEE Engineering in Medicine and Biology Conference, Cancun, September, 2003.)
- Diffuse Electrical Injury – A Study of 136 Subjects M.S. Morse, J.S. Berg , R.L.TenWolde (Presented at: The 25th IEEE Engineering in Medicine and Biology Conference, Cancun, September, 2003.)

- **Diffuse Electrical Injury Presenting as Chronic Pain: Systemic and Neuropsychological Symptomatology**, Berg JS, Morse MS, J. of Psychosomatic Research, vol 55 No 2, August 2003 , pg 151. (Presented at the 17th World Congress on Psychosomatic Medicine, Waikolao, HI, August 2003.)
- A Study of Carpal Tunnel Injury Following Electrical Trauma, M. S. Morse (Presented at IEEE EMBS Chicago, July 2000)
- An Evaluation Protocol For Electric Shock Injury Supported By Minimal Diagnostic Evidence M.S. Morse, D. Weiss, University of San Diego, Alcala Park, San Diego, CA 92110 (Presented at IEEE EMBS San Diego, 1993)

## Other

Invited participant and presenter at "Stun Devices: Uncertainties & Gaps In Knowledge Conference", Potomac Institute for Policy Studies, Arlington, VA, February 23rd and 24th.

Contributing source to an article on diffuse electrical injury entitled "What Happens When Electricity Doesn't Play by the Rules?" by Matt Halverson, EC&M (The Magazine of Electrical Design Construction and Maintenance), June 2004.

Contributing source to an article on electrical injury entitled "A Little Time and a Lot of Pressure" by Matt Halverson, EC&M (The Magazine of Electrical Design Construction and Maintenance), June 2003.

Contributing source to Maxim Magazine (October 2003, page 48) Provided an answer to that age old question of what happens when you stick a fork in an electrical outlet.

Morse Retainer Agreement

# Michael S. Morse and Jennifer S. Morse
# Retainer Agreement/Fee Schedule
### December 2005

**Michael S. Morse, Ph.D. / (619) 847-3336**
DrMMorse@ElectricalInjury.com
**Jennifer S. Morse, M.D. / (619) 405-5919**
DrJMorse@ElectricalInjury.com
**P.O. Box 710402**
**San Diego, CA 92171**
**(619) 374-1947 (FAX)**

Providing a confirmation letter, case materials (to be defined in the context of the particular case), and *a non-refundable $2000 retainer fee constitutes an agreement by which the initial review of materials may be started* and indicates acceptance of the terms and conditions of this agreement.

It is agreed that the following schedule of fees is to apply to all work related to the individual case that is the subject of the review materials to be provided by your office. Any broader context is to be defined in the cover letter to the materials and must be mutually agreed upon by your office and by Dr. Michael S. Morse and/or Dr. Jennifer S. Morse. This retainer agreement covers all work to be performed by Michael S. Morse and Jennifer S. Morse in their capacity as consultants and experts. The timeframe for completion of the review may be specified in the confirmation letter or by mutual agreement during the process of material review. The non-refundable retainer fee will be applied against the time spent for review. Payment of all bills is to be made within 30 days of the receipt of each bill. Billing will be conducted on a regular basis or as is necessary during the progress of the case.

Prior to deposition, court dates or any travel, payment is to be made in full and is to include pre-payment for all reasonable estimated time and expenses that will be incurred for the deposition, court appearance, or travel. Should your client require evaluation by Dr. Jennifer Morse, all fees associated with that evaluation must be paid in advance.

It is agreed that the services to be rendered by either Dr. Michael Morse or Dr. Jennifer Morse are limited to those associated with consultation, case material review, and evaluation of records within the boundaries of their expertise as appropriate to the matter that is the subject of this agreement. Dr. Jennifer Morse, being trained and licensed as a physician, may at her choosing provide patient evaluation as is necessary to support her expertise and opinion but will not be providing medical treatment.

Morse Retainer Agreement

## Schedule of Fees
December, 2005

**Time used pursuant to this agreement by either Michael S. Morse, Ph.D. or Jennifer S. Morse, M.D. is billed as follows:**

| | |
|---|---|
| Material review and analysis: | $350.00/hour |
| Court time: | $2400/half day |
| Deposition time: | $2400/half day |
| Travel time (non-working)[1]: | $150.00/hour |
| Rebilling charge (after 45 days) | $100.00 |

**Specific to Dr. Jennifer Morse:**

| | |
|---|---|
| Patient evaluation (2 hr minimum) | $350/hour |

**Associate time will be billed as follows:**

| | |
|---|---|
| Literature searches/library work: | $50.00/hour |
| Case Preparation: | $50.00/hour |
| Other: | $35.00/hour |

**Expenses will be billed as follows:**

All reasonable expenses are directly billable.

Expenses include but are not limited to:
Hotel, meals, mileage ($0.50 per mile), telephone and cellular phone as appropriate. FAX, photocopies, component purchases, airfare (unrestricted business class)

[1] Travel time spent working is billed at the full consulting rate of $350/hr.

Page 2 of 2

Morse Courtroom Testimony Current to January 2008

| Case Name | Location | Testimony Date | Jurisdiction | Client (attorney) |
|---|---|---|---|---|
| Garretson v. Miller | Stockton, CA | December, 1999 | California | Kirby |
| Unknown | San Diego, CA | August, 2000 | California | Arthur Tait |
| Unknown | Forsyth, GA | March, 2001 | Georgia | State of Georgia |
| Unknown | Elbert, GA | April, 2001 | Georgia | State of Georgia |
| Trahane v. Wayne Home Equipment | Chicago | January, 2002 | Federal | Joseph Tighe |
| Warford v. B.C. Hydro | Vancouver, BC | February, 2002 | Canada | Campbell |
| Brendan McConnachie v. SCE | Los Angeles | April, 2002 | California | John McAvoy |
| Cservak v. SCE | Santa Ana, CA | July, 2002 | California | Simon |
| Conrad Kimes v. William Lyon Property | Santa Ana, CA | October, 2003 | California | Burge |
| Kemerer v Illinois Power | Illinois | January, 2004 | Illinois | Prendergast |
| Nebraska v. Erick Fernando Vela | Madison County, NE | April, 2004 | Nebraska | State of Nebraska (Testified at depo for use in hearing) |
| Lee v. SDGE | Vista, CA | August, 2005 | California | Michael Goldstein |
| Akkerman v. Mecta | Los Angeles | October, 2005 | Federal | Rick Moxon |
| Alvarado v. Taser | Los Angeles | November, 2006 | Federal | Danilo Becerra |
| Pergosky v FPL | Daytona, Florida | November, 2007 | Florida | David Russell |
| Harris v. Amell | Brooklyn, NY | December, 2007 | New York | Ralph Franco |

**Morse Deposition Testimony Current to January 2008**

| Case Name | Testimony Date | Jurisdiction | Client (attorney) |
|---|---|---|---|
| Brendan McConnachie v. SCE | Jan-02 | California | McAvoy |
| Alaniz | Mar-02 | Texas | Juneau |
| Cservak v. SDGE | Apr-02 | California | Dave Simon |
| Ainsworth v. Advanced Micro Devices | Apr-02 | Texas | Mallios |
| Connie Tomlin, et. al. v. AEP | Jul-02 | Ohio | Moore |
| Rory Moore | Sep-02 | Texas | Joe Alexander |
| Conrad Kimes v. William Lyon Property | Feb-03 | California | Burge |
| Arenal v. Rich Homes | Feb-03 | California | Devor |
| Kuhn v. Hasley Canyon Mobile Home Park | Apr-03 | California | Rosenfeld |
| McClain v. East United Pentecostal Church | Aug-03 | California | J. Skeath |
| Mendi Shelton, et al v. TXU Corp | Aug-03 | Texas | Molter |
| Jackson v. Multiquip | Oct-03 | Washington, DC | Glaser |
| Schultz v. SCE | Dec-03 | California | D.E. Lonnie |
| Schulenberg v. Jolly Jumps | Sep-04 | California | Bill Friedman |
| Ruth Johnson | Mar-05 | Washington | Stephen Eggerman |
| Lee v. SDGE | Apr-05 | California | Michael Goldstein |
| Bobby Joe Hale v. Toler | Jan-06 | Illinois | Womick |
| Alvarado v. Taser | Mar-06 | Federal (California) | Becerra |
| Pardee v. Smurfit Stone | Mar-06 | Louisiana | Smitherman Law |
| Moreno v. Hospitality Group | Apr-06 | Texas | Eric Marye |
| Castro v. MW Builders | May-06 | Texas | Frank Hererra |
| Estate of Tracy Murk | May-06 | Michigan | Bonnie Sawusch |
| Schmidt v. KCPL | Jun-06 | Kansas | Petere Jouras |
| Van Duinen v. Consumer's Energy | Nov-06 | Michigan | Tim Groustra |
| Wilson v. Constellation Energy Group/BGE | Nov-06 | Maryland | David Ellin |
| Brutlag v.Meany Electric | Feb-07 | State of Illinois | Bryan O'Connor |
| Kryzak v. KB Homes | Apr-07 | California | Dean Rice |
| Pearce-Bediger v. UNS | Jul-07 | Arizona | Scott Wickland |
| Mulford v. Mastec | Oct-07 | Florida | Ross Davis |
| Vonk v Central Illinois Light | Nov-07 | Illinois | Steve Wakeman |
| Castro v. SDGE | Nov-08 | California | Terry Singleton |